**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WANDA RICHARDSON, <br> Mother and Next Friend of W.R., a Minor, <br><br>     Plaintiff, <br><br>       v. <br><br> DISTRICT OF COLUMBIA, <br> A municipal corporation, *et al.,* <br><br>     Defendants. | Civil Action No. 06-2121 (CKK) |

## <u>NOTICE OF FILING OF THE ADMINISTRATIVE RECORD</u>

The Defendants, through counsel, respectfully submit the District of Columbia

Public Schools' administrative record from the September 14, 2006, Hearing Officer's

Determination at issue in this case. Consistent with LCvR 5.4(f), the Defendants have

redacted personal information about the minor W.R., including his name, date of birth

and Social Security Number.

The undersigned counsel has served a copy of the unredacted record on counsel

for the Plaintiff, by U.S. mail, simultaneous with the filing of the redacted record with the

Clerk through the e-filing system.

                                       Respectfully submitted,

                                       LINDA SINGER
                                       Attorney General
                                       for the District of Columbia

                                       GEORGE C. VALENTINE
                                       Deputy Attorney General
                                       Civil Litigation Division

**/s/ Edward P. Taptich**
EDWARD P. TAPTICH
Chief, Equity Section 2
Bar Number 012914

**/s/ Eden I. Miller**
EDEN I. MILLER
Assistant Attorney General
Bar Number 483802
441 Fourth Street, N.W., Sixth Floor South
Washington, D.C. 20001
(202) 724-6614
(202) 727-3625 (fax)
May 23, 2007                    E-mail: Eden.Miller@dc.gov

Richardson  v. District of Columbia
Civil Action No. 06-2121 ( CKK)

## **INDEX OF RECORD**

| **Description** | | **Page** |
|---|---|---|
| Certification of Record | - | 1 |
| Hearing Officer's Determination (HOD) dated 9/14/06 | - | 2 |
| Due Process Hearing Attendance sheet dated 8/29/06 | - | 12 |
| DCPS Disclosure Notice dated 8/22/06 w/ attachments | - | 13 |
| Hearing Complaint Request dated 6/5/06 | - | 15 |
| Fax confirmation of Hearing Notice sent 8/7/06 | - | 20 |
| DCPS Interim Order signed 8/4/06 | - | 21 |
| DCPS Interim Order signed 8/3/06 | - | 22 |
| DCPS Letter Motion For Continuance dated 8/3/06 | - | 23 |
| Student's Disclosure Letter dated 7/28/06 with attachments | - | 24 |
| WR 1 – Due Process Complaint Notice dated 6/5/06 | - | 26 |
| WR 2 – IEP dated 4/1/04 | - | 31 |
| WR 3 – MDT Student Evaluation Plan (SEP) dated 12/14/05 | - | 52 |
| WR 4 – Social Work Evaluation dated 7/13/04 | - | 56 |
| WR 5 – Psychoeducational Evaluation Report dated 8/20/04 | - | 66 |
| WR 6 – Resume/ Arvette Page, Derek Marryshow, S. Millis | - | 73 |
| WR 7 – Report Card SY 2004-2005 | - | 82 |

WR 8 – DCPS Student referral for special ed. dated 12/12/05     -     84

WR 9 – Student Referral Form dated 9/29/05     -     91

WR 10 – Interim Progress Report dated 9/30/05     -     93

WR 11 – Certificate of Records dated 1/25/06     -     94

WR 12 – Letter from A. Pressley to G. Everett requesting notice.     -     95

WR 13 – Request for documents from A. Pressley to C. Kelley     -     98

WR 14 - Letter from A. Pressley to G. Everett dated 5/11/06     -     104

WR 15 – Social Work Evaluation Report dated 2/9/06     -     107

WR 16 – Psychological Report Review dated 1/9/06     -     118

WR 17 – MDT Eligibility Meeting Notes dated 5/10/06     -     127

Fax confirmation of Hearing Notice dated 7/3/06     -     134

Scheduling Memorandum dated 6/5/06     -     135

Due Process Complaint Notice dated 6/5/06     -     139

Transcript of Hearing dated 8/23/06     -     145

# CERTIFICATION OF RECORD

INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### *STUDENT HEARING OFFICE*
#### SPECIAL EDUCATION

In the Matter RE:  **R██████, W███ vs. DCPS**

Case Information:    **Hearing Dates: 08/29/2006**
Held at: **District of Columbia Public Schools Headquarters**
**825 N. Capitol Street, N.E.**
**Washington, D.C. 20002**
Student Identification Number:  **9119990**
Student's Date of Birth: **██████/1996**
Attending School: **Assumption Catholic School**
Managing School: **Patricia Harris Educational Center**
Hearing Request Date(s) 06/05/2006

## <u>CERTIFICATION OF RECORD</u>

I, **Shawnta Maddox, Legal Assistant of the Student Hearing Office,**

DO HEREBY CERTIFY that the attached Record of Proceeding is the entire record in

the above entitled matter as of this date, consisting of all letters, pleadings, orders,

exhibits and depositions.

I FURTHER CERTIFY that the materials forwarded herewith are the true copy

of the original documents submitted in this matter.

EXECUTED this 3rd day of April 2007.

**LEGAL ASSISTANT**
**STUDENT HEARING OFFICE**

1

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
# STATE ENFORCEMENT & INVESTIGATONS DIVISION

David R. Smith, Due Process Hearing Officer
825 North Capitol Street, 8th Floor, N.E.
Washington, DC 20002
(202) 442-5432 (phone); (202) 442-5556(fax)

| | |
|---|---|
| In the Matter of ) | **IMPARTIAL DUE PROCESS** |
| ) | |
| W███, D. R███████, II ("Student") ) | **HEARING OFFICER'S DECISION**[1] |
| Date of Birth: ██████ 1996 ) | |
| Petitioner, ) | Hearing Date: |
| ) | August 29, 2006 |
| v. ) | Held at: 825 North Capitol Street, NW |
| ) | 8th Floor |
| ) | Washington, DC 20002 |
| District of Columbia Public Schools ) | |
| 825 North Capitol Street, NW ) | Attending School: |
| Washington, DC 20002 ) | Assumption Catholic School |
| ("DCPS" or "District") ) | |
| ) | Due Process Complaint Notice: |
| Respondent.                                    ) | June 5, 2006 |

Counsel for Parent:

Fatmata Barrie, Esq.
1003 K Street, NW
Suite 565
Washington, D.C. 20020

Counsel for DCPS:

Stephanie Ramjohn-Moore, Esq.
District of Columbia Public Schools,
9th Floor
825 North Capitol Street, NW
Washington, DC 20002

---

[1] An index of names is attached hereto for the benefit of the parties. The index will permit the parties to identify specific witnesses and other relevant persons. The index is designed to be detached before release of this Hearing Officer's Determination as a public record.

## INDEX OF NAMES

W█████ D. R█████████, II v. DCPS

| Parent/Student's Representative | Fatmata Barrie, Esq. |
|---|---|
| Special Education Advocate | Ms. Latanya Higginbotham |
| Psychologist | Dr. Derrick Marryshow |
| Parent | Ms. Wanda Craig |
| High Road School | Mr. David Clark |
| The Assumption School | Ms. Alice Wilson |
| DCPS Representative | Stephanie Ramjohn-Moore, Esq. |
| Social Worker | Ms. Gloria Everett |
| School Psychologist | Ms. Yvonne E. Rojas |

3

# INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### IMPARTIAL DUE PROCESS HEARING

**INTRODUCTION:**

A Due Process Hearing was convened on August 29, 2006. The Hearing was held at the District of Columbia Public Schools ("DCPS"), 825 North Capitol Street, N.E. Washington, D.C. 20002. The Hearing was held pursuant to a Due Process Complaint Notice submitted by counsel for the parent dated June 5, 2006.

**ISSUES:**

Whether DCPS failed to determine the student eligible for special education and related services?

**JURISDICTION:**

The Hearing was held and this decision was written pursuant to the *Individuals with Disabilities Education Improvement Act* (I.D.E.I.A.), 20 U.S.C. 1400, et. seq. and the *Rules of the Board of Education of the District of Columbia.*

**DUE PROCESS RIGHTS:**

Counsel for the parent waived a formal reading of the due process rights.

**FINDINGS OF FACT:**

1.    A Psycho-Educational Evaluation was conducted of the student and a report prepared dated August 20, 2004, by Mr. Anthony White, DCPS School Psychologist.[2] In the Summary of his report, Mr. White stated:

> (The student) is an 8-year –old child who completed a psychoeducational Evaluation. His overall cognitive ability, as evaluated by the WISC-III, cannot easily be summarized because his verbal reasoning abilities are much better Developed than his nonverbal reasoning abilities. (The student's) reasoning Abilities on verbal tasks are generally average (VIQ=106), while his nonverbal Reasoning abilities are significantly lower and in the borderline range (PIQ=79). When compared to others at his age level, (the student's) academic skills are within the low average range. His fluency with academic tasks is average. (The student's) performance is average in mathematics and math calculation skills, and low average in reading. Based on the current test data, (the student) does not meet the criteria for special education services as a learning disabled student. At this time his academic skills are commensurate with his cognitive abilities. But in

---

[2]    WR-04

light of (the student's) history of disruptive behaviors, a clinical psychological evaluation should be conducted to determine if his social-emotional functioning is having a negative impact on his achievement.

2.      As a result of a referral from the Assumption Catholic School, a non-public school, on December 12, 2005, the DCPS CARE Center reviewed information concerning the student. The referral note that had been sent to DCPS indicated that the student's academic performance was well below average in all subjects, except for math.[3] The report of the CARE Center also notes that the parent had requested a psycho-educational evaluation and also noted that the student was not currently receiving special or remedial service in the Assumption School, but that private therapy had resumed.

3.      On January 9, 2006, Ms. Yvonne Rojas, a School Psychologist for DCPS, observed the student at the Assumption School. Ms. Rojas noted in her report that she reviewed the Assumption school's counselor's report and observed the student on two occasions. Ms. Rojas noted that the student had been diagnosed with Attention Deficit Hyperactive Disorder and Oppositional Defiant Disorder. She also noted that the student's behavior from her observation "seemed different from the behaviors described by his parent and teacher." Ms. Rojas concluded her report by recommending that an MDT meeting be convened to review the student's assessments and make recommendations about his educational programming and that there should be a follow-up to the student's current clinical treatment to determine if further assessment is indicated.[4] Ms. Rojas testified at the Hearing that the student was not recommended for special education as learning disabled.

4.      On February 9, 2006, a Social Work Evaluation was conducted by Ms. Gloria Everett, a Licensed Clinical Social Worker with DCPS.[5] Among other things, the report of the evaluation states that beginning at age 3 years, the student began to receive psychological services at the Washington Assessment Treatment Services and that at age 5 years he qualified for SSI Benefits as an emotional disturbed child. The report states further that the student has a psychiatric history, but that the information was not released to DCPS.

5.      Ms. Everett testified at the Hearing that the student's case was referred to her team in December 2005. She testified that evaluations were completed prior to the MDT meeting on May 10, 2006. Ms. Everett testified that the parent had informed the MDT that the student was seeing a psychiatrist. The parent also requested that DCPS conduct a psychiatric evaluation of the student; however, the DCPS team concluded that since the student was already seeing a psychiatrist, it would be better to first get information from that person, rather than conduct a new evaluation. Therefore, DCPS requested that the mother provide the information from the student's treating medical provider and the mother told the team that the information would be provided. Ms. Everett informed the parent that she would help with getting the information, but the parent had to sign a release form that would authorize DCPS to obtain the information. The information was needed because it would help support the diagnosis of the student. Ms. Everett also stated that the parent informed the team that she was told not to give DCPS the information from the psychiatrist who had been treating the student.

---

[3]     WR-8
[4]     WR-16
[5]     WR-15

6.    The parent was to complete the release form that would be sent to her and then send it back to DCPS. However, the release form has not been received by DCPS. Ms. Everett sent the release form to the mother on two separate occasions, once by certified mail, which was returned as undelivered and the second by regular mail, that did not come back. Ms. Everett confirmed that the mailing address that she had sent the forms to in December is the same address listed in the Complaint of June 5, 2006, that initiated this Hearing.

7.    On May 10, 2006, DCPS convened an MDT/Eligibility meeting to determine whether the student was eligible for special education. The student has been attending the Assumption Catholic School since the 2004-2005 school year. The student's report cards reflect that he was performing below grade level in nearly all academic areas.[6] Prior to the Assumption School, the student attended school in Maryland at the Longfields Elementary School. An IEP was prepared for the student dated April 1, 2004. This IEP listed the student's primary disability as Emotional Disturbance.[7]

8.    At the May 10, 2006 MDT/eligibility meeting, notes were taken reflecting the discussions that had taken place. The notes state that the student's teacher reported that the student is below grade level in his academic work and that the student's behavior is "out of control." According to the mother, the student's behavior has impacted his classroom work due him being disruptive.[8]

9.    The May 10, 2006 MDT notes also state that the student's advocate requested a psychological evaluation and reported that the student is in therapy. The notes also indicated that the mother was requested to provide information about the student's therapy, but that the mother refused to provide the information. The MDT found the student not eligible for special education. Also, the notes state that the mother was requested to sign a medical release form that would be mailed to her home and that DCPS would request information from the student's medical providers. The MDT meeting notes go on to state that when DCPS receives the information from the medical providers, an MDT meeting will be reconvened. The DCPS members of the team concluded that the student was not eligible for special education services.[9]

10.   Ms. Alice Wilson, a School Social Worker at the Assumption School testified at the Hearing for the parent. She testified that the student attended the school for the 3rd and 4th grades. She said that the student had exhibited behavior problems at Assumption. Ms. Wilson testified that she made the referral to DCPS to have the student reviewed for special education with DCPS.[10] Ms. Wilson testified tat she was invited to attend the May 10, 2006 MDT meeting, but she was unable to go. However, she was interviewed by Ms. Rojas. Ms. Wilson also testified that the parent did not tell her that the student had an IEP from Maryland prior to his enrollment at the Assumption School. In any event, Assumption does not provide special education services.

11.   Dr. Derek Marryshow testified for the parent at the Hearing. Dr. Marryshow is a child development psychologist and a licensed school psychologist. He had worked for DCPS for four years. He was not presented as an expert witness, providing expert testimony and opinions at the Hearing. In

---

6    WR-7
7    WR-02
8    WR-17
9    WR-17
10   WR-08

any event, Dr. Marryshow testified that in addition to meeting with the student and the parent, he was asked to review certain documents pertaining to the student that included a psychological evaluation dated August 20, 2004, a Psychological Review Report dated January 9, 2006, IEP dated April 1, 2004, MDT notes of the May 10, 2006 meeting, report cards from the Assumption School, 2 social history reports and observation notes from the CARE Center, Student Evaluation Plan of December 14, 2005. Dr. Marryshow testified that it was his opinion based on what he reviewed that the student should qualify for special education as ED and possibly OHI. This was also based in part on the Maryland IEP of April 1, 2004.

12.    Dr. Marryshow was asked to comment on the need for information from the student's outside provider. He testified that such information is important to have, but if there was enough information available then a determination could be made. Dr. Marryshow felt that there was sufficient information available to determine the student as ED.

13.    Dr. Marryshow was also asked to comment on the fact that the student went two years in a school that did not provide him with special education services. He testified that this could be detrimental to a student if the student in fact required the services.

14.    Mr. David Clark testified at the Hearing on behalf of the student. Mr. Clark is the Admission Director for the High Road School, a private school in the District of Columbia. He testified that the student has been accepted at High Road following interviews with the parent and the student on the day of this Hearing. Also, he testified that the acceptance of the student was based on his review of the student's last IEP, dated April 1, 2004, Psycho-Educational Evaluation of August 20, 2004, Social work Evaluation and Psychological Evaluation of January 9, 2006. Mr. Clark testified that High Road provides a small class setting, low student to teacher ration of 4 students for each teacher and an aide. Additionally, High Road employs 4 LCSW's and a full time psychologist and related services personnel.

## DECISION AND CONCLUSIONS OF LAW:

1.    This matter is before this Hearing Officer as the result of the parent filing a Complaint contending that DCPS had failed to offer the student a Free and Appropriate Public Education ("FAPE") in accordance with 34 C.F.R. §300.300. The parent contends that DCPS failed to evaluate the student in all areas of suspected disabilities and that DCPS denied the student FAPE by failing to determine him eligible for special education services. In accordance with the IDEA, DCPS is obligated to ensure that all children with disabilities receive FAPE. This obligation includes identifying, locating and evaluating children in all areas of suspected disabilities 34 C.F.R. §300.125, developing an IEP, 34 C.F.R. §300.340, convening a meeting to develop, review and revise the IEP of a student with a disability, 34 C.F.R. §300.340 and determining an appropriate placement 34 C.F.R. §300.552, et. seq.

2.    Based on the record the evaluations were conducted of the student's needs and an MDT meeting held. As a result of the meeting, the student was determined not eligible for special education services. The record also establishes that the parent was requested to provide information about the student's history of receiving psychiatric services, but that she failed to provide the information. DCPS contends that this information would be helpful in making a determination about any special education services the student should be receiving. The parent on the other hand requested that DCPS perform a new evaluation. DCPS had agreed to reconvene the MDT meeting once the information was received.

3.    Dr. Marryshow believed that there was enough information to determine that the student was eligible for special education. Even so, Dr. Marryshow agreed that it was important for an MDT team to have available to it all information regarding a student's eligibility. The record here is clear that the student has been seeing a psychiatrist for several years. It is reasonable to assume that the treating psychiatrist may have information relevant for the student's disability classification and therefore reasonable for DCPS to request the information. Based on the testimony of Ms. Everett, whose testimony is deemed credible, DCPS told the parent that she would assist in obtaining the information, but needed the release form, which the parent has failed to provide. It must be noted that an MDT meeting should involve the good faith participation of all parties. Therefore, if information was available that the team considered important to be considered and was willing to assist in obtaining it, then steps in that direction should have been taken.

4.    Based on the record here, the student has been receiving psychiatric services since he was 3. Although not clear from the record, it is assumed that this has something to do to the student's ADHD and ODD. Since such information may have an impact on the services that should be incorporated into an IEP, it was reasonable for DCPS to request the information. It is not clear why the parent was reluctant to sign a release form that would have enabled DCPS to obtain the information. Furthermore, it would appear that the parent would want DCPS to get the information since DCPS agreed to reconvene the MDT meeting once it is received. It should be noted here that a determination as to the eligibility of a student for special education is a decision made by a team, including the parent. Therefore, it is necessary for the team to have as much information about the student's needs as possible. Furthermore, DCPS' argument of not pursuing another evaluation if the information may already be available from the student's treating psychiatrist is reasonable. In this regard, Ms. Everett's testimony is viewed as credible.

5.    The record also indicates that the student was at the Assumption School for two academic years and received no special education services because Assumption does not provide such. The referral to DCPS to evaluate the student came from the Assumption School, where a teacher reported that the student's behavior was "out of control." Yet, DCPS Ms. Rojas testified that when she observed the student at Assumption she did not come to the same conclusion as the teacher. Even though the teacher may have seen the student on a daily basis, it is not clear what "out of control" meant in view of Ms. Rojas' testimony and report.

6.    Since the Complaint was filed on June 26 2006, based on The Rules of the D.C. Board of Education, Section 3030.3, DCPS had the burden of proof, based solely upon the evidence and testimony presented at the hearing, that the action or proposed placement is adequate to meet the educational needs of the student and to provide the student with FAPE. Based on the record, DCPS has met its burden with regard to the evaluations conducted and the development of the IEP.

**ORDER:**

The Complaint is DISMISSED and the request for relief is DENIED.

**APPEAL PROCESS:**

This is the final administrative decision in this matter. Appeals on legal grounds may be made to a court of competent jurisdiction within 90 days of the rendering of this decision.

Date: 9-14-06

Issued: _____

_____

David R. Smith, Esq.
Impartial Hearing Officer

**INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400**
**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**IMPARTIAL DUE PROCESS HEARING**

| | |
|---|---|
| In the Matter of ) | **CERTIFICATION OF RECORD** |
| ) | |
| W████ D. R█████, II, ) | |
|     Petitioner, ) | |
| ) | |
|       v. ) | |
| ) | |
| District of Columbia Public Schools ) | |
| 825 North Capitol Street, NW ) | |
| Washington, DC 20002 ) | |
| ("DCPS" or "District") ) | |
|         Respondent. ) | |

I, David R. Smith, Impartial Due Process Hearing Officer in this matter, DO

HEREBY CERTIFY that the attached Record of Proceeding itemizes the record in

the above-entitled matter as of this date, consisting of the items admitted into evidence,

including disclosure exhibits and the audio tape recording of the Due Process Hearing.

EXECUTED this ____ day of _____, 2006.

_____
DUE PROCESS HEARING OFFICER

**MATTER OF W██████ D. R██████, II VS. DCPS**

**RECORD OF PROCEEDING**

| DATE | DESCRIPTION |
|---|---|
| 6-5-06 | Request for Due Process |
| | Notice of Pre-Hearing Conference (as applicable) |
| 8-7-06 | Notice of Hearing |
| 8-22-06 | DCPS Disclosure Exhibits: DCPS-01 though DCPS-10 |
| 8-29-06 | Audio recordings of hearings |
| 7-28-06 | Parent Disclosure Exhibits: WR-01 through WR-17 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

# ATTENDANCE SHEET

| STUDENT'S NAME: | ██████ 12 ██████ | ██████ 9 6 |
|---|---|---|
| HEARING DATE: | 8 - 29-06 | 3 P/m |
| | A - 1 ON BEHALF OF DCPS OR STUDENT | TITLE |
| PRINTED NAME | | |
| Stephanie Ramjohn Moore, DCPS | | Attorney Advisor |
| Gatmata Barrie | Student | Atty. |
| Gloria Everett | DCPS (via telephone) | Social Worker |
| Alice Wilson, MSW | Assumption Catholic School on behalf of student | SW |
| Wanda Richardson | W████ D. R████ II | Mother |
| Yvonne E. Rojas | DCPS (via telephone) | School Psychologist |
| M. Derrick Magington | student | |
| ██████ | █████ | ██████ |

Impartial Hearing Officer

*SHO*



**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

*Office of the Superintendent*
**Office of the General Counsel**
825 North Capitol Street, N.E., 9th Floor
Washington, D.C. 20002-4232
202-442-5000  Fax # 202-442-5098
*www.k12.dc.us*

August 22, 2006

Fatmata Barrie, Esq.
Law Offices of Christopher N. Anwah
1003 K Street, NW
Suite 565
Washington DC 20020

**By Facsimile: 202-626-0048**

RE:    **Due Process Hearing for W██████ R█████████**
       **DOB: ████████96**
       **Disclosure Notice**

Dear Ms. Barrie:

At the upcoming due process hearing in the above-referenced matter, that is scheduled for
August 29, 2006 at 3:00 p.m. and pursuant to 34 C.F.R. 300.509(a)(3), in addition to all
documents disclosed by the parent, DCPS may rely upon any of the following witnesses[1] and
documents:

<div align="center">

**Witnesses**

</div>

  Gayle Amos or her designee(s), Associate Superintendent of Differentiated
  Learning, DCPS
  Jeffrey Grant, Principal or designee, P. R. Harris Educational Center
  Anita Drayton, Assistant Principal or designee, P.R. Harris Educational
  Center
  Tracye Garrett, Special Education Coordinator, or designee, P.R. Harris
  Educational Center
  Gloria Everett, Social Worker, or her designee, C.A.R.E. Center, DCPS
  Gayle Hall, Liason Private and Religious Schools or her designee, DCPS
  Natalia Houston, Assistant Director, or her designee, C.A.R.E. Center,
  DCPS
  Pat Young, Director, or her designee, C.A.R.E. Center, DCPS
  Christopher Kelley, Principal or designee, Assumption Catholic School

---

[1] Witnesses may testify by telephone.

**W█████R██████ Disclosure Letter**
**Page 2 of 3**

**Pursuant to 34 C.F.R. 300.509(a)(2) and 5DCMR 3031.1(b), DCPS hereby compels the attendance of the below named individual as a necessary and material witness(es):**

**Wanda Richardson**

## Documents
DCPS-01 Hearing Complaint Request 6/5 /06

DCPS reserves the right to rely on any documents disclosed by the parent that it deems relevant in this case.

DCPS will object to the testimony of any expert witnesses if a curriculum vitae and/or resume is not provided with the student's 5-day disclosure.

Additionally, DCPS reserves the right to introduce any and all witnesses and/or documents for the purpose of impeachment and rebuttal.

*In the interest of time and efficiency, DCPS will not physically disclose this document, as it is believed to be in the possession of the parent/parent's counsel.

If you wish to discuss any aspect of this case further, or have questions, please contact me at 202/442-5173.

Sincerely,


Stephanie Ramjohn Moore, Esq.
Attorney Advisor


CC:    Student Hearing Office

*State Education Agency for the District of Columbia*
*State Enforcement and Investigation Division (SEID)*
*Special Education Programs*



# Due Process Complaint Notice

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents** with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting **(called a "Resolution Session")** with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A.  INFORMATION ABOUT THE STUDENT:

Student Name  W██████ D. R█████ ██ II          Birth Date: ████/96

Address:  4321-3RD STREET, S.E., #302, WASHINGTON, D.C.  20032

Home School:  P.R. HARRIS EC

Present School of Attendance: ASSUMPTION CATHOLIC SCHOOL
        Is this a charter school?   NO          (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student:

Address (if different from the student's above):

1

Phone/Contact Number:  (202) 561-0574        Fax Number (if applicable): _____

**B.    Individual Making the Complaint/Request for Due Process Hearing:**

Name:   WANDA RICHARDSON _____

Complete Address:   4321-3RD STREET, S.E., #302, WASHINGTON, D.C. 20032 _____

_____

Phone:  (h)  (202) 561-0574      (w) _____  (Fax) _____  (e-mail) _____

Relationship to the Student:

X        Parent                    Legal Guardian          ☐    Parent Surrogate

☐       Self/Student           ☐   Local Education Agency (LEA)    ☐   Parent Advocate

**C.    Legal Representative/Attorney (if applicable):**

Name:   Fatmata Barrie, Esq.  (Law Offices, Christopher N. Anwah, PLLC) _____

Address:   1003 K St. NW #565 Washington, DC  20020 _____

_____

Phone: (w)   202-626-0040        (Fax)  202-626-0048      (e-mail) _____

Will attorney / legal representative attend the resolution session?    **X** Yes          ☐ No

**D.    Complaint Made Against (check all that apply):**

**X** DCPS school (name of the school if different from page one) _____
☐ Charter school (name of the charter school if different from page one) _____
☐ Non-public school or residential treatment facility (name) _____
☐ Parent

**E.    Resolution Session Meeting Between Parent and LEA:**

I understand that it is my right to have a resolution meeting to resolve this complaint.  I also understand that I may voluntarily waive this right if I choose.  (Note:  All parties must agree to waive the resolution meeting to avoid having this meeting.)

☐ I wish to waive the Resolution Session Meeting

**F.    Mediation Process:**

2

SEID DPCN Rev'd. 7/12/05

IDEIA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session Meeting or as an alternative to a Due Process Hearing. Please check all that apply:

☐     I am requesting mediation as an alternative to the resolution session meeting.

☐     I am requesting mediation and a due process hearing.

☐     I am requesting mediation **only** at this time.

## G.   Facts and Reasons for the Complaint:

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions. Provide complete details about all the facts supporting your claims. (You may attach additional pages if needed):

1.    What is the nature of the problem, including the facts relating to the problem that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

    A. An MDT eligibility meeting was held on 5/10/06 and the student was erroneously found ineligible for special education services although there was sufficient evidence for W████ to be found eligible for services under the IDEA. DCPS has failed to honor the "child find" statute under the IDEA and to evaluate W████ for all suspected disabilities by not completing all appropriate evaluations, that is, the psycho-ed, social history, clinical, occupational therapy, and psychiatric evaluation as requested by the Advocate and Parent

    B. DCPS has failed to convene an MDT/IEP meeting to develop the student's IEP for the upcoming school year and to provide an appropriate placement based on the evidence provided in the student's file, teacher's observation, parent's observation, and the psychological report review dated 1/9/06.

    C. DCPS has failed to afford Ms. Richardson an opportunity to participate in a placement meeting to determine an appropriate placement of parent's choice. DCPS also failed to inform the parent of her due process rights prior this year. Therefore, denying the student a FAPE.

    D. DCPS has failed to provide student compensatory education for denial of FAPE for the past two school years because it has failed to convene an MDT meeting to provide all of the necessary and appropriate evaluations, IEP, related services, and placement to address his multiple disabilities for which he is entitled under the IDEA.

2.    To the extent known to you at this time, how can this problem be resolved?

    A. DCPS to fund a placement of parent's choice.

    B. DCPS to fund independent psycho-ed, social history, occupational therapy, clinical, and psychiatric evaluations and any other evaluations which the independent evaluations recommend.

    C. DCPS to convene an MDT/IEP meeting to discuss the independent assessments at the placement of parent's choice and to develop the student's IEP for the 2006/07 school year.

    D. DCPS to provide all appropriate related services, including transportation.

    E. DCPS to convene an MDT meeting to discuss the amount of comp education owed to student and develop a comp education plan to determine the amount, form and delivery of the comp education.

    F. DCPS to pay reasonable attorney fees.

3

3.    Issues presented:

    A.    Whether DCPS denied W█████ a Free and Appropriate Public Education (FAPE) when it failed to complete a psycho-ed, social history, occupational therapy, clinical, and psychiatric evaluations in a timely manner?

    B.    Whether DCPS denied W█████ a Free and Appropriate Public Education (FAPE) when it failed to convene an appropriate MDT meeting to discuss and to develop an appropriate IEP for the 2005/06 school year and failed to make an appropriate determination for special education?

    C.    Whether DCPS denied W█████ a Free and Appropriate Public Education (FAPE) when it failed to provide student with appropriate related services, especially transportation services in an appropriate manner?

    D.    Whether DCPS denied W█████ a Free and Appropriate Public Education (FAPE) when it failed to afford parent an opportunity to fully participate in a placement meeting?

    E.    Whether DCPS denied W█████ a Free and Appropriate Public Education (FAPE) when it failed to provide him with the needed compensatory education for the past and present denial of FAPE for over two (2) years?

## H.    Estimated amount of time needed for the hearing: _____

Note:   In the absence of a specified amount of time, the SHO schedules hearings in two hour blocks of time and will allocate two hours to conduct the hearing.  Please indicate if you believe more than two hours will be needed.

## I.    Accommodations and Assistance Needed:

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type) _____
- Special Communication (please describe the type) _____
- Special Accommodations for Disability (please be specific) _____
- Other _____

## J.    Waiver of Procedural Safeguards:

☐  I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

## K.    Parent Signature and Affirmation:

I affirm that the information provided on this form is true and correct.

_____
Signature of Parent or Guardian              Date

4

**L.**   **Signature of Attorney/ Legal Representative:**

06/05/06

_____
Legal Representative / Advocate                     Date

**M.**   **Signature of LEA Representative (if hearing requested by LEA):**


_____
Representative of LEA                               Date


Mail, fax or deliver this complaint notice to:
State Enforcement and Investigation Division
For Special Education Programs  (SEID)
Student Hearing Office (SHO)
825 North Capitol Street, NE, 8th Floor
Washington, DC  20002
Fax number: 202/442-5556

5

```
┌─────────────────────────────────────────┐
│   TRANSMISSION VERIFICATION REPORT       │
└─────────────────────────────────────────┘
```

```
                              TIME : 08/07/2006 08:18
                              NAME : STUDENT HEARINGS OFF
                              FAX  : 2024425556
                              TEL  : 2024425432
                              SER. # : BROH3J608601
```

```
┌────────────────────────────────────────────────────────┐
│   DATE,TIME              08/07  08:17                    │
│   FAX NO./NAME           96260048                        │
│   DURATION               00:00:28                        │
│   PAGE(S)                01                              │
│   RESULT                 OK                              │
│   MODE                   STANDARD                        │
│                          ECM                             │
└────────────────────────────────────────────────────────┘
```

# District of Columbia Public Schools
## *State Enforcement & Investigation Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8ᵀᴴ Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



X *REVISED*
*COPY*

### HEARING NOTICE

MEMORANDUM VIA: [✓] FACSIMILE [ ] MAIL [ ] HAND DELIVERY

TO:    Parent (or Representative): **F. BARRIE**    Fax No.: **626-0048**

LEA Legal Counsel: **S. RAMJOHN-MOORE**

RE:    R_____, W_____ and (LEA) DOB: _____
            Student's Name

FROM:    **SHARON NEWSOME**
            Special Education Student Hearing Office Coordinator

DATE SENT: _____**8/7/06**_____

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
_____. Please be advised that the hearing has been scheduled for:

DATE: **8/29/06**                    *Con't f*
TIME: **3:00 Pm**                    *o/u/u/*

20

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

In the Matter of:                          )

                                           )     BEFORE A SPECIAL EDUCATION

_William R_____      )

_____Petitioner_     )     INDEPENDENT HEARING OFFICER

_D C P S_  vs.                )

_____Respondent_     )     STATE EDUCATION AGENCY

## INTERIM ORDER

ON THIS DAY came on to be heard _____DCPS_____'s Motion For Continuance in the above styled cause. After hearing the evidence and argument of counsel, the Motion For Continuance is:

_____ DENIED.

__X__ GRANTED. The hearing is reset for _3:00_ A.M. (P.M.) on _____8/29/06_____

**(PLEASE CONFIRM NEW DATE & TIME WITH HEARING COORDINATOR)**

The Hearing Officer finds there is good cause to grant the continuance because:

__X__ The parties have agreed to this continuance ~~and the parent has waived the right to receive a final decision within 45 days;~~ _KB_

_____ Petitioner's legal representative is unavailable.

_____ Assigned DCPS attorney-advisor unavailable. DCPS has / has not made diligent efforts to have an attorney-advisor available.

__X__ Witness unavailable. The party has / has not made diligent efforts to secure the witness:

_____ Parent or student unavailable;

_____ Conflict in the schedule of the assigned hearing officer. The Student Hearing Office has / has not made diligent efforts to secure a replacement and no other hearing officer is available;

_____ Insufficient time allotted for the hearing. The time that was allotted is less than / equal to / more than the time requested by the parent;

_____ No hearing room available. The Student Hearing Office has / has not made diligent efforts to secure a hearing room;

_____ Movant did not receive prior notice of the hearing;

_____ Other:

_____ The hearing request was filed on _____. The 45-day deadline for issuance of a final Hearing Officer's Determination is extended for the specific number of days granted by the continuance. The new deadline for issuance of the final decision is _____

SIGNED this date _August 4, 2006_

_Terry Michael Banks_
Independent Special Education Hearing Officer

Issue Date _____

Original to SHO – Hearing File

Copy To:        Parent - C/O:
                DCPS - C/O:            _Fatmata Barrie, Esq._
                Charter School - C/O:  _Stephanie Ramjohn-Moore_

Rev'd. Dec. 2005

21

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

In the Matter of:                          )        BEFORE A SPECIAL EDUCATION
                                           )
_William R_____                       )
                    **Petitioner**         )        INDEPENDENT HEARING OFFICER
                                           )
        Vs.                                )
_DCPS_                                     )        STATE EDUCATION AGENCY
                    **Respondent**         )

## INTERIM ORDER

ON THIS DAY came on to be heard ___DCPS___'s Motion For Continuance in the above styled cause. After hearing the evidence and argument of counsel, the Motion For Continuance is:

__X__ DENIED.

_____ GRANTED. The hearing is reset for _____ A.M. / P.M. on _____

**(PLEASE CONFIRM NEW DATE & TIME WITH HEARING COORDINATOR)**

The Hearing Officer finds there is good cause to grant the continuance because:

_____ The parties have agreed to this continuance and the parent has waived the right to receive a final decision within 45 days;

_____ Petitioner's legal representative is unavailable.

_____ Assigned DCPS attorney-advisor unavailable. DCPS has / has not made diligent efforts to have an attorney-advisor available;

_____ Witness unavailable. The party **has / has not** made diligent efforts to secure the witness:

_____ Parent or student unavailable;

_____ Conflict in the schedule of the assigned hearing officer. The Student Hearing Office **has / has not** made diligent efforts to secure a replacement and no other hearing officer is available;

_____ Insufficient time allotted for the hearing. The time that was allotted is **less than / equal to / more than** the time requested by the parent;

_____ No hearing room available. The Student Hearing Office **has / has not** made diligent efforts to secure a hearing room;

_____ Movant did not receive prior notice of the hearing;

_____ Other:

_____

_____ The hearing request was filed on _____. The 45-day deadline for issuance of a final Hearing Officer's Determination is extended for the specific number of days granted by the continuance. The new deadline for issuance of the final decision is

_____

SIGNED this date _August 3, 2002_

_Terry Michael Banks_
**Independent Special Education Hearing Officer**

_____
**Issue Date**

Original to SHO – Hearing File
Copy To:
        Parent - C/O: _Fatmata Barrie_
        DCPS - C/O : _Stephanie Ranjoha-Moore_
        Charter School - C/O: _____

Rev'd. Dec. 2003

22

**LETTER MOTION FOR CONTINUANCE**

District of Columbia Public Schools
State Enforcement & Investigative Division
Special Education Student Hearing Office
825 North Capitol Street, N.E. 8th Floor
Washington, DC 20002

Dear Student Hearing Officer:

This letter is to request a continuance of my due process hearing currently scheduled to take place on _Friday, August 4, 2006_ for _Willi___ R_____ . I am unable to appear for the hearing on this date for the following reasons: _My witnesses are unavailable_ _____

I am available to appear for the hearing on the following dates:
1. _First Available_ 2. _____ 3. _____
I attempted to contact opposing counsel to discuss scheduling before proposing these dates. I spoke to _Fatmata Barrie_ (opposing counsel) at _11:50_ A.M. / P.M. on _August 3 2006_ (date).

Opposing Counsel ☐ agreed to the continuance ☐ did not agree to the continuance.
☑ undecided - she must speak w/ parent

   I UNDERSTAND THAT THESE DATES MAY NOT BE AVAILABLE AND THAT THE STUDENT HEARING OFFICE MAY NEED TO RESCHEDULE MY HEARING FOR ANOTHER DATE.

   I ALSO UNDERSTAND THAT BY REQUESTING A CONTINUANCE I HEREBY WAIVE RIGHTS TO A FINAL DECISION WITHIN 75 DAYS OF FILING THE DUE PROCESS COMPLAINT.

   FURTHERMORE, I REALIZE THAT THE HEARING MAY GO FORWARD AS SCHEDULED UNLESS I RECEIVE A WRITTEN DECISION FROM THE HEARING OFFICER GRANTING A CONTINUANCE. IF I DO NOT RECEIVE A WRITTEN DECISION GRANTING A CONTINUANCE AND I FAIL TO APPEAR FOR A SCHEDULED HEARING, I UNDERSTAND THAT THE HEARING OFFICER MAY DISMISS MY REQUEST.

   BY MY SIGNATURE BELOW I CERTIFY THAT I HAVE PROVIDED THE OPPOSING PARTY WITH A COPY OF THIS MOTION AND HAVE ATTACHED PROOF OF SERVICE (FAX CONFIRMATION, COURIER RECEIPT, ETC.)

Parent/Advocate or Attorney Advisor: _Stephanie Ramjohn Moore_    Date:- _8/3/06_
Telephone: _202 442-5173_                    Fax: _202-442-5098_

Revised 05/23/2006

# LAW OFFICES,
## CHRISTOPHER N. ANWAH, PLLC

**Attorneys and Counselors at Law**

Christopher N. Anwah, Esq.
(DC, MD, NJ)
Fatmata Barrie, Esq.
(DC, FL)
Georgina A. Oladokun, Esq.
(MD)
Tamika N. Jones, Esq.
(DC)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email:chrisanwahfirm@chrisanwahfirm.com

July 28, 2006

Stephanie Ramjohn Moore, Esq.
Office of General Counsel
825 North Capitol St, NE
9th Floor
Washington, DC 20002

**Via Facsimile: 202-442-5098/97**

RE: William R███████
DOB: ████/96

### Disclosure of Witnesses and Documents

Dear Mrs. Ramjohn-Moore:

Pursuant to the five-day rule set forth in 34.C.F.R. 509 (a) (3), attached is a list of witnesses and documents, which we intend to rely on for the upcoming Due Process Hearing scheduled for August 4, 2006.

### Witnesses

1. William R█████ –Student
2. Wanda Richardson and/or designee – Parent
3. Educational Advocate and/or her designee
4. Keren Plowden and/or designee -- Rock Creek Academy
5. Sharon Millis and/or designee – Expert and/or Knowledgeable Person in Special Educational
6. Arvette Page and/or designee - Expert and/or Knowledgeable Person in Special Educational
7. Dr. Derek Marryshow and/or designee -- Psychologist
8. Teacher and/or designee – Assumption Catholic School
9. Social Worker and/or designee
10. Michelle Yong and/or designee High Road
11. Alicia Wilson and/or designee – Counselor (Assumption Catholic School)
12. Teacher and/or designee – Longfields ES

*Witnesses may testify by telephone

**Documents**

WR-01    06/05/06 Hearing Request
WR-02    04/01/04 IEP
WR-03    12/14/05 SEP
WR-04    07/13/04 Social Work Evaluation
WR-05    08/20/04 Psycho-educational Report
WR-06    Sharon Millis', Arvette Page's and Derek Marryshow's Curriculum Vitas
WR-07    2005-2006 Report Card
WR-08    12/12/05 IEP
WR-09    09/29/05 Student Referral Form
WR-10    09/30/05 Interim Progress Report
WR-11    01/25/06 Certificate of No Records
WR-12    04/03/06 Request for Documents
WR-13    01/22/06 Request for Documents
WR-14    05/11/06 Letter to DCPS
WR-15    02/09/06 Social Work Evaluation
WR-16    01/09/06 Psychological Report Review
WR-17    05/10/06 MDT/Eligibility Meeting Notes

     We reserve the right to disclose additional documents as they become available, the right to
rely on DCPS' witnesses and evidence as if disclosed by parent and the right to rely on documents
previously disclosed to counsel for any prior hearings or procedures.  We also reserve the right to
produce rebuttal witnesses.  Should you have any questions or need additional information, please do
not hesitate to contact me.

                                        Sincerely,

                                        Fatmata Barrie, Esq.


cc: SHO

25

WR-01

**State Education Agency for the District of Columbia**
**State Enforcement and Investigation Division (SEID)**
**Special Education Programs**



# *Due Process Complaint Notice*

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or parents** with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8th Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting **(called a "Resolution Session")** with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A.    INFORMATION ABOUT THE STUDENT:

Student Name    W███████ D. R███████ II                    Birth Date:    ████/96

Address:    4321-3RD STREET, S.E., #302, WASHINGTON, D.C. 20032

Home School:    P.R. HARRIS EC

Present School of Attendance:    ASSUMPTION CATHOLIC SCHOOL

    Is this a charter school?    NO            (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student:

Address (if different from the student's above):

1

Phone/Contact Number:  (202) 561-0574     Fax Number (if applicable): _____

**B.**     **Individual Making the Complaint/Request for Due Process Hearing:**

Name:    WANDA RICHARDSON

Complete Address:    4321-3RD STREET, S.E., #302, WASHINGTON, D.C. 20032

Phone: (h)   (202) 561-0574     (w) _____   (Fax) _____   (e-mail) _____

Relationship to the Student:

X        Parent              Legal Guardian        ☐    Parent Surrogate

☐        Self/Student        ☐   Local Education Agency (LEA)   ☐   Parent Advocate

**C.**     **Legal Representative/Attorney (if applicable):**

Name:    Fatmata Barrie, Esq. (Law Offices, Christopher N. Anwah, PLLC)

Address:  1003 K St. NW #565 Washington, DC  20020

Phone: (w)   202-626-0040          (Fax) 202-626-0048       (e-mail)_____

Will attorney / legal representative attend the resolution session?     **X** Yes          ☐ No

**D.**     **Complaint Made Against (check all that apply):**

**X** DCPS school (name of the school if different from page one) _____
☐ Charter school (name of the charter school if different from page one) _____
☐ Non-public school or residential treatment facility (name) _____
☐ Parent

**E.**     **Resolution Session Meeting Between Parent and LEA:**

I understand that it is my right to have a resolution meeting to resolve this complaint.  I also understand that I may voluntarily waive this right if I choose.  (Note:  All parties must agree to waive the resolution meeting to avoid having this meeting.)

☐ I wish to waive the Resolution Session Meeting

**F.**     **Mediation Process:**

2

IDEIA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session Meeting or as an alternative to a Due Process Hearing. Please check all that apply:

☐      I am requesting mediation as an alternative to the resolution session meeting.

☐      I am requesting mediation and a due process hearing.

☐      I am requesting mediation **only** at this time.

## G.   Facts and Reasons for the Complaint:

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions. Provide complete details about all the facts supporting your claims. (You may attach additional pages if needed):

1.    What is the nature of the problem, including the facts relating to the problem that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

     A.  An MDT eligibility meeting was held on 5/10/06 and the student was erroneously found ineligible for special education services although there was sufficient evidence for W████to be found eligible for services under the IDEA. DCPS has failed to honor the "child find" statute under the IDEA and to evaluate W████ for all suspected disabilities by not completing all appropriate evaluations, that is, the psycho-ed, social history, clinical, occupational therapy, and psychiatric evaluation as requested by the Advocate and Parent

     B.  DCPS has failed to convene an MDT/IEP meeting to develop the student's IEP for the upcoming school year and to provide an appropriate placement based on the evidence provided in the student's file, teacher's observation, parent's observation, and the psychological report review dated 1/9/06.

     C.  DCPS has failed to afford Ms. Richardson an opportunity to participate in a placement meeting to determine an appropriate placement of parent's choice. DCPS also failed to inform the parent of her due process rights prior this year. Therefore, denying the student a FAPE.

     D.  DCPS has failed to provide student compensatory education for denial of FAPE for the past two school years because it has failed to convene an MDT meeting to provide all of the necessary and appropriate evaluations, IEP, related services, and placement to address his multiple disabilities for which he is entitled under the IDEA.

2.    To the extent known to you at this time, how can this problem be resolved?

     A.  DCPS to fund a placement of parent's choice.

     B.  DCPS to fund independent psycho-ed, social history, occupational therapy, clinical, and psychiatric evaluations and any other evaluations which the independent evaluations recommend.

     C.  DCPS to convene an MDT/IEP meeting to discuss the independent assessments at the placement of parent's choice and to develop the student's IEP for the 2006/07 school year.

     D.  DCPS to provide all appropriate related services, including transportation.

     E.  DCPS to convene an MDT meeting to discuss the amount of comp education owed to student and develop a comp education plan to determine the amount, form and delivery of the comp education.

     F.  DCPS to pay reasonable attorney fees.

3.    Issues presented:

A.  Whether DCPS denied W▮▮▮ a Free and Appropriate Public Education (FAPE) when it failed to complete a psycho-ed, social history, occupational therapy, clinical, and psychiatric evaluations in a timely manner?

B.  Whether DCPS denied W▮▮▮ a Free and Appropriate Public Education (FAPE) when it failed to convene an appropriate MDT meeting to discuss and to develop an appropriate IEP for the 2005/06 school year and failed to make an appropriate determination for special education?

C.  Whether DCPS denied W▮▮▮ a Free and Appropriate Public Education (FAPE) when it failed to provide student with appropriate related services, especially transportation services in an appropriate manner?

D.  Whether DCPS denied W▮▮▮ a Free and Appropriate Public Education (FAPE) when it failed to afford parent an opportunity to fully participate in a placement meeting?

E.  Whether DCPS denied W▮▮▮ a Free and Appropriate Public Education (FAPE) when it failed to provide him with the needed compensatory education for the past and present denial of FAPE for over two (2) years?

## H.    Estimated amount of time needed for the hearing:    _____

Note:  In the absence of a specified amount of time, the SHO schedules hearings in two hour blocks of time and will allocate two hours to conduct the hearing.  Please indicate if you believe more than two hours will be needed.

## I.    Accommodations and Assistance Needed:

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type) _____
- Special Communication (please describe the type) _____
- Special Accommodations for Disability (please be specific) _____
- Other _____

## J.    Waiver of Procedural Safeguards:

☐ I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

## K.    Parent Signature and Affirmation:

I affirm that the information provided on this form is true and correct.

_____         _____
Signature of Parent or Guardian                    Date

4

SEID DPCN Rev'd. 7/12/05                                   W▮▮▮ Ric▮▮▮▮ ---▮▮/96          29

**L.**   **Signature of Attorney/ Legal Representative:**

06/05/06

———————————————————————————
Legal Representative / Advocate                     Date

**M.**   **Signature of LEA Representative (if hearing requested by LEA):**

———————————————————————————
Representative of LEA                                 Date

Mail, fax or deliver this complaint notice to:
State Enforcement and Investigation Division
For Special Education Programs (SEID)
Student Hearing Office (SHO)
825 North Capitol Street, NE, 8th Floor
Washington, DC 20002
Fax number: 202/442-5556

5

WA-02

Page: _____ of

2004-2005

# Individualized Education Plan (IEP)

**IEP Meeting Date:** 04/01/2004
**IEP Approved Date:** 04/01/2004
**Review Date:** 04/01/2005

**Current Eval. Date:**
**Reevaluation Date:**

## Student Information

| | | |
|---|---|---|
| **Name:** William Richardson II | **Student ID:** 000401205 | **Alt. ID:** |
| **Sex:** Male | **Birthdate:** /1996 | **Grade:** 02 | **Ethnicity:** African American | **Native Language:** English |

**Ethnicity:** African American

**Native Language:** English

**School of Attendance (Service School):** LONGFIELDS ELEMENTARY

**District of Attendance (Service District):** PRINCE GEORGES COUNTY PUBLIC SCHOOLS

**Residence School:**

**Residence District:**

## Contact Information

**Name:** William & Wanda Richardson Sr.

**Address:** 6314 Elmhurst Street

**City:** District Heights **State:** MD **Zip:** 20747

**Home Phone:** 301.736.6607 **Day Phone:** 301.839.1930 **E-Mail Address:**

**Native Language:** **Translation/Interpreter Needed:** ○ Yes ◉ No

## IEP Information

**Primary Disability:** Emotional Disturbance

**Case Manager:** Renee Reynolds **Title:** Special Educator

**SSIS #:** 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 **Medical Assistance:** ○ Yes ◉ No **Medicaid #:** 6284291601

## Team Members

| Name | Title |
|---|---|
| Renee Reynolds | Special Educator |
| Devon Stancell | Special Educator |
| Diana Lockett | Speech/Language Pathologist |
| Ilene May | Psychologist |
| Sandra Boswell | Pupil Personnel Worker |
| Kathryn Kady | RSES - Regional Special Education Specialist |
| Ms. C. Hannon | General Education Teacher |
| Mrs. S. Janowsky | General Education Teacher |

31

# Multidisciplinary Team Meeting Summary Notice
## Part 2

Meeting Date: 04/01/2004     Notice Date: 04/01/2004     Initiation Date:

Name: W█████ R███████ II     ID: 000401205     Grade: 02

### Team Members

| Name | Title |
| --- | --- |
| Y. Crawford | Principal |
| William & Wanda Richardson Sr. | Parent |
| S. Janowsky | Teacher |
| Renee Reynolds | Special Educator |
| C. Hannon | Teacher |
| A. Taylor | Counselor |

32

Page: _____ of _____

2004-2005

# Individualized Education Plan (IEP)

| | |
|---|---|
| William & Wanda Richardson Sr. | Parents |
| | Principal |
| Yvonne Crawford | |
| Andrea Taylor | Counselor |

## Individualized Education Plan (IEP)

2004-2005

**IEP Meeting Date:** 04/01/2004

| Name: W███ R███████ II | ID: 000401205 | Grade: 02 |

### Special Considerations

**The IEP Team has considered these special factors and concluded that the factors indicated need to be addressed in the IEP.**

☐ Limited English Proficiency

☐ Adapted Physical Education

☐ Behavior Strategies (including positive behavior interventions, strategies, and supports to address that behavior)

☐ Assistive Technology

☐ Communication Needs

**In the case of a child who is deaf or hard of hearing:**

☐ Language and communication needs

☐ Opportunities for direct communication with peers and professional personnel in the student's language and mode of communication

☐ Academic level and full range of needs (including opportunities for direct instruction in the student's language and mode of communication)

**In the case of a child who is blind or visually impaired:**

☐ Instruction in Braille and the use of Braille (if the IEP team determines that instruction in Braille is not language and mode of communication)

**Special Considerations Comments:**

### Behavior Intervention Plan

Was a Functional Behavior Assessment Conducted?    ○ Yes    ⦿ No
**Date Conducted:**

Is a Behavior Intervention Plan needed?    ⦿ Yes    ○ No
**Behavior Intervention Plan Date:**    12/18/2003

**Behavior Intervention Plan:**

34

# Present Levels

**IEP Meeting Date:** 00/00/00

2004-2005

| Name: W████ R█████ II | ID: 000401205 | DOB: ████1996 |
|---|---|---|

## Intellectual/Cognitive Functioning

**Present Level of Performance:**

**Suggested Educational Need:**

## Academic Performance

**Present Level of Performance:**

**Suggested Educational Need:**

## Communication

**Present Level of Performance:**

**Suggested Educational Need:**

## Emotional/Social/Behavior Development

**Present Level of Performance:**

Presently, W█████ has exhibited many inappropriate behaviors in his classroom throughout this year. These behaviors consist of calling out across the classroom, using inappropriate language towards peers and his teacher, constantly out of his seat, fighting, instigating situations in the classroom, disrespect, and insubordination. As a result of his behavior, W█████ has been suspended from school (in and out) several times. In addition, W███████ academic production is beginning to be affected by his behavior.

**Suggested Educational Need:**

The student demonstrates educational need(s) in the following area(s):
Basic social skills
Organizational skills
Self-control
Social responsibility

## Fine Motor

**Present Level of Performance:**

**Suggested Educational Need:**

## Gross Motor

**Present Level of Performance:**

**Suggested Educational Need:**

## Sensory/Health

**Present Level of Performance:**

**Suggested Educational Need:**

## Functional/Developmental Skills

**Present Level of Performance:**                                                  35

**Suggested Educational Need:**

## Present Levels

IEP Meeting Date: 00/00/00

2004-2005

ID: 000401205                                    DOB: ######1996

Name:  W#####, R######## II

**Vocational/Occupational/Transition**

**Present Level of Performance:**

**Suggested Educational Need:**

36

# Goals & Objectives

**IEP Meeting Date:** 04/01/2004

**2004-2005**

| | | |
|---|---|---|
| **Name:** W█████ R█████ II | **ID:** 000401205 | **Grade:** 02 |

## Domain/Area

| | | | | |
|---|---|---|---|---|
| ☐ Cognitive | ☐ Academic | ☐ Communication | ☑ Emotional/Social | |
| ☐ Fine | ☐ Gross | ☐ Sensory/Health | ☐ Functional | ☐ Voc/Transition |

## Person/Agency Responsible

Special Educator & General Educator

## Annual Goal

The student will demonstrate appropriate classroom behaviors and social skills (out of seat).

## Objectives

**Objective:** 1 Without prompting, the student will sit quietly in his seat during instruction and independent work.

Criteria: 18 out of 20 minutes
Evaluation: teacher observation and data collection
Initiation Date: 04/13/2004

**Objective:** 2 Given eye contact, the student will sit quietly in his seat during instruction and independent work.

Criteria: 12 out of 20 minutes
Evaluation: teacher observation and data collection
Initiation Date: 04/13/2004

**Objective:** 3 Given verbal prompting, the student will sit quietyly in his seat during instruction and independent work.

Criteria: 8 out of 20 minutes
Evaluation: teacher observation and data collection
Initiation Date: 04/13/2004

**Objective:** 4 Given verbal prompting and proximity control by the teacher, the student will sit quietly in his seat during instruction and independent work.

Criteria: 5 out of 20 minutes
Evaluation: teacher observation and data collection
Initiation Date: 04/13/2004

# Goals & Objectives

**IEP Meeting Date:** 04/01/2004

| 2004-2005 | ID: 000401205 | Grade: 02 |
|---|---|---|

**Name:** William Ri██████ II

### Domain/Area

- [ ] Cognitive
- [ ] Fine
- [ ] Academic
- [ ] Gross
- [ ] Communication
- [ ] Sensory/Health
- [x] Emotional/Social
- [ ] Functional
- [ ] Voc/Transition

### Person/Agency Responsible

Special Educator & General Educator

### Standard(s)

General Education Standard with Accommodations - grade level expectancies with accommodations    [ ] ESY

### Annual Goal

The student will demonstrate approriate self-related behavior skills (communication skills).

### Objectives

**Objective:** 1 Without verbal reminders, the student will demonstrate elements of effective communication (raising hand to be recognized).

Criteria: 80% of the time
Evaluation: teacher observation
daily progress reports
behavior management plan

Initiation Date: 04/13/2004

**Objective:** 2 Given verbal reminders, the student will demonstrate elements of effective communication (raising hand to be recognized).

Criteria: 80% of the time
Evaluation: teacher observation
daily progress reports
behavior management plan

Initiation Date: 04/13/2004

**Objective:** 3 With verbal prompting and eye contact, the student will demonstrate elements of effective communication (raising hand to be recognized).

Criteria: 80% of the time
Evaluation: teacher observation
daily progress reports
behavior management plan

Initiation Date: 04/13/2004

# Goals & Objectives

**IEP Meeting Date:** 04/01/2004

| 2004-2005 | ID: 000401205 | Grade: 02 |
|---|---|---|

**Name:** William R█████ II

### Domain/Area

☐ Cognitive    ☐ Academic    ☐ Communication    ☑ Emotional/Social    
☐ Fine    ☐ Gross    ☐ Sensory/Health    ☐ Functional    ☐ Voc/Transition

### Person/Agency Responsible

Special Educator & General Educator

### Standard(s)

General Education Standard with Accommodations - grade level expectancies with accommodations    ☐ ESY

### Annual Goal

The student will improve behavior by completing 80% of the following objectives.

### Objectives

**Objective:** 1  Given discussions about situations faced in the classroom, the student will list the consequences to given behaviors.

Criteria:    80% Mastery
Evaluation:    Teacher observation and data collection
Initiation Date:    04/13/2004

**Objective:** 2  The student will be able to eliminate inappropriate responses/behaviors.

Criteria:    80% Mastery
Evaluation:    Teacher observation and data collection
Initiation Date:    04/13/2004

**Objective:** 3  The student will follow classroom rules.

Criteria:    80% Mastery
Evaluation:    Teacher observation and data collection
Initiation Date:    04/13/2004

**Objective:** 4  Given a different situation, the student will adjust his/her behavior to fit the rules and routine of the new situation.

Criteria:    80% Mastery
Evaluation:    Teacher observation and data collection
Initiation Date:    04/13/2004

# Accommodations/State and District Assessments

**IEP Meeting Date: 04/01/2004**

| 2004-2005 | ID: 000401205 | Grade: 02 |
|---|---|---|

**Name:** W█████ R█████ II

## Accommodations and Modification for Use in General and Special Education

Notes sent home to parents daily (agenda book).
Seating near teacher or in the front of the classroom away from distrations (window, doors, coat area, etc.)
Modified assignments, especially with homework
Teacher and/or student to monitor on-task behavior (use the created behavior chart after each subject).

Provide frequent breaks.
Supervised breaks during test session.
General education classroom, with special seating (front of room, carrel, etc.)   Support
General education classroom, with additional school support (instructional assistant, guidance, etc.)   Support
person is not to help student read or respond to items.
Small group setting for test

## STATE AND DISTRICT ASSESSMENTS

### Maryland School Performance Assessment Program (Grades 3, 5, and 8)

○ Student will participate in the MSPAP without accommodations.
◉ Student will participate in the MSPAP with accommodations
○ Student will be excused from the MSPAP. Please justify rationale for the excuse:

○ Student is exempt from the MSPAP because goals and objectives of the IEP do not reflect Maryland
Learning Outcomes. Please justify rationale for the exemption:

☐ The Student will participate in Independent Mastery Assessment Program (IMAP)

○ NA (not applicable to the student for the time frame of this IEP)

### Maryland Functional Testing Program

| Area | Score | Pass/Fail | Date |
|---|---|---|---|

○ Student will participate in the Maryland Functional Testing Program without accommodations.
○ Student will participate in the Maryland Functional Testing Program with accommodations.
○ Student will not participate in the Maryland Functional Testing Program because the child is not
working toward a Maryland High School diploma.
◉ NA (not applicable to the student for the time frame of this IEP)

### CTBS Version 5 (Grades 2, 4, and 6)

○ Student will participate in the CTBS/5 without accommodations.
○ Student will participate in the CTBS/5 with accommodations.
○ The Student will be excused from the CTBS/5. Please justify rationale for the excuse:
◉ The student is exempted from the CTBS/5 because goals and objectives of the IEP do not reflect Maryland
Learning Outcomes. Please justify rationale for the exemption:

☐ The Student will participate in Independent Mastery Assessment Program (IMAP)

○ NA (not applicable to the student for the time frame of this IEP)

### District Assessment

○ Student will participate in the District Assessment without accommodations.
◉ Student will participate in the District Assessment with accommodations.
○ Student will be excused from participation. Provide rationale for the excuse:
○ Student will be exempt from participation. Provide rationale for the exemption. Address and identify alternative

**40**

Student will be exempt from participation. Provide rationale for alternate assessments:

○ NA (not applicable to the student for the time frame of this IEP)

# Accommodations/State and District Assessments

IEP Meeting Date: 04/01/2004

2004-2005

| Name: W█████ R████████ II | ID: 000401205 | Grade: 02 |

## Part 1

Is the Accommodation Permitted? Yes, No or NA (not applicable or not necessary because allowed under test administration procedures).

### I.  Scheduling Accommodations

| MFTP | CTBS/5 | MSPAP | HSA | | |
|------|--------|-------|-----|---|---|
| Yes | Yes | Yes | Yes | ☑ | A. Supervised breaks during test session. |
| Yes | Yes | Yes | Yes | ☐ | B. Tests given regularly within a single day/session, may be administered over multiple days without exceeding total time allowances. Tests must be given within the constraints of test administration procedures. |
| Yes | *Yes | Yes | Yes | ☐ | C. Extra response and processing time.  (MSPAP time extensions must allow for participation in group activities). |
| Yes | Yes | Yes | Yes | ☐ | D. Tests are administered at best time of day for student. |
| Yes | **Yes | Yes | Yes | ☐ | E. Other-proposed by Local Accountability Coordinator and Special Education or LEP staff and approved by MSDE Assessment Office and MSDE Special Education or LEP staff. |

* Invalidates comparison to national norms.

** May invalidate comparison to national norms.

### II.  Setting Accommodations

| MFTP | CTBS/5 | MSPAP | HSA | | |
|------|--------|-------|-----|---|---|
| Yes | Yes | Yes | Yes | ☑ | A. General education classroom, with special seating (front of room, carrel, etc.) |
| Yes | Yes | Yes | Yes | ☐ | B. General education classroom, with adjusted grouping. |
| Yes | Yes | Yes | Yes | ☑ | C. General education classroom, with additional school support (instructional assistance, guidance, etc.)  Support person is not to help student read or respond to items. |
| Yes | Yes | Yes | Yes | ☐ | D. General education classroom, with special education or LEP staff as support.  Support person is not to help student read or respond to items. |
| Yes | Yes | Yes | Yes | ☑ | E. Small group setting. |
| Yes | Yes | Yes | Yes | ☐ | F. Small group setting with special education or LEP teacher as examiner. |
| Yes | Yes | NA | Yes | ☐ | G. Individual administration within the school building. |
| Yes | Yes | NA | Yes | ☐ | H. Individual administration outside school (home, hospital, etc.) |
| Yes | *Yes | Yes | Yes | ☐ | I. Other-proposed by Local Accountability Coordinator and Special Education or LEP staff and approved by MSDE Assessment Office and MSDE Special Education or LEP staff. |

* May invalidate comparison to national norms.

42

## Accommodations/State and District Assessments

IEP Meeting Date: 04/01/2004

| 2004-2005 | | | |
|---|---|---|---|
| Name: W█████ Ri███████ II | | ID: 000401205 | Grade: 02 |

## Part 2

### III. Equipment/Technology Accommodations

| MFTP | CTBS/5 | MSPAP | HSA | | |
|---|---|---|---|---|---|
| Yes | Yes | Yes | Yes | ☐ | A. Large print test materials. |
| Yes | *Yes | Yes | Yes | ☐ | B. Braille test materials. |
| Yes | >Yes | Yes | Yes | ☐ | C. Calculator for mathematics testing for special education or 504 students only. |
| Yes | *Yes | ***Yes | ***Yes | ☐ | D. Use of electronic devices (e.g..mechanical speller, computer, augmented communication device, etc.) |
| Yes | Yes | Yes | Yes | ☐ | E. Use of computer with spell and grammar checkers blocked as certified by LAC. |
| Yes | Yes | Yes | Yes | ☐ | F. Published or electronic bilingual dictionary (a synonym dictionary, without definitions, in the student's native language.) |
| Yes | **Yes | Yes | Yes | ☐ | G. Other, proposed by LAC and Special Education or LEP staff and approved by MSDE Assessment Office and MSDE Special Education or LEP staff. |

* Invalidates comparison to national norms.

** May invalidate comparison to national norms.

*** Entire MSPAP tests are administered; student's language usage score is invalidated in the scoring/data processing process. For the HSA English test, grammar and spell check functions are not permitted.

>For the mathematics computation subtest and parts of the mathematics subtest, using a calculator invalidates comparison to national norms.

### IV. Presentation Accommodations

| MFTP | CTBS/5 | MSPAP | HSA | | |
|---|---|---|---|---|---|
| Yes | Yes | Yes | Yes | ☐ | A. Verbatim repetition of scripted directions, as needed. |
| Yes | NA | Yes | Yes | ☐ | B. Written copies of orally presented materials that are found only in examiner's manual. |
| NA | NA | NA | NA | ☐ | C. Accessibility to close-caption or video materials. |
| Yes | Yes | Yes | Yes | ☐ | D. Sign language interpreter, amplification, or visual display required for test directions/examiner-led activities. |
| Yes | Yes | Yes | Yes | ☐ | E. Verbatim audiotape of directions. |
| >Yes | *Yes | ***Yes | >Yes | ☐ | F. Verbatim audiotape of entire test. |
| >Yes | *Yes | ***Yes | >Yes | ☐ | G. Verbatim reading of selected sections of test or vocabulary. |
| Yes | **Yes | Yes | Yes | ☐ | I. Other, proposed by LAC and Special Education or LEP staff and approved by MSDE Assessment Office and MSDE Special Education or LEP staff. |

* Invalidates comparison to national norms.

** May invalidate comparison to national norms.

*** Entire tests are administered. Student's reading score is invalidated in the scoring/data processing process.
Not permitted for the Maryland Functional Reading Testing and the HSA English test.

43

## Accommodations/State and District Assessments

**2004-2005**                                                    **IEP Meeting Date: 04/01/2004**

| Name: W█████ R█████ II | ID: 000401205 | Grade: 02 |

### Part 3

| MFTP | CTBS/5 | MSPAP | HSA | | V. Response Accommodations |
|------|--------|-------|-----|---|----------------------------|
| Yes | Yes | NA | Yes | ☐ | A. For machine-scored tests, student marks answers in test booklet. (Transfer to answer sheet completed by school personnel.) |
| Yes | Yes | Yes | Yes | ☐ | B. For selected response items, student indicates answers by pointing or other method. |
| Yes | NA | ***Yes | Yes | ☐ | C. For constructed response (brief or extended) items, student tapes response for later verbatim transcription by school personnel. |
| **Yes | Yes | NA | Yes | ☐ | D. School personnel may check student's transferred responses (alignment and completeness of hand-filled bubles). |
| Yes | NA | ***Yes | Yes | ☐ | E. For constructed response (brief or extended) items, student dictates response to examiner for verbatim transcription by school personnel. |
| Yes | NA | NA | Yes | ☐ | F. For constructed response (brief or extended) items or oral presentation, student signs response to interpreter of the deaf/hearing impaired for transcription. |
| Yes | *Yes | Yes | Yes | ☐ | G. Other, proposed by Local Accountability Coordinator and Special Education or LEP staff and approved by MSDE Assessment Office and MSDE Special Education or LEP staff. |

* May invalidate comparison to national norms
** Not applicable to Maryland Writing Test
*** Entire tests are administered; student's language usage score is invalidated in the scoring/data processing process.

### VI. Other

Other, proposed by Local Accountability Coordinator and Special Education or LEP staff and approved by MSDE Assessment Office and MSDE Special Education or LEP staff.

44

# Progress/Transportation/ESY

**IEP Meeting Date:** 04/01/2004

**2004-2005**

| | | |
|---|---|---|
| **Name:** W████ R██████ II | **ID:** 000401205 | **Grade:** 02 |

## Progress Reported to Parents

Parents will be informed of the progress in meeting the goals of the IEP on the same timelines as students without disabilities.

How often will the student's progress be reported:    Quarterly

Method by which the progress will be reported:    Writing

## Transportation

○ None    ○ Regular    ◉ Special    (If Special, fill out Transportation Form in Supplemental)

**Comments:**

W████ will need special education transportation due to his disability.

## ESY

Consider the following factors and document if any of these factors will prevent the student from receiving some benefit from the student's educational program during the regular school year, if the student does not receive extended school year services.

○ Yes    ◉ No    Does the student's IEP include annual goals related to critical life skills?

○ Yes    ◉ No    Is there a likelihood of substantial regression of critical life skills caused by the normal school break and a failure to recover those lost skills in a reasonable time?

○ Yes    ◉ No    Is the student's degree of progress toward mastery of  IEP goals related to critical life skills?

○ Yes    ◉ No    Is there a presence of emerging skills or breakthrough opportunities?

○ Yes    ◉ No    Are there interfering behaviors?

○ Yes    ◉ No    Will the nature and severity of the disability prevent the student from receiving benefit from the educational program if the student does not receive extended school year services?

○ Yes    ◉ No    Are there special circumstances to be considered?

If the answer to any question above is yes, document the considerations below:

Are Extended School Year services needed for this student?

○ Yes    ◉ No    ○ To be determined by

45

## Services/Interagency

**IEP Meeting Date:** 04/01/2004

**2004-2005**

**ID:** 000401205          **Grade:** 02

**Name:** William R████████ II

**Frequency Key:** 80=One Time Service
90=Recheck Periodically  99=Residential

| Special Education and Related Services | | | ESY: No |
|---|---|---|---|
| **Service:** Special Education Instruction | | | |
| | **Provider/Agency:** IEP Team | **Subject:** General | **Indirect Hours/Freq.:** 0.00 |
| | **Location:** Both General and Special Education Classroo | **Start Date:** 08/23/2004 | **Direct Hours/Freq.:** 5.00 |
| | **How Often:** 3 times/week | **End Date:** 04/02/2005 | **Duration:** 36 Week(s) |
| | | | ESY: No |
| **Service:** Special Education Instruction | | | |
| | **Provider/Agency:** IEP Team | **Subject:** General | **Indirect Hours/Freq.:** 0.00 |
| | **Location:** Both General and Special Education Classroo | **Start Date:** 04/02/2004 | **Direct Hours/Freq.:** 5.00 |
| | **How Often:** 3 times/week | **End Date:** 06/21/2004 | **Duration:** 10 Week(s) |
| | | | ESY: No |
| **Service:** Special Education Instruction | | | |
| | **Provider/Agency:** IEP Team | **Subject:** General | **Indirect Hours/Freq.:** 10.00 |
| | **Location:** Gen Ed Classroom | **Start Date:** 06/18/2003 | **Direct Hours/Freq.:** 0.00 |
| | **How Often:** 5 days/week | **End Date:** 06/18/2004 | **Duration:** 36 Week(s) |

### Supplementary Aids and Services

Check assignment book for accuracy and completeness.
Supervise during transition activities.
Use of Behavior Intervention Plan.
Manage behaviors by providing clearly defined limits.
Provide frequent reminders of the rules.
Provide positive reinforcement.
Control behaviors through frequent eye contact and proximity.
In-class timeout.
Peer tutoring/paired work arrangement
Tutorial assistance

### Program Modifications

### Supports for Personnel

### Statement of Service Delivery

46

# LRE

**IEP Meeting Date:** 04/01/2004

**2004-2005**

**ID:** 000401205                    **Grade:** 02

**Name:** W▇▇▇ R▇▇▇▇ II

## Placement Considerations

◉ Yes  ○ No   Will the student be educated in the school that the student would attend if not disabled? (If no, explain why.)

◉ Yes  ○ No   Is the educational placement as close as possible to the student's home? (If no, explain why.)

◉ Yes  ○ No   Is the educational placement decision based on the student's IEP? (If no, explain why.)

○ Yes  ◉ No   Will the placement decision have any potential harmful effect on the student? (If yes, explain why.)

## Explanation of the extent, if any, to which the student will not participate with nondisabled peers in the general classroom and non-academic and extracurricular activities:

## Continuum of Alternative Placements

Provide a rationale for each placement reflected that is less restrictive than the placement selected.

| Considered/ Selected | Considered/ Rejected | |
|:---:|:---:|---|
| ○ | ◉ | **General Education Class (Outside general education class less than 21% of the school day)** W▇▇ needs a more intensive placement to work on behavior management skills. |
| ◉ | ○ | **Resource Room/Combined Program (Outside general education class for at least 21% but no more than 60% of school day)** This setting will provide W▇▇ with more one on one assistance for working on behavior management skills. |
| ○ | ○ | **Separate Class (Outside the general education class for more than 60% of the school day)** |
| ○ | ○ | **Homebound Placement (Student receives greater than 50% of instruction homebound)** |
| ○ | ○ | **Hospital Placement (Student receives greater than 50% of instruction in hospital)** |
| ○ | ○ | **Public Separate Day School (Includes students who spend greater than 50% of the school day in a separate private facility as a day student)** |
| ○ | ○ | **Private Separate Day School (Includes students who spend greater than 50% of the school day in a separate private facility as a day student)** |
| ○ | ○ | **Public Residential Facility (Placement as a residential student)** |
| ○ | ○ | **Private Residential Facility or Center (Placement as a residential student)** |

47

## IEP Signature Page

**IEP Meeting Date: 04/01/2004**

**2004-2005**                          **ID: 000401205**          **Grade: 02**

**Name:** W_____ R_____ II

---

PROPOSED PLACEMENT    *Resource Room*

---

As a result of the development of this student's Individualized Education Program, the MDT has recommended the following educational placement, which is reasonably calculated to meet the student's special education needs in the least restrictive environment.

Placement:

School (enter the projected school here and on the School tab of the Student Information section):

*Longfields Elementary*

---

IEP APPROVAL

---

My signature on this form indicates that I have reviewed the assessments and had an opportunity to participate in the development of the IEP. I understand that I may request mediation and/or a due process hearing concerning the identification, evaluation, or educational placement of this student, or the provision of a free, appropriate public education, by sending a written request to the Department of Special Education, Board of Education of Prince George's County, 14201 School Lane, Upper Marlboro, MD 20772.

X Please check A or B below.
_____ A. My signature on this form indicates that I consent to this IEP and placement and that the IEP may be implemented as described.

_____ B. My signature on this form indicates that the IEP may be implemented as described pending a conference on _____ to further discuss _____

X Please check the following:
_____ I have received/reviewed the Procedural Safeguards: Parental Rights.
_____ I have received a copy of the Maryland Graduation Requirements.
_____ I have received a copy of the IEP.

I understand that granting initial consent for IEP implementation is voluntary and may be revoked at any time. I also understand if I revoke consent, Prince George's County Public Schools may initiate a due process hearing to obtain consent.

If the student is eligible for Medical Assistance, please complete:

_____ I agree to IEP coordination and that _____ may be appointed as the IEP Coordinator.

_____ I give permission to PGCPS to recover cost from Medicaid for service coordination, as well as health-related services, related to the implementation of my child's IEP goals. I understand that this service does not restrict or otherwise affect my child's eligibility for other Medical Assistance benefits. I also understand that my child may not receive a similar type of case management service under Medical Assistance if he/she qualifies for more than one type.

48

# Multidisciplinary Team Meeting Summary Notice

**Meeting Date:** 04/01/2004          **Notice Date:** 04/01/2004          **Initiation Date:**

| | |
|---|---|
| **Time Meeting Started:** 10:50 AM | **Time Meeting Ended:** 11:20 AM |

| | | |
|---|---|---|
| **Student's Name:** W█████ R████████ II | **ID:** 000401205 | **Grade:** 02 |
| **School:** LONGFIELDS ELEMENTARY | **Age:** 7 | **D.O.B.:** █████1996 |

**Reason For Meeting:**

to review existing/additional information and to revise W███████ IEP.

**Actions Proposed, with Explanations of Why Proposed**

In the meeting Mrs. Janowsky stated that she is seeing some progress with W█████. W█████ is beginning to tell his teachers about situations before he reacts in a negative manner. Mom stated that Friday will be the last day for W█████ and his sister. They will be attending a school in Washington, DC. Throughout the meeting, mom expressed concerns about W█████ placement, his work load, and transportation for his new school. From this meeting, it was determined that W█████ continues to have a disability and remains in need of special education. As a result, W█████ will continue in the current program. In terms of his placement, it was decided that W█████ will will begin to receive resource services for his behavior. However, W█████ placement should be reviewed at the end of the year to see how he is progressing and determine if he should be placed in a more restrictive environment. In regards to W█████ transportation to school in D.C., it has been determined that W█████ will definitely need bus services because of his disability and his tendency to be very unfocused and act impulsively. In addition, a evaluation was requested and ~~will be conducted be for the end of~~ this 2003-2004 school year.

**Actions Refused, with Explanations of Why Refused**

**Other Options Considered and Reasons Rejected**

**Basis for Determination**

The basis for the proposed action(s) considered by the team includes evaluation information, including assessments, records and other relevant information related to the area of behavior/social/emotional and classroom observations.

**Other Relevant Information**

The multidisciplinary team (MDT) is not aware of any other factors than those previously addressed.

**Procedural Safeguards**

You were provided a copy of the "Graduation Requirements" document at the meeting and any questions you had were addressed. If you have further questions, please contact the MDT Chairperson.
You were provided a copy of the "Procedural Safeguards: Parental Rights" document at the meeting and any questions you had were addressed. If you desire to seek assistance on filing a complaint, refer to the section on resolving disagreements. You were also asked to sign a receipt for our records. If you have further questions, please contact the MDT Chairperson.

**Contacts for Assistance**

If you desire additional sources of assistance, you may contact the Prince George's County Special Education Parent Center at 301-925-2811, or The Parents Place of Maryland, Inc at 1-410-859-5300.

If you have any questions regarding this meeting or the student's program or, if you wish to schedule another meeting, please call the MDT Chairperson.

49

# Multidisciplinary Team Meeting Summary Notice
## Part 2

Meeting Date: 04/01/2004          Notice Date: 04/01/2004          Initiation Date:

| Name: William Richardson II | ID: 000401205 | Grade: 02 |
| --- | --- | --- |

| Team Members | |
| --- | --- |
| Name | Title |
| Y. Crawford | Principal |
| William & Wanda Richardson Sr. | Parent |
| S. Janowsky | Teacher |
| Renee Reynolds | Special Educator |
| C. Hannon | Teacher |
| A. Taylor | Counselor |

50

# Progress/Transportation/ESY

**IEP Meeting Date:** 04/01/2004

**2004-2005**

| Name: W████ R████████ II | ID: 000401205 | Grade: 02 |
|---|---|---|

## Progress Reported to Parents

Parents will be informed of the progress in meeting the goals of the IEP on the same timelines as students without disabilities.

**How often will the student's progress be reported:**  Quarterly

**Method by which the progress will be reported:**  Writing

## Transportation

◯ None   ◯ Regular   ◉ Special   (If Special, fill out Transportation Form in Supplemental)

**Comments:**
W████ will need special education transportation due to his disability.

## ESY

Consider the following factors and document if any of these factors will prevent the student from receiving some benefit from the student's educational program during the regular school year, if the student does not receive extended school year services.

◯ Yes   ◉ No   Does the student's IEP include annual goals related to critical life skills?

◯ Yes   ◉ No   Is there a likelihood of substantial regression of critical life skills caused by the normal school break and a failure to recover those lost skills in a reasonable time?

◯ Yes   ◉ No   Is the student's degree of progress toward mastery of IEP goals related to critical life skills?

◯ Yes   ◉ No   Is there a presence of emerging skills or breakthrough opportunities?

◯ Yes   ◉ No   Are there interfering behaviors?

◯ Yes   ◉ No   Will the nature and severity of the disability prevent the student from receiving benefit from the educational program if the student does not receive extended school year services?

◯ Yes   ◉ No   Are there special circumstances to be considered?

If the answer to any question above is yes, document the considerations below:

**Are Extended School Year services needed for this student?**

◯ Yes   ◉ No   ◯ To be determined by

51

WR-03

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
DIVISION OF SPECIAL EDUCATION
WASHINGTON, D.C.

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**STUDENT EVALUATION PLAN**
**(SEP)**

MDT
SEP

MEETING DATE: 12/14/05

MDT REFERRAL DATE: 12/14/05

STUDENT: William D. Ri_____ II            DOB: ___96    AGE: 9    GRADE: 4    SCHOOL: Assumption

STUDENT IDENTIFICATION NUMBER: _____    TEACHER / HOMEROOM: Ms. White

ADDRESS: 4324 3rd St SE Apt 302    WDC 20032

Street #    Street Name,    Quadrant,    Apartment #    City,    State,    Zip Code

PARENT(S)/GUARDIAN: Wanda Richardson    TELEPHONE (H): 202-561-0574    (W): 202-316-4207

**Summarize Area(s) of Concern:**

According to parent discussion & student referral (_____) is below average in all subject areas and is struggling academically & emotionally.

**Team Recommendation:**

The Student Evaluation Plan Recommended for (_____) to go as follows:

☒ Review Psycho-Educational          ☒ Educational
☒ Social History                    ☒ Observation
☒ OT Evaluation                     ☒ Clinical

**EVALUATION(S) IN AREA(S) OF LEARNING CONCERN(S)**

| ASSESSMENT | ASSESSOR | TEST INSTRUMENT | TIMELINE ASSIGNED | DUE DATE |
|---|---|---|---|---|
| ☒ Psychological | Review (TBD) | | | |
| ☐ Speech/Language | | | | |
| ☒ Social History | TBD | | | |
| ☐ Audiological | | | | |
| ☐ Vision Screening | | | | |
| ☐ Medical | | | | |
| ☒ Educational | TBD | | | |
| ☐ Hearing Screening | | | | |
| ☒ Other | Other: Clinical | Other: observation | | |

| TEAM MEMBERS: | NAME | POSITION | TEAM MEMBERS: | NAME | POSITION |
|---|---|---|---|---|---|
| | _____ | Mother | | | |
| | Nicole Hall | Liaison Private Religious Program | | | |
| | Natalie Houston | Assessment Coordinator | | | |

The MDT meeting to discuss the evaluation results is scheduled on _____ at _____ in room _____

**Place completed form in MDT folder.**
DISTRICT OF COLUMBIA PUBLIC SCHOOLS    07-02-2001    DIVISION OF SPECIAL EDUCATION    MDT - SEP    APPENDIX - A

52

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
DIVISION OF SPECIAL EDUCATION
WASHINGTON, D.C.

**MULTIDISCIPLINARY TEAM**
**(MDT)**
**STUDENT EVALUATION PLAN**
**(SEP)**

MDT REFERRAL DATE: 12/14/05

MEETING DATE: 12/14/05

STUDENT: W____ D. R_____ II        DOB: ____96    AGE: 9    GRADE: 4    SCHOOL: Assumption

STUDENT IDENTIFICATION NUMBER: _____    TEACHER / HOMEROOM: Ms. White

ADDRESS: 4321 3rd St. SE Apt 302    WDC 20032

Street #    Street Name,    Quadrant    Apartment #    City,    State,    Zip Code

PARENT(S)/GUARDIAN: Wanda Richardson        TELEPHONE (H): 202-561-0574    (W): 202-316-4207

**Summarize Area(s) of Concern:**

According to Parent discussion & Student referral W____ is below average in all subject areas and is struggling academically & emotionally.

**Team Recommendation:**

The Student Evaluation Plan Recommended for W____ is as follows:

☒ Review Psycho-Educational    ☒ Educational
☒ Social History                ☒ Observation
☒ OT Evaluation                 ☒ Clinical

**EVALUATION(S) IN AREA(S) OF LEARNING CONCERN(S)**

| ASSESSMENT | ASSESSOR | TEST INSTRUMENT | TIMELINE ASSIGNED | DUE DATE |
|---|---|---|---|---|
| ☒ Psychological | Review (TBD) | | | |
| ☐ Speech/Language | | | | |
| ☒ Social History | TBD | | | |
| ☐ Audiological | | | | |
| ☐ Vision Screening | | | | |
| ☐ Medical | | | | |
| ☒ Educational | TBD | | | |
| ☐ Hearing Screening | | | | |
| ☒ Other | Other: Clinical | Other: Observation | | |

| TEAM MEMBERS: | NAME | POSITION | TEAM MEMBERS: | NAME | POSITION |
|---|---|---|---|---|---|
| | | Mother | | | |
| | Hoyle Hall | Liaison Private Religious Program | | | |
| | Natalie Houston | Assessment Coordinator | | | |

The MDT meeting to discuss the evaluation results is scheduled on _____ at _____ in room _____

Place completed form in MDT folder.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS        07-02-2001    DIVISION OF SPECIAL EDUCATION    MDT - SEP    APPENDIX - A

53

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

| MDT |

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MDT REFERRAL DATE: 12/14/05

STUDENT: W_____ D. R_____ II          SCHOOL: Assumption          DATE: 12/14/05

PARTICIPANTS: (Print Name)          PARTICIPANTS: (Sign Name)          POSITION

| Gayle A. Hall | _Gayle Hall_ | Liaison Private-Religious |
| Natalia Houston | _Natalie Houston_ | Assessment Coordinator |
| Wanda M. Richardson | | Mother |

**PURPOSE:**

✓ To discuss concerns, strengths and weakness that may impact on the educational/academic growth of the student
  Develop a Student Evaluation Plan (SEP) to order assessments if warranted
✓ Develop a Student Evaluation Plan SEP) to review current assesments
The Student Evaluation Plan is developed to confirm or rule out a suspected or confirm disability

**Parent/s Report:**

W_____ is really struggling in school which impacts on his self esteem. Auditory processing is a problem. He has difficulty following simple directions, organizing his work, + sequencing his thoughts. W_____ is in the 4th grade he dued not start printing until the 3rd grade. He writes like a 1st grader. Reading appears to be on the first grade level. School Refusal speaks to W_____ areas of weakness being in all subject areas w/ the exception of math, He presents w/ a low self esteem, low attention span, mood swings and anger is often exhibited w/ temper tantrums.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

Pg 2

MDT

MDT REFERRAL DATE: _____

STUDENT: W_____ R_____     SCHOOL: Assumption     DATE: 12/14/05

PARTICIPANTS: (Print Name)     PARTICIPANTS: (Sign Name)     POSITION

Additional info. * The father is incarcerated.
W_____ plucks his ear until it bleeds, Wanders off,
and bangs on the table often.
Currently his sister attends Episcopal for ED
Students. She also has schizophrenia.
W_____ is seeing a outside therapist at
Washington Assessment & Therapy Services (WATS)
2x a week.
He was taken 27mg Concerta & 50mg of
Zoloft, and Clonidin at night to sleep 0.1mg)
He use to take Adderall but he had side-
effects.
W_____ was diagnosed w/ a disability since the
age of 3 yrs old.
*W_____ father's family has a very strong
history of mental illness;

WR-04

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## SPECIAL EDUCATION BRANCH
## SOCIAL WORK EVALUATION REPORT

Student Name: Wi███ Ri█████                    DOB:███96    Age: 8
Social Security: ████████                       Student ID: 9119990
Parent/Guardian: Wanda Richardson

Address:                          Apt:              City:
2008 -A 38th St. SE                                 Washington
State: DC    Zip: 20020
Home Phone: 202-582-8618    Work Phone:            Emerg: 301-736-6607

School: Anne Beers E.S.              Grade:2    Teacher: Ms. O'Brien

Referral Source: School              Primary Language: English

Date of Interview: 7/13/04    Social Worker: Vanessa Countee

Person(s) Interviewed:
Wanda Richardson

Relationship to Student: Mother

Reason for Referral:

The Mother requested testing. Wi███ was last evaluated at age 4 and diagnosed in the Prince George's schools as emotionally disturbed.

Reports Reviewed:
None

Services Currently Being Received From Community Agencies:
Social Work Services:                Service Provider:

| | Phone: |
|---|---|
| Where: | Service Provider: |
| Psychological Services: | Christopher L. Bazemore |
| 1x wk group and 1x week indiv | Phone: 301-577-8152 |
| Where: 5900 Princess Garden Pkwy Ste 300 Lanham, MD | Service Provider: |
| Speech and Language Services: | |
| | Phone: |
| Where: | Service Provider: |
| Legal Services: | |
| | Phone: |
| Where: | Service Provider: |
| Other Services: | Dr. Vincent Tomasino |
| 1x month for medication | Phone: 301-577-8152 |
| Where: 5900 Princess Garden Pkwy Ste 300 Lanham, MD | |

56

1

# I. FAMILY DATA

Household Composition

| Name | Age | Relationship | Education | Occupation |
|------|-----|-------------|-----------|------------|
| Wanda Richardson | 39 | Mother | 12th some college | Unemployed Disability |
| William Richardson, Sr. | 35 | Father | 10th | Shipping and Receiving |
| Jielle Richardson | 12 | Sister | 7th | Assumption Catholic Sch |
| Jasmine Richardson | 9 | Sister | Non-Graded | Episcopal Child. Cente |
| | | | | |
| | | | | |

Family Members/Significant Others not in Household-Phone, # if available

| Name | Age | Relationship | Phone | Occupation |
|------|-----|-------------|-------|------------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Is your family or child currently involved with any community programs or legal system?**
Yes: ☒        No: ☐

Explain:

The family attends therapy sessions at Washington Assessment and Therapy Services.

57

**Family Relationships and Living Situations:**

According to the Mother the family relationships and living situations are fine. She stated that everyone gets along fine.

**Has child experienced any traumatic events, such as the death of a close relative, divorce, family crisis, or relocation?**
Yes: ☒          No: ☐

If yes, explain below:

Last year the family was homeless when W█████ father was incarcerated. The family rented a unit temporarily, and they lived with the Grandparent's. Mother believes W█████ was very angry during this time and he would tell her, "I can't wait until Daddy comes back home". According to the Mother W█████ shows anger toward his sisters but he does not "have any anger toward her". Mom stated that W█████ father used PCP and he abuses alcohol. W█████ has witnessed his father "being high" so often that he asks her, "Is Daddy going to die". Mom says that impact is balanced by Father urging the kids never to drink or use drugs.

## II. DEVELOPMENTAL AND MEDICAL HISTORY

**Did the mother experience any health problems/complications during the pregnancy?**
Yes: ☒          No: ☐

If yes, explain below:

Mother developed gestational diabetes and therefore W█████ was a very large baby. Consequently Mother had to have a C-section.

**Was there any substance/alcohol abuse?**
Yes: ☐          No: ☒

If yes, explain below:

58

Birth Weight: 13 lbs 12 ozs          Age of mother at birth: 33

**Did any of the following occur during the birth process?** ☒ Yes ☐ No
☐ Premature        ☐ Transfusion        ☒ Caesarean Section
☐ Breech Birth     ☐ Prolonged Labor    ☐ Oxygen Problem
☐ Fetal Distress   ☐ Blood Incompatibility (RH factor)

**Other birth problems and/or concerns:**

## MEDICAL HISTORY  (Cont.)

**List completion of developmental milestones with reference to age:**

W██████ walked and talked pretty early.  According to the Mother, he was pretty fast achieving all developmental milestones.

**Expand on any that are not within normal limits.**

**Please check below any illnesses or problems the child has had and age of onset.**
☐ Physical Disability      ☐ Frequent Colds      ☒ Allergies
☐ Speech Problems          ☐ Eye Problems        ☐ Ear Problems
☐ Frequent Sore Throats    ☐ Asthma              ☐ Dietary Problems
☐ Headaches                ☐ Seizures            ☐ Epilepsy
☐ Heart Disease            ☐ Diabetes            ☐ Bed-wetting
☐ Serious Accidents        ☐ Temperature         ☐ Lead Poison
   or Injuries                above 104
☐ Operations:
☒ Other:

**Describe any of the problems checked above:**

According to the Mother W██████ has excema really bad and he has to use a cream to control it.  Also, W██████ grew too fast so his bones ache and he would limp, causing him to fall.  Further, he is not as mature as his body would suggest.

59

## MEDICAL HISTORY (Cont.)

**How would you rate the child's general health?**
☒ Excellent ☐ Good ☐ Fair ☐ Poor

**Date of last physical?** 5/1/04   **By Whom?** Children's Hospital

**Where?** DC
**Vision:** X
**Hearing:** X

**Has the child ever been hospitalized?** ☐ Yes ☒ No   **How long?**
**Age at the time:**
**Reason(s):**

**Is the child in treatment and/or receiving medication at present?** ☒ Yes ☐ No
**Describe:**

According to Mother W▮▮▮▮ takes Abilify(5mg/day)for his schizophrenia;Buprorion SR(100 mg/day)for his depression;Benztropine(.5mg/day)for his side effects of the Abilify;and Concerta(54mg/day)for his ADHD and other behavioral problems.

**Date of next appointment:**                    **Name of Physician:** <u>Dr.Vincent Tomasino</u>
**Psychiatric History?** ☒ Yes ☐ No
**If yes, describe below:**

According to his Mother W▮▮▮▮ has been disgnosed as suffering from oppositional Defiant Disorder(ODD),Bipolar Disorder,Depression,and he is showing signs of schizophrenia.

60

# III. SIGNIFICANT SOCIAL PERSONAL FUNCTIONING

**Self Help Skills:**
According to the Mother, Willi■■ can groom and dress himself but his parents have to stay on him. Additionally, he will got into the bathroom with his clothes, but they will not hear any running water. He has to leave the bathroom door open.

**Independent Travel:**
According to the Mother, W■■■■ cannot travel independently because he will wander off. When he is supposed to be at recess in school he will just leave. He needs adult supervision at all times.

**Household Chores/Responsibility:**
W■■■■is pretty good with his household chores. He can clean his own room according to Mother.

**Study Habits:**
According to the Mother, W■■■■ study habits are okay if he is working on something that he likes. With other things he is easily distracted and he becomes discouraged very easily and will shut down.

**Vocational Interest Expressed / Jobs Held:**
W■■■■ wants to work in an office and have his own business. He has expressed an interest in basketball, as well.

**Student Interest and Leisure Activities:**
According to the Mother, W■■■■plays football, basketball, soccer, swims, and he loves to go to church.

61

## IV. SOCIAL / BEHAVIORAL CHARACTERISTICS

☒ Consistent short attention span

☒ Difficulty with organization

☒ Difficulty understanding questions or directions

☐ Difficulty using numbers

☐ Difficulty telling time

☐ Gets ideas quickly

☒ Avoids homework

☒ Enjoys being read to

☒ Avoids reading

☐ Enjoys reading

☒ Outgoing

☐ Self-confident

☐ Strong-willed

☒ Excessive inconsistency in behavior

☒ Unusually shy and withdrawn

☒ Musical

☐ Alcohol usage

☒ Frequent / Sudden changes in mood

☒ Temper tantrums

☒ Unreasonable Fears

☒ Poor self control

☒ Unusually aggressive toward others

☒ Unusually demanding

☒ Lack of motivation

☒ Frequently tells lies

☒ Needs constant approval or assurance

☐ Cooperative

☒ Uncooperative

☒ Over-active

☐ Under-active

☒ Bites Nails

☐ Thumb sucking

☐ Inappropriate sexual concerns

☐ Drug abuse

☒ Rocking

☒ Head Banging

☐ Day dreaming

☒ Likes to be in control

☐ Sleepwalking

☐ Nightmares

☒ Gets along with peers

☐ Prefers to play alone

☒ Difficulty making or keeping friends

☒ Difficulty completing jobs and activities

☒ Difficulty with change in routine

☒ Excessive watching of television/video games

☒ Creative

☒ Athletic

☐ Artistic

☐ Self injurious

62

7

## SOCIAL / BEHAVIORAL CHARACTERISTICS (Cont.)

**Comment on any of these behaviors that are of concern to you:**

The Mother and school are concerned about W███████ behavior. According to the Mother W███████ hits his teachers in the back, he chokes them and kicks them. He is very disrespectful of his female teachers and a male teacher has to come into the classroom to calm him down. The Mother hopes that W███ will get himself under control before he reaches his teenage years. She believes that if he receives the proper treatment for his mental health problems and appropriate services at school he will be able to turn things around. According to the Mother both she and W███████ father suffer from depression and bipolar disorder so W███████ mental health problems are hereditary.

## V. SCHOOL HISTORY

**Schools Attended / Grades:**

W██████ attended Ft. Foote Elementary School in Prince George's County for Headstart; Thomas Pullen Performing Arts School for Kindergarten; Valley View Elementary for 1st grade; Long Fields Elementary for two months in 2nd grade, and Ann Beers for 2nd grade.

**Grade Retention / Attendance Concerns:**

No.

**School Related Services Received:**

None

63

## SCHOOL HISTORY (Cont.)

**School Adjustment (Include Onset of Problems):**
According to the Mother, when W██████ was in the Prince George's County schools she stayed at the schools a lot so W██████ would know she was near by to help him control his behavior. She did this so the teachers would be able to teach.

### Does your child enjoy school?
W██████ often does not like school according to the Mother. He is very self conscious and shuts down. He is teased and accused of things at school, and the teachers do not like to help him maintain some self control. He often comes home and is very sad. He asks her, "Do I have to go back to school"?

### Do you feel that your child is making progress?
Mother feels that this school year has been a disaster. W██████ behavior plays a big part in his academic progess the Mother noted. W██████ writing skills are beginning to get a little better, but his reading is going down.

### What does your child do well?
W██████ is very good in math according to his Mother. He is very athletic and he makes friends easily. W██████ also has a nice singing voice.

### How do you think the school can help your child?
The Mother believes W██████ requires a lot more one on one assistance as well as a dedicated Aide at school.

**Has your child had any evaluation that the school may be unaware of?** ☐ Yes  ☒ No

☐ Educational  ☐ Psychological  ☐ Medical  ☐ Other  ☐ Speech  ☐ OT / PT

**When:** **Where:**

64

9

## VII. PSYCHOSOCIAL ANALYSIS AND EDUCATIONAL IMPLICATIONS

W████ is an eight year old child who, according to his Mother, is big for his age and maturity level. He lives with his Mother, Father and two older sisters. W████ has been diagnosed with multiple mental health problems (both his parents suffer from depression and bipolar disease), and he is taking a variety of medications on a daily basis (Abilify (5 mg/day) for his schizophreniz; Bupropion SR (100 mg/day) for his depression; Benztropine (.5mg/day) for the side affects of the Abilify; and Concerta (54mg/day) for his ADHD and other behavioral problems). Additionally, he appears to have some behavioral problems, specifically at school, and he has a particular hostility toward females including his sisters. According to the Mother W████ actually kicks and hits his female teachers. W████ will just wander off and he walks away during recess at school. He needs constant adult supervision according to his Mother. It also appears that W████ is teased and taunted at school, at which time he just shuts down. According to the Mother W████ receives no services in school.

W████ has suffered a variety of traumatic events including homelessness, the incarceration of his father, and repeatedly witnessing his father abuse alcohol. W████ appears to be very concerned about his father and he fears that his father may die of alcohol abuse. W████ Mother noted that despite everything he is very athletic and plays multiple sports. He enjoys going to church and he makes friends easily. His Mother stated he has a good singing voice and math is his best subject in school.

_Vanessa Counter_                            7-13-04

**Signature of Social Worker**                **Date**

65

10

WR-05

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## DIVISION OF SPECIAL EDUCATION

## PSYCHOEDUCATIONAL EVALUATION REPORT

NAME: W███ R███████          REPORT DATE: 08/20/04
AGE: 8 years, 2 months        EXAMINER: Anthony White, M.S.
DATE OF BIRTH: ███/96         TITLE: DCPS School Psychologist
GENDER: Male
GRADE: 3rd
SCHOOL: Ann Beers Elementary School

### REASON FOR REFERRAL/BACKGROUND INFORMATION:

W███ R███████ is a 8-year-old male who was referred to this examiner to determine his
present level of cognitive and academic functioning. W███ is currently in the process of being
assessed as part of re-evaluation to determine the appropriate placement. A review of his
school records indicates that W███ was classified as "Emotional Disturbed" while he attended
school in Maryland. However, his services were not implemented because he was leaving the
school district. According to his teachers at Beers ES, W███ is performing within the average
range academically but his limited social-emotional skills impact his educational development. It
has been reported that W███ has mood swings which endangers both him and his classmates.
His mother, Mrs. Wanda Richardson states W███ is currently taking several medications to
address his emotional deficits.

### PRIOR ASSESSMENTS:

A review of his records indicated that W███ was evaluated on 12/14/99 at Washington
Assessment and Therapy Services by Stephen Thornton, Ph.D., a clinical psychologist. Dr.
Thornton found that W███ general cognitive abilities were in the average range (FSIQ = 92)
as measured by the Weschsler Preschool and Primary Scale of Intelligence - Revised. W███
also displayed average academic skills in the areas of reading and reading. Dr. Thornton
reported that W███ that suffered from Attention Deficit-Hyperactivity Disorder and
Oppositional Defiant Disorder. The diagnosis of Bipolar Disorder was deferred at that time but
the examiner suggested that may also be accurate given W███ family history.

## CLINICAL OBSERVATION AND TEST BEHAVIOR:

W█████ was seen for testing by this examiner on 8/9/04.   W████ was cooperative but quiet throughout the assessment.  Rapport was easily established and maintained throughout the test session. He did listen carefully to directions and displayed a confident problem-solving style even when the items became more difficult. W████ demonstrated appropriate attention, concentration, and tolerance when faced with frustration.  He appeared interested in the various test items and was eager to attempt new tasks.  W████ was especially excited to complete math operations. The following test results appear to be an accurate reflection of W████ cognitive and academic functioning.

## TEST ADMINISTERED:

1. Wechsler Intelligence Scale for Children-Third Edition (WISC-III)
2. Woodcock-Johnson III Tests of Achievement (W-J III)
3. Beery Visual-Motor Integration Test (VMI)
    Standard Score = 92;  Age Equivalent =7 years, 0 months
4. Clinical Observation and Test Behavior
5. Record Review

## ANALYSIS OF TEST RESULTS
### Cognitive Functioning:

W█████ unique set of thinking and reasoning abilities make his overall intellectual functioning difficult to summarize by a single score on the Wechsler Intelligence Scale for Children--Third Edition.  His verbal reasoning abilities are much better developed than his nonverbal reasoning abilities.  Making sense of complex verbal information and using verbal abilities to solve novel problems are a strength for W████.  Processing complex visual information by forming spatial images of part-whole relationships and/or by manipulating the parts to solve novel problems without using words is a weakness.  His verbal reasoning abilities are in the average range and above those of approximately 66% of his peers (VIQ = 106; 90% confidence interval = 100 - 111).  His nonverbal reasoning abilities are in the borderline range and better than those of approximately 8% of his peers (PIQ = 79; 90% confidence interval = 74 - 88).

W█████ performance was significantly better on the Coding subtest than his own mean score for all nonverbal reasoning tasks.  The Coding subtest required W████ to use a key to associate a series of symbols with a series of shapes and to use a pencil to draw the symbols next to the shapes.  A direct test of speed and accuracy, the Coding subtest assesses ability in quickly and correctly scanning and sequencing simple visual information.  Performance on this subtest also may be influenced by short-term visual memory, attention, or visual-motor coordination (Coding scaled score = 10).

67

W▓▓▓achieved his best performance among the verbal reasoning tasks on the Comprehension and Similarities subtests and lowest score on the Arithmetic subtest. His performance across these areas differs significantly and suggests that these are the areas of most pronounced strength and weakness, respectively, in W▓▓▓▓ profile of verbal reasoning abilities. Much better than the performance of most of his age-mates, W▓▓▓▓ performance demonstrated strong abilities on the Comprehension and Similarities subtests.

The Comprehension subtest required W▓▓▓a to provide oral solutions to everyday problems and to explain the underlying reasons for certain social rules or concepts. This subtest provides a general measure of verbal reasoning. In particular, this subtest assesses his comprehension of social situations and social judgment as well as his knowledge of conventional standards of social behavior (Comprehension scaled score = 13). On the Similarities subtest W▓▓▓ was required to respond orally to a series of word pairs by explaining how the words of each pair are alike. This subtest examines his ability to abstract meaningful concepts and relationships from verbally presented material (Similarities scaled score = 13).

W▓▓▓ was required to mentally solve a series of orally presented problems on the Arithmetic subtest. A direct measure of his numerical reasoning abilities, the subtest requires attention, concentration, short-term memory, and mental control (Arithmetic scaled score = 9).

### Academic Functioning:

On 8/9/04, W▓▓▓ completed the Woodcock-Johnson III Tests of Achievement (W-J III) which assesses his current level of functioning in specific academic areas. W▓▓▓▓ overall academic skills are estimated to be in the low average range with a grade equivalent of 2.1.

### Reading

W▓▓▓ performed in the low average range in overall reading skills, as indicated by his standard score in Broad Reading (89). His skills in this area exceed those of only approximately 23% of students his age. W▓▓▓ performed comparably on tasks that required him to correctly read a series of printed words (Letter-Word Identification standard score = 89) and to read sentences and answer questions about what was read (Passage Comprehension standard score = 91).

### Mathematics

In overall mathematics skills W▓▓▓ performed in the average range, as indicated by his Broad Math standard score (102). His achievement in this area is better than approximately 55% of students his age. W▓▓▓ performance on tasks that required him to understand number and

68

consumer math concepts, geometric measurement, and simple one-step word problems (Applied Problems standard score = 110) was better than his performance on tasks that required him to add and subtract numbers up to three digits and to multiply and divide two-digit numbers (Calculation standard score = 99). W███ demonstrated the ability to add, subtract, and multiply one-digit numbers. W███ was unable to successfully complete operations that involved regrouping or required basic division.

## Writing

In overall writing skills, W████ appears to be in the low average range, as indicated by his scores on the Spelling and Writing Fluency subtests. W████ adequately poorly developed writing skills on the Writing Fluency subtest where he attained a standard score of 95. On tasks that required him to correctly spell verbally presented words, W████ achieved a standard score of 86 on the Spelling subtest.

## Perceptual-Motor Functioning:

On the VMI, a visual-motor perception/integration test requiring the copying of geometric designs, W████ performed approximately 12 months below his chronological age. He attained a standard score of 92 and an age equivalent of 7-0 years-old. His perceptual motor skills appear to be adequate for his age level.

## Summary:

W███ is an 8-year-old child who completed a psychoeducational evaluation. His overall cognitive ability, as evaluated by the WISC-III, cannot easily be summarized because his verbal reasoning abilities are much better developed than his nonverbal reasoning abilities. W██████ reasoning abilities on verbal tasks are generally average (VIQ = 106), while his nonverbal reasoning abilities are significantly lower and in the borderline range (PIQ = 79). When compared to others at his age level, W████ academic skills are within the low average range. His fluency with academic tasks is average. W████ performance is average in mathematics and math calculation skills, and low average in reading. Based on the current test data, W████ does not meet the criteria for special education services as a learning disabled student. At this time his academic skills are commensurate with his cognitive abilities. But in light of W██████ history of disruptive behaviors, a clinical psychological evaluation should be conducted to determine if his social-emotional functioning is having a negative impact on his achievement.

**Recommendations:**

1.  W▮▮▮▮should read aloud daily on a regular basis at a specific time.  Materials read should be at a level that he can understand but that also challenge him.

2.  W▮▮▮▮s parents should be involved in a home-based plan to complement the reading program at school.

3.  Reading should be combined with other sensory experiences such as writing.  For example, W▮▮▮ can read stories that he has written.

4.  W▮▮▮▮s parents and teachers can assist in building W▮▮▮▮s vocabulary by asking him to read magazines or comic books in which he is interested and to list words he is unable to define.

5.  W▮▮▮▮should practice weekly spelling and sight-vocabulary words with different modalities.  A computer or even plastic magnetic letters could be used to provide motivation.

6.  W▮▮▮ should receive psycho-social counseling to address his negative classroom behaviors.

_Anthony White_

**Anthony White, M.S.**
**DCPS School Psychologist**

**Wechsler Intelligence Scale for Children-Third Edition (WISC-III):**

| VERBAL SUBTESTS | RAW SCORE | SCALED SCORE | PR |
|---|---|---|---|
| Information (IN) | 10 | 10 | 50 |
| Similarities (SM) | 14 | 13 | 84 |
| Arithmetic (AR) | 13 | 9 | 37 |
| Vocabulary (VO) | 19 | 10 | 50 |
| Comprehension (CO) | 18 | 13 | 84 |

| PERFORMANCE SUBTESTS | RAW SCORE | SCALED SCORE | PR |
|---|---|---|---|
| Picture Completion (PC) | 11 | 7 | 16 |
| Coding (CD) | 30 | 10 | 50 |
| Picture Arrangement (PA) | 12 | 7 | 16 |
| Block Design (BD) | 11 | 6 | 9 |
| Object Assembly (OA) | 7 | 3 | 1 |

IQ SCORES SUMMARY

| SCALE | IQ | 90% CONFIDENCE INTERVAL | PR | CLASSIFICATION OF INTELLECTUAL FUNCTIONING |
|---|---|---|---|---|
| Verbal | 106 | 100-111 | 66 | Average |
| Performance | 79 | 74-88 | 8 | Borderline |
| Full Scale | 92 | 88-97 | 30 | Average |

Difference Between VIQ and PIQ = 27 (p < .05, Freq =3.1%)

71

### Woodcock-Johnson III Tests of Achievement:

| CLUSTER/Test | RAW | AE | EASY to DIFF | | RPI | PR | SS(90% BAND) | GE |
|---|---|---|---|---|---|---|---|---|
| BROAD READING | – | 7-6 | 7-2 | 7-10 | 58/90 | 23 | 89 (86-92) | 2.2 |
| BROAD MATH | – | 8-4 | 7-6 | 9-3 | 91/90 | 55 | 102 (95-109) | 2.8 |
| MATH CALC SKILLS | – | 7-10 | 7-0 | 8-10 | 86/90 | 38 | 96 (89-102) | 2.4 |
| ACADEMIC SKILLS | – | 7-6 | 7-3 | 7-10 | 56/90 | 24 | 89 (86-93) | 2.1 |
| ACADEMIC FLUENCY | – | 7-8 | 6-11 | 8-6 | 82/90 | 31 | 93 (88-97) | 2.4 |

Form A of the following achievement tests was administered:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Letter-Word Identification | 33 | 7-6 | 7-3 | 7-8 | 30/90 | 22 | 89 (85-93) | 2.2 |
| Reading Fluency | 21 | 7-9 | 7-4 | 8-3 | 79/90 | 36 | 95 (90-99) | 2.4 |
| Calculation | 11 | 8-1 | 7-6 | 8-9 | 88/90 | 46 | 99 (91-107) | 2.6 |
| Math Fluency | 22 | 7-1 | 5-2 | 9-0 | 83/90 | 14 | 84 (77-91) | 1.7 |
| Spelling | 20 | 7-4 | 7-0 | 7-8 | 40/90 | 18 | 86 (80-92) | 1.7 |
| Writing Fluency | 8 | 7-9 | 6-10 | 8-8 | 84/90 | 37 | 95 (86-105) | 2.5 |
| Passage Comprehension | 19 | 7-4 | 7-0 | 7-10 | 61/90 | 27 | 91 (86-96) | 2.0 |
| Applied Problems | 30 | 9-0 | 8-4 | 9-10 | 97/90 | 75 | 110 (101-120) | 3.5 |

72

WB-06

# Resume

Arvette D. Page
6204 Gothic Lane
Bowie, MD 20720
(202) 491-3451
(301) 464-0676
adpage@verizonmail.com

Objective: To obtain a challenging position in an organization where I can grow as an employee and utilize my skills and work experience.

## JOB EXPERIENCE

**October 2004 to Present** — **Special Education Coordinator,** (Rock Creek Academy), Washington, DC: Works collaboratively with DCPS, Attorneys, Educational Advocates, teachers and clinical staff by coordinating and facilitating meetings to assess student's performance, both educationally and socially according to their Individual Education Plan (IEP) for grades K-12. Assist in maintaining accurate and confidential records of all students, as well as use data to articulate the results of performance base assessment to determine educational appropriateness in the classroom setting. Provides information, support, and communication w/parents and families; provides referral information to community agencies to address students needs. Develop and maintain open lines of communication with student representation, parents and DCPS-LEA Monitor. Assist teachers and clinicians with the usage of e-IEPPro and maintain equipment and supplies used for IEP meetings.

**October 2004 to May 2004** — **Educational Consultant,** (Educational Diagnostic Institute, Inc.) Washington, DC: Coordinated meetings with attorneys and educational advocates to describe services EDI could provide for their clients to help fulfill the orders of HOD's in obtaining independent testing. Also submitted written bid proposals to charter schools to provide diagnostic services.

**May 2004 to June 2003** — **Special Education Teacher,** (Rock Creek Academy), Washington, DC: Provided instruction to 6th & 8th grade students in the areas of reading, written language and mathematics, monitor tracking progress for related services and implement behavior modification plan, as well as evaluate educational needs to devise goals & objectives for annual IEP meetings. Also helped assist in creating school-wide goals and school activities for the summer.

**June 2003 to August 2001** — **Special Education Coordinator,** Edison Friendship Public Charter School (Chamberlain Campus), Washington, DC: Implemented federal guidelines bided by IDEA (Individual Disability Education Act), monitor tracking progress for related services provider who rendered speech, OT/PT, and counseling to students. Conducted educational evaluations on students being identified for special education. Facilitated educational workshops on responsible inclusion, to ensure staff intensified and tailored curriculum for students with disabilities, as well as inform parents of Due Process Rights, chair eligibility determination

and IEP meetings.  Instructed 5th grade students using the Wilson Reading Series.

| | |
|---|---|
| August 2001 to<br>June 2000 | **Special Education Coordinator**, (Montebello Elementary An Edison Partnership School), Baltimore, MD: Provided educational testing and instruction to 4th & 5th grade students on K-1.0 level.  Implemented federal guidelines bided by IDEA (Individual Disability Education Act), monitor tracking progress for related services provider who rendered speech, OT/PT, and Counseling to students.  Facilitated educational workshops on responsible inclusion, to ensure staff intensified and tailored curriculum for students with disabilities, as well as inform parents of Due Process Rights, chair eligibility determination; a liaison between Baltimore City Schools, Edison and Kennedy Kreiger. |
| June 2000 to<br>August 1998 | **Special Edison Support (Resource Teacher), Edison Friendship Public Charter School (Chamberlain Campus), Washington, DC, Grade K-3:**  Instructed students in the area of reading, written language.  Co- taught and planned with regular education teachers.  Administered the Woodcock Johnson and Woodcock Reading Inventory; communicate with parents and team members regarding performance and behavior. |
| August 1998 to<br>June July 1997 | **Special Ed. Teacher/Coor., Prince George's County Schools, Prince George's MD, Grade K-5 (Thomas Stone Elementary):** Case Manager of 26 Learning Disabled students in an inclusion setting; responsibilities included; co-planned and taught 6th grade reading and mathematics.  Chaired School Instructional Team (SIT) and School Supplementary Team (SST) to assist in the referral process for special education. |

## PRACTICUM

**Prince George's County Public Schools    Prince George's County    Aug. 2002-Dec. 2002**
**Grad. Intern, Grade 3rd & 4th  Self Contained Class        Benjamin Foulois Academy**
Provided instruction to emotionally disturbed and artistic students.  Also completed testing and reporting for initial placement and re-evaluation.

**Norfolk & Portsmouth Public Schools        Tidewater Area    Jan. 1997-Feb. 1997**
**Student Teacher, Grade 6th Inclusion        Lake Taylor Middle School**
Assist training teacher in providing instruction to 6th grade inclusion class in all academic areas, maintain quarterly reports, and implemented effective management techniques to ensure the environment is conducive for learning.

## EDUCATION

| | |
|---|---|
| June 1997 | Norfolk State University, Norfolk, VA<br>Bachelor of Science in Psychology<br>Minor in Special Education (LD/ED) |
| May 2005 | George Washington University, Washington, DC<br>Masters in Special Education (Emotional Behavior Disorders/Learning Disabled) |

## REFERENCES FURNISHED UPON REQUEST

Vitae

- Provide leadership to staff and help them understand the nature and needs of the special education population.
- Help devise concrete intervention strategies
- Provide technical support including assisting schools in compiling data charts on students in the special education program.
- Act as a liaison between DCPS, Parents and Attorneys/Educational Advocates to ensure effective communication transpires.
- Administer and interpret educational evaluation, supervised, trained, and evaluated multidisciplinary team meetings.
- Consulted and advised parents, attorneys, and related service providers as to whether the child has been denied a free and appropriate education.
- Attended and testified at hearings.
- Devised IEP goals and objectives, tailored curriculum and teaching style to ensure the students Individualized Education Plan was being fully implemented and in compliance with the law.

# PROFESSIONAL VITA

## DEREK MARRYSHOW
5104 Aldershot Dr.
Lanham, MD. 20706
(301) 333-2009 (Work)
(301) 918-7175 (Home)

## EDUCATION

Ph.D.     Doctor of Philosophy in Developmental/Child Psychology.
          Howard University, Washington, D.C. 1995

M.Ed.     Master of Education, Major: Educational Psychology.
          Howard University, Washington, D.C. 1986

B.A.      Bachelor of Art in Psychology. Lincoln University,
          Lincoln, Pennsylvania. 1984

## LICENSE
Licensed School Psychologist, District of Columbia Public Schools

## PROFESSIONAL EXPERIENCE

2004-     **Executive Director, Educational Advocates for
Present   Children, PLLC.** Provide special education advocacy for
          children receiving or requiring special education
          services. Provide testimony in due process hearings
          as an expert witness in the areas of psychology and
          special education.

2002-     **School Psychologist, District of Columbia Public
2004      Schools** Conduct psychoeducatioal assessments,
          individual, family and group counseling, and Chair
          MDT/IEP meetings for elementary, middle, and high
          school students in DCPS.

2000-
2001      **University Supervisor, John Hopkins University**
          Supervise Masters level graduate student majoring in
          special education during their eight-week teaching
          internship. Supervision include conducting formal
          observation of instructional competencies, reviewing
          and grading assignments, conducting group seminars, and
          giving the students a final grade for the internship.

1

vita
Derek Marryshow

1990–
1992

**Senior Family Therapist, Progressive Life Center
Inc., Washington, D.C.**
Provide individual, group and family therapy to
adolescent male delinquents and their families; maintain
up-to-date and confidential documentation of client
contact and case progress; and provide relevant crisis
intervention and advocacy services and referrals.
Supervise two family therapists.

1990–
1991

**Research Assistant, American Psychological Association**
Conduct literature reviews, identify experts in the
field, and responsible for writing a section of a
comprehensive manual on the etiology of youth violence.

1986–
1990

**Psychologist, PSI Associates, Inc.**
Responsible for conducting psychological evaluations, and
developing behavior modification programs for mentally
retarded and dual diagnosed adults, and serving as a
member of the interdisciplinary team.

3

vita
Derek Marryshow

## WORKSHOPS/PRESENTATIONS/TRAINING EXPERIENCE

**9/04-Present**
Conduct workshops with parents and professionals in the area of special education advocacy. Topics including: Understanding the Individuals with Disability Education Act, Negotiating the Due Process Hearing, Transition Services for Special Education Students. Trainings are conducted in conjunction with Educational Advocates For Children, LLC.

**3/03-Present**
Trainer for Behavioral and Social Scientist Volunteer Program (BSSVP). Train Behavioral scientist, and Direct Service Providers working in the HIV prevention field on new intervention models and best practice models for HIV prevention.

**7/04-Present**
Conduct monthly workshops on Team Building, Stress Management, and Parenting for clients at a community mental health firm: Akoma Community Supports, Inc.

**3/05**
Effective Communication with Children and Adolescents. Presentation to seven classes of District of Columbia Public School Security Officers.

**8/04**
Awareness and Prevention: DCPS Policy on Sexual Harassment in the Workplace. Presentation to seven classes of District of Columbia Public School Security Officers.

**8/04**
Awareness and Prevention: DCPS Policy on Sexual Harassment in the Workplace. Presentation to staff at two DCPS special education schools.

**8/03**
Conduct workshop on Inclusion Model at four District of Columbia Public Middle School at Staff Development.

**9/03**
Conduct workshop on Inclusion at four District of Columbia Elementary School at Staff Development.

4

vita
Derek Marryshow

**2002/2003**
Conduct Parenting Workshops for fathers at DCPS Head Start
Program.

Conduct Parenting Workshops for fathers at Progressive Life
Center's Umoja Program.

Conduct team building and conflict resolution training for youth
and adult groups.

Develop training manual for teaching parenting skills. Conduct
parenting workshops.

Conduct on-going staff development and teacher training for the
staff at DCPs

Teach NTU psychotherapy to clinical staff at Progressive Life
Center Inc.

**1994, Aug.**
The impact of a school-based prevention and intervention program
on at-risk Junior High School students' academic performance,
attendance, and behavior. Presentation at the Association of
Black Psychologist 26th Annual Convention. Philadelphia, Pa.

**1994, Nov.**
The Progressive Life Turning Points Center at Frederick Douglass
Junior High Alternative School. Testimony at the District of
Columbia City Council Hearings on Youth Services. Washington,
D.C.

**1992, Aug.**
The Impact of Learning Orientations of African American
Children's Attitudes Toward High Achievers. Presentation at the
Association of Black Psychologist 24th Annual Convention. Denver,
Colorado.

**1993, Aug.**
The Role of Cultural Sensitivity in Community Law Enforcement.
Presentation at the National Association of Social Workers
Conference.

**REFERENCE AVAILABLE UPON REQUEST**

5

# CURRICULUM VITAE

Sharon L. Millis
11666 Cygnet Drive
Waldorf, Maryland 20601
(301) 870-6474

## AREAS OF EXPERTISE

Special Education Advocacy

Expert Testimony in Special Education Court and School Hearings

Expert testimony on observation/comparison/determination of student placement

Mediation of Special Education issues

Parent support, education and training on Special Education issues

Individualized Education Plan (IEP) Training, Writing and Implementation

School and Student Observation

Public, Private and Residential Special Education Compliance Monitoring for IDEA.

Public, Private and Residential Monitoring for State Standards (DC, MD and VA)

Public, Private and Residential Special Education Program Evaluation

Collection, Organization and Analysis of Special Education Program Data to Determine Degree
of Program Compliance and/or Student Progress

Educational Record Review

Special Education Curriculum Development

Administrative, Teacher and Related Service Provider Technical Assistance/Instructional Support

Special Education Workshop Development and Presentation

School-Based Classroom Instruction

Seriously Emotionally Disturbed Classroom Instruction

Learning Disabilities Classroom Instruction

Administrative Debriefing

State and Local Special Education Policy and Procedure Development

Inclusion Consultation

Special Education Teacher Mentoring

Special Education Teacher Training

Dissemination, Follow-up and Corrective Action Responses to Data Collected from Special
Education Programs

Administrative Training for Compliance Monitoring

Volunteer Training for Compliance Monitoring

Parent Training for Compliance Monitoring

Child Count Monitoring

## EMPLOYMENT HISTORY

| | |
|---|---|
| 1998 - Present | Independent Special Education Advocate/Expert for District of Columbia Special Education Attorneys |
| 1997 - 1998 | Acting Assistant Principal, Moten Elementary School/Director, P.A.C.E./Moten Special Education Program for ED students requiring Level IV/V intensity |
| 1986 - 1997 | LEA/SEA Special Education Compliance Monitor and Program Evaluator, Office Of Corporate and Community Relations, DC Public Schools, Washington, DC |
| 1992 - 1993 | Educational Assessor, Therapeutic Counselor and Early Childhood Language Facilitator, Chapter I Summer Enrichment Program, Department of Human Services, District of Columbia Government, Washington, DC |
| 1981 - 1986 | Middle School/High School/Elementary School Teacher of the Seriously Emotionally Disturbed, Gibbs/PACE Program/Buddy Program, DC Public Schools, Washington, DC |
| 1973 - 1981 | School-Based/Learning Center Teacher, Watkins Elementary School, DC Public Schools, Washington, DC |

81

# Archdiocese of Washington
## Report Card Grades 4-8

School: WK-07
Name: W... Assumption R...
Grade: 4    Year: 2005-2006
Teacher: Ms. White

Placement for next year:

## EXPLANATION OF SYMBOLS:

**ACADEMICS**
A 93-100
B 85-92
C 77-84
D 70-76
F Below 70
✓ Area of Concern

**SPECIALS**
E Excellent
G Good
S Satisfactory
I Improvement needed
U Unsatisfactory

- With Accommodations
- The language arts grade is a composite of the reading, English, spelling, and penmanship grades.

### ATTENDANCE

| | 1 | 2 | 3 | 4 | Total |
|---|---|---|---|---|---|
| Days absent | 4 | 8 | | | |
| Days late | 5 | 8 | | | |

### SPECIALS

| | 1 | 2 | 3 | 4 | Final |
|---|---|---|---|---|---|
| **ART** | | | | | |
| Strives to learn new skills | F | S | | | |
| Follows directions | | | | | |
| Displays appropriate behavior | | | | | |
| Comment codes: | | | | | |
| **MUSIC** | | | | | |
| Shows appreciation for music | U | U | | | |
| Understands music theory | | | | | |
| Participates/shows effort | | | | | |
| Displays appropriate behavior | | | | | |
| Comment codes: | | | | | |
| **PHYSICAL EDUCATION** | | | | | |
| Demonstrates skill development | G | G | | | |
| Participates/shows effort | 15 | 19.23 | | | |
| Practices sportsmanship | | | | | |
| Comment codes: | | | | | |

### ACADEMICS

| | 1 | 2 | 3 | 4 | Final |
|---|---|---|---|---|---|
| **RELIGION** | C | F | | | |
| Shows knowledge of faith/prayers | | | | | |
| Produces Gospel values | | | | | |
| Displays Gospel values | | | | | |
| **LANGUAGE ARTS •** | | | | | |
| **READING** | F | F | | | |
| Comprehends material read | F | D | | | |
| Applies critical thinking skills | | | | | |
| Reads independently | | | | | |
| Comment codes: | 19.8.13 | | | | |
| **ENGLISH** | F | F | | | |
| Uses correct mechanics | | ✱ | | | |
| Uses writing process | | | | | |
| Shows originality | | | | | |
| Listens attentively | | | | | |
| Expresses ideas orally | | | | | |
| Shows vocabulary growth | | ✓ | | | |
| Works well independently | | | | | |
| Works cooperatively in groups | | | | | |
| Accepts responsibility | | | | | |
| Is well prepared for class | | | | | |
| Comment codes: | 18.17 | | | | |
| **SPELLING** | F | F | | | |
| Comment codes: | 16 | 16 | | | |
| **PENMANSHIP** | F | F | | | |
| **MATHEMATICS** | F | F | | | |
| Understands concepts | | ✱ | | | |
| Computes accurately | | ✱ | | | |
| Applies problem solving skills | | | | | |
| Comment codes: | 19.17 | | | | |
| **SOCIAL STUDIES** | F | F | | | |
| Understands concepts | | | | | |
| Identifies cause and effect | | | | | |
| Sequences events | | | | | |
| Interprets maps/graphs | | | | | |
| Comment codes: | 19.8.18 | | | | |
| **SCIENCE** | F | F | | | |
| Understands concepts | | | | | |
| Applies scientific method | | | | | |
| Uses proper lab procedure | | | | | |
| Comment codes: | 16.20.21.22 | | | | |

| | 1 | 2 | 3 | 4 | Final |
|---|---|---|---|---|---|
| Effort | 14 | 14 | | | |
| Comment codes: | | | | | |
| Conduct | U | U | | | |
| Comment codes: | | 22.23 | | | |

## COMMENT CODES:

1. Displays courtesy/respects authority
2. Produces excellent work
3. Works consistently
4. Shows enthusiasm
5. Is active in class discussions
6. Works well independently
7. Works cooperatively in groups
8. Accepts responsibility
9. Is well prepared for class
10. Completes work thoroughly
11. Completes assignments promptly
12. Works beyond required content
13. Shows significant improvement
14. Works to minimum expectations
15. Performance is influenced by absence
16. Needs to improve work and/or study habits
17. Does not apply acquired skills to daily work
18. Fails to complete assignments
19. Produces incomplete and/or inconsistent work
20. Is easily distracted
21. Does not respect property
22. Is disruptive during class
23. Talks at inappropriate times
24. Is not prepared for class
25. Request conference

RCS 4-8

# Archdiocese of Washington
## Report Card Grades 4-8

School _Assumption_
Name _Latin Rein_
Grade _4_   Year _2005-2006_
Teacher _Ms. White_

Placement for next year: _____

### EXPLANATION OF SYMBOLS:

**ACADEMICS**
A 93-100
B 85-92
C 77-84
D 70-76
F Below 70
✓ Area of Concern
• With Accommodations

**SPECIALS**
E Excellent
G Good
S Satisfactory
I Improvement needed
U Unsatisfactory

• The language arts grade is a composite of the reading, English, spelling, and penmanship grades.

| ACADEMICS | 1 | 2 | 3 | 4 | Final |
|---|---|---|---|---|---|
| **RELIGION** | C | | | | |
| Shows knowledge of faith/prayers | | | | | |
| Displays Gospel values | | | | | |
| Comment codes: | | | | | |
| **LANGUAGE ARTS •** | F | | | | |
| **READING** | F | | | | |
| Comprehends material read | | | | | |
| Applies critical thinking skills | | | | | |
| Reads independently | | | | | |
| Comment codes: | | | | | |
| **ENGLISH** | 18,9 | | | | |
| Uses correct mechanics | F | | | | |
| Uses writing process | | | | | |
| Shows originality | | | | | |
| Listens attentively | | | | | |
| Expresses ideas orally | | | | | |
| Shows vocabulary growth | | | | | |
| Comment codes: | | | | | |
| **SPELLING** | 18 | | | | |
| | F | | | | |
| **PENMANSHIP** | 16 | | | | |
| **MATHEMATICS** | H | | | | |
| | F | | | | |
| Understands concepts | | | | | |
| Computes accurately | | | | | |
| Applies problem solving skills | | | | | |
| Comment codes: | | | | | |
| **SOCIAL STUDIES** | 19 | | | | |
| | F | | | | |
| Understands concepts | | | | | |
| Identifies cause and effect | | | | | |
| Sequences events | | | | | |
| Interprets maps/graphs | | | | | |
| Comment codes: | | | | | |
| **SCIENCE** | 18 | | | | |
| | F | | | | |
| Understands concepts | | | | | |
| Understands the scientific method | | | | | |
| Applies scientific method | | | | | |
| Uses proper lab procedure | | | | | |
| Comment codes: | 16,20,24 | | | | |

| SPECIALS | 1 | 2 | 3 | 4 | Final |
|---|---|---|---|---|---|
| **ART** | E | | | | |
| Strives to learn new skills | | | | | |
| Follows directions | | | | | |
| Displays appropriate behavior | | | | | |
| Comment codes: | | | | | |
| **MUSIC** | U | | | | |
| Shows appreciation for music | | | | | |
| Understands music theory | | | | | |
| Participates/shows effort | | | | | |
| Displays appropriate behavior | | | | | |
| Comment codes: | | | | | |
| **PHYSICAL EDUCATION** | G | | | | |
| Demonstrates skill development | | | | | |
| Participates/shows effort | | | | | |
| Practices sportsmanship | | | | | |
| Comment codes: | | | | | |

| ATTENDANCE | 1 | 2 | 3 | 4 | Total |
|---|---|---|---|---|---|
| Days absent | 4 | | | | |
| Days late | 5 | | | | |

| | 1 | 2 | 3 | 4 | Final |
|---|---|---|---|---|---|
| Comment codes: **Effort** | 14 | | | | |
| Comment codes: **Conduct** | U | | | | |
| Comment codes: | 22 | | | | |

### COMMENT CODES:

1. Displays courtesy/respects authority
2. Produces excellent work
3. Works consistently
4. Shows enthusiasm
5. Is active in class discussions
6. Works well independently
7. Works cooperatively in groups
8. Accepts responsibility
9. Is well prepared for class
10. Completes work thoroughly
11. Completes assignments promptly
12. Works beyond required content
13. Shows significant improvement
14. Works to minimum expectations
15. Performance is influenced by absence
16. Needs to improve work and/or study habits
17. Does not apply acquired skills to daily work
18. Fails to complete assignments
19. Produces incomplete and/or inconsistent work
20. Is easily distracted
21. Does not respect property
22. Is disruptive during class
23. Talks at inappropriate times
24. Is not prepared for class
25. Request conference

RCS 4-8

District of Columbia Public Schools
The C.A.R.E Center @ Shaw Junior High School
925 Rhode Island Avenue, NW
Washington, DC 20001
(202) 671-0800

PRIVATE-RELIGIOUS SCHOO
STUDENT REFERRAL
FOR SPECIAL EDUCATION SERV  WR-08

Student: William D. Richardson II    Student ID#: _____    Grade 4th

Race: Black    Sex: Male    Date of Birth: ___/__/96    Primary Language: English

Parent/Guardian: Wanda Marie Richardson    Work Phone: (2o3) 316-4201 cell

Address: 4321 3rd Street S.E. Apt 302    Home Phone: (202) 561-4201

City/State/Zip: Washington D.C. 20032

DCPS Neighborhood School: P.R. Harris    DCPS School ID#: _____

Private-Religious School: Assumption Catholic School    Private-Religious School ID#: _____

Private-Religious School Address: 220 Highview Place S.E, Washington D.C. 20032

Principal/Headmaster of Private-Religious School: Christopher Kelly    Phone: (202) 562-7070

Referral Submitted By: _____    Date: __/__/__

### Summarize the student's educational or learning problem(s) that necessitates this referral.

Performing well below average in all subjects except for math.
Standardized test scores also below average.
Low self esteem, poor attention & concentration, mood changes
with anger often exhibited

### Chronological List of Information and Records

List all documents and date submitted.    ☐ Check here and attach list if more space is needed.

| | Document Name | Date | | Document Name | Date |
|---|---|---|---|---|---|
| 1 | Teacher report | 12/12/05 | 6 | PPVT (04) | 12/12/05 |
| 2 | Terra Nova scores | 12/9/05 | 7 | (Please request IEP notes from | |
| 3 | 3rd Grade report card | 12/9/05 | 8 | PG Co, Longfields E.S. dated 4/1/04) | |
| 4 | Class observation | 12/12/05 | 9 | (Please obtain DCPS evaluation 8/20/01) | |
| 5 | Report cards | 12/12/05 | 10 | | |

Type of Service(s) Requested: Full psycho-educational evaluation

Special or Remedial Service Currently Provided: none in school, private therapy has resumed

Student Performance Summary (Code: 1 = Above Average    2 = Average    3 = Below Average)

☒ 3 Reading    ☒ 3 Written/Oral Language    ☒ 2 Mathematics    ☒ 2 Perception/Motor Functioning    ☒ 2 Spelling    ☐ Other

Comments: _____

I have reviewed this application and the information/records specified and authorize their release to the District of Columbia Public Schools for use in the Individualized Education Program (IEP) process to determine the eligibility of my child for special education services. By signing this form, I give DCPS permission to evaluate my child in all areas of suspected disabilities.

Parent/Guardian Signature: _[signature]_    Date: __/__/__

nave reviewed the documentation compiled for this student and authorize transmittal of the records specified.

Principal/Headmaster Signature: _____    Date: __/__/__

Signature and Title of Person Completing This Form: _Alvin A. Parker, School Counselor_    Date: 12/12/05    84

DCPS 2003



**The CHILD Center @ Shaw Junior High School**
925 Rhode Island Avenue, NW
Washington, DC 20001
(202) 671-0800

**EDUCATIONAL HISTORY**

Student's Name: William R██████████     Student ID# ____ DOB ██/96

Student's Date of Birth: ████/96   Current Grade: 4   Teacher: _Ms. White_

Private-Religious School: _Assumption_     DCPS Neighborhood School: _P.R. Harris_

**Part 1: Health Record Review**

A. Vision Screening: _8/13/05_   _no problem_    Glasses: ____ Yes _X_ No
      Date            Results

B. Hearing Screening _8/13/05_   _no problem_    Hearing Aid: ____ Yes _X_ No
      Date            Results

C. Indication of Medical Concerns: ____ Yes ____ No   If yes, explain below:

_allergies_
_medication ① Concerta has been prescribed_
_has not taken it for a month, (M) does not give it_
_to him because it "gets him to sleep"_
_② this will be re-evaluated by his pediatric_
_③ Clonidine at night for sleep & mood swings_
_④ Claritin for allergies_

**Part 2: School History Information**

A. Preschool: _✓_ Yes ____ No ____ Not applicable after the third grade

B. Schools Attended (K through present)

| School | Grade(s) Completed | School | Grade(s) Completed |
|---|---|---|---|
| Ft. Foote E.S. (P.G.) | 2 yrs preschool | Assumption | 3rd, currently 4th |
| Thos. G. Pullen (P.G.) | K | | |
| Valley View (P.G.) | 1½ 1st grade | | |
| Longfields (P.G.) | ½ 1st, 2nd | | |
| Geth Beers (D.C.) | last 2 mo. 2nd grds | | |

C. List grades with absence of over 20 days/year or loss of credit due to attendance. _N/A_

If indicated in record, list care of absence(s):

D. Retention: ____ Yes _X_ No   If yes, grade of retention: _____

**Part 3: Academic Record Review**

A. General Education Program: (include synthesis of past classroom performance, classroom accommodations, and general test information) Attach all appropriate documentation.

_Difficulties indicated in reading and language arts as well as social_
_skills._
_Relative strengths in math._
_Standardized test scores may not reflect actual aptitude._

**B.** Is previous testing being used for consideration for special education services? If yes, list type of evaluation(s) and date(s) of administration.

Terra Nova Standardized test 4/05

(Please obtain evaluation information from Longfields E.S. in
PG Co. and DCPS evaluations from Ann Beers E.S.)

**C.** IEP for Special Education Services ___ ✓ Yes _____ No

| Disability Code(s) | Program(s) |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Completed by: Alice Wilson, School Counselor          Date: 12/12/05



District of Columbia Public Schools
Office of Special Education
The C.A.R.E Center @ Shaw Junior High School
925 Rhode Island Avenue, NW
Washington, DC 20001
(202) 671-0800

**CLASSROOM OBSERVATION**

**This observation should focus on problems identified in the referral.**

**Part 1: General Information**

Student's Name: Willis R██████    Student ID# ███/96   DOB

Student's Date of Birth: █████/96   Subject/Area/Class Observed: Religion

Teacher: Ms. White   Teacher/Pupil Ratio: 1/24

**Part 2: Setting**

Describe Observation Setting:

Students all in their seats at their desks. Desks separated. W█████ desk placed in back corner of classroom facing the wall, W█████ has chair turned so he is diagonally facing the class. As described below Wm. moved to chair in middle of room, back to desk at back, then back to desk at center of room.

**Part 3: Observation**

Describe the task:

Discussion of religion lesson. Students raising hands, called on, read their answers to questions on Bible story.

End of class, teacher waits for homeroom teacher to return

Homeroom teacher attempts to settle class, science teacher comes in

Describe the student's performance:

W█████ looking at teacher & classmates. Responding verbally when question asked for all students to answer together. During class break W█████ talks quietly with nearby peers.

Homeroom teacher asks students to get the science homework out, W█████ goes to locker and takes paper out of his bookbag. Wm. moves to desk in middle of room, sits in chair, writing down his assignment off chalkboard onto paper; quiet and concentrating. Tapping pencil quietly on desk. Leaning forward and rocking desk on front legs (back legs off the floor) & talking quietly to peers beside & in front of him. Kicks text book across floor. Teacher tells W█████ to move desk back until it is in line with peer to left. W█████ continues to write on his paper. W█████ slides foot over to right pushing room divider closer to classmate who has been placed behind room divider. W█████ gets out of seat & returns to the chair next to his desk in back of room. W█████ scanning floor for object, sees pencil & walks half-way across the room to get it off the floor. W█████ returns to desk in middle of room, moves his chair there, leaves the room (science teacher appears not to notice). W█████ walks back in, goes to peer behind barrier and pretends to jump and hit that peer. W█████ sits in chair which is pushed up to the room divider. Peer behind barrier pokes W█████. W█████ goes to trash can w/out permission. Peer comes from behind barrier & sits next to W█████. Peer pokes W█████ with his finger

**Part 4: Rate the Student's Performance**

| | Behavior Not Observed | Significant Problem | Some Problem | No Problem | Strength |
|---|---|---|---|---|---|
| Listening Comprehension | ☒ | ☐ | ☐ | ☐ | ☐ |
| Oral Expression | ☒ | ☐ | ☐ | ☐ | ☐ |
| Basic Reading Skills | ☒ | ☐ | ☐ | ☐ | ☐ |
| Reading Comprehension | ☒ | ☐ | ☐ | ☐ | ☐ |
| Written Expression | ☒ | ☐ | ☐ | ☐ | ☐ |
| Math Calculation (_____) Operation | ☒ | ☐ | ☐ | ☐ | ☐ |
| Math Reasoning | ☒ | ☐ | ☐ | ☐ | ☐ |
| Discrimination (visual/auditory) | ☐ | ☐ | ☐ | ☐ | ☐ |
| Memory (visual/auditory) | ☐ | ☐ | ☐ | ☐ | ☐ |
| Visual Motor Coordination | ☒ | ☐ | ☐ | ☐ | ☐ |
| Attention | ☐ | ☒ | ☐ | ☐ | ☐ |
| Organization | ☐ | ☒ | ☐ | ☐ | ☐ |
| Activity level | ☐ | ☒ | ☐ | ☐ | ☐ |
| Social Interaction | ☐ | ☒ | ☐ | ☐ | ☐ |
| Work habits | ☐ | ☒ | ☐ | ☐ | ☐ |
| Task completion | ☒ | ☐ | ☐ | ☐ | ☐ |
| Motivation | ☐ | ☐ | ☒ | ☐ | ☐ |
| Speech | ☒ | ☐ | ☐ | ☐ | ☐ |

**Comments:**

_____ is in his seat, looking at teacher during Religion. During transition between classes _____ is moving back and forth between desks and interacting with peer behind barrier. The 2 boys appear to be poking each other quietly and no teacher notices or comments.

_____ is unsettled, keeps his eyes on teacher at all times before each interaction with peer.

When Science video begins, _____ peer watch video.

Does the classroom teacher feel that the behavior observed is representative of the usual behavior for this student in this class? __✓__ Yes _____ No

Date of Observation: _12_/_12_/_05_ Start Time: _1:40_ End Time: _2:05_ Total Observation Time: _25 min_

Observation conducted by: _Alice H. Wilson_

88

DCPS 2003

Page 2 of 2



**District of Columbia Public Schools**
**Office of Special Education**
**The C.A.R.E Center @ Shaw Junior High School**
925 Rhode Island Avenue, NW
Washington, DC 20001
(202) 671-0800

| | **TEACHER REFERRAL/REPORT** |

Student Name: ~~William R.~~                                    Student ID#: DoB ~~~~ /96

Private-Religious School Name: _Assumption_

Subject: _All_                                                          Grade: _4_

**PART 1:** (Check only where applicable)

**EMT Report**
- ☐ EMT Progress Report
- ☐ EMT Referral
  - ☐ Was referral discussed with parent? ___ Yes ___ No
  - ☐ If yes, date of discussion _____/_____/_____
  - ☐ Parent conference notes attached? ___ Yes ___ No

**MDT Report**
- ☐ MDT Screening
- ☐ Annual Review
- ☐ Progress Update

**PART 2:** Reason for Referral/Report

Please indicate the reason for the referral/report. Include a summary of the student's strengths and weaknesses. Attach all supporting documentation.

William has severely unpredictable behaviors chk which greatly interferes w/ William work and academic progress. William strength lies in his math skills and basic computations.

**Check any interventions used:**

- ☒ Student conference
- ☒ Note/call to parent
- ☒ Consultation with specialist(s)
- ☒ Consultation with colleague(s)
- ☒ Counselor involvement
- ☒ Tutoring
- ☒ Behavior management techniques
- ☒ Referral to principal
- ☒ Adjusted workload
- ☒ Modifying methods, materials, and presentations
- ☐ Change of text/materials
- ☐ Change in grouping
- ☐ None
- ☒ Other (specify) getting back in contact w/ therapist

| Which interventions were the most effective? Explain. |
| The most effective intervention was William going back to see his therapist to gain back a known role needed and confident. |

**Estimate the student's level of ability as compared to expectations for students in that grade.**

| | Above Average | Average | Below Average |
|---|---|---|---|
| Listening Comprehension | ☐ | ☒ | ☐ |
| Oral Expression | ☐ | ☒ | ☐ |
| Basic Reading Skills | ☐ | ☒ | ☒ |
| Reading Comprehension | ☐ | ☐ | ☒ |
| Written Expression | ☐ | ☐ | ☒ |
| Math Calculation | ☐ | ☒ | ☐ |
| Math Reasoning | ☐ | ☐ | ☒ |
| Social Studies | ☐ | ☐ | ☒ |
| Science | ☐ | ☐ | ☒ |

Reading Level: _approx. 3rd grade_                    ISM Level: _____ 89

DCPS 2003                                                          Page 1 of 2

**PART 2: Reason for Referral/Report (continued)**

Based on your observation, evaluate the student in comparison to other students in the same grade. Use a minus (-) sign to indicate weaknesses and a plus (+) to indicate strengths frequently observed.

**Listening Comprehension**
- Understanding spoken language
- Following verbal directions

**Oral Expression**
- Expressing thoughts and ideas
- Speaking vocabulary

**Reading**
- Letter/word recognition
- Word attack skills
- Oral reading fluency
- Comprehension (factual)
- Comprehension (inferential)

**Written Expression**
- Spelling
- Writing speed
- Completing written work
- Punctuation
- Writing a sentence
- Organizing sentences and ideas into meaningful paragraphs

**Mathematics Number recognition**
- Number concepts
- Basic operations
- Addition
- Subtraction
- Multiplication
- Division
- Understanding place value
- Solving word problems

**Speech**
- Stutters
- Articulating speech sounds
- Voice quality

**Discrimination**
- Discriminating letter symbols
- Discriminating letter sounds

**Memory**
- Remembering what is seen
- Remembering what is heard
- Retaining information over a period of time

**Visual Motor Coordination**
- Small motor tasks
- Paper/pencil tasks
- Copying from the board

**Social/Emotional**
- Motivation
- Self-control
- Frustration tolerance
- Consistency in performance
- Interpreting social cues
- Making and keeping friends
- Accepts responsibility for own behavior
- Gets along with adults
- Sudden changes in mood throughout day
- Needs constant approval
- Interrupts and distracts class
- Unusually aggressive toward others
- Unusually shy or withdrawn
- Easily influenced by others

**Attention/Organization/Activity Level**
- Beginning a task
- Maintaining attention
- Has work and/or materials
- Organization
- On time for class
- Completing tasks
- Changes in routine
- Distractibility
- Overactive
- Underactive

**General**
- Completes homework
- Study habits
- Follows school rules
- Attendance (explain)
  _often late_
- Other (specify)

Submitted by: _Ms. White_                    Date: _12, 12, 05_

90

FROM :CHRIST CHILD SOCIETY OF DC    FAX NO. :2029669250    Oct. 25 2002 09:37A

WR-09

## Student Referral Form

Date: 9/24/05    Refer to Social Worker ✓    Refer To Teacher Assistance Team _____

Student W_____ R_____    Grade _4_    DOB _____/96

Referred by _Ms. White_    Teacher: _Ms. White_

**Please describe the reason for referral:**

### Academic levels:

|  | Above Grade | On Grade | Below Grade |
|---|---|---|---|
| Listening Comprehension |  | ✓ |  |
| Verbal Skills |  |  | ✓ |
| Reading Skills |  |  | ✓ |
| Writing Skills |  | ✓ |  |
| Math Skills |  |  | ✓ |

### Check areas of concern:

**Social/Emotional/Behavioral Concerns:**
- _____ Appears depressed
- ✓ Has sudden mood changes
- ✓ Exhibits poor self-control
- ✓ Lacks consistency in performance
- _____ Needs constant approval
- _____ Acts aggressively towards others
- _____ Is unusually shy or withdrawn
- _____ Has problems interpreting social cues
- _____ Making and keeping friends
- ✓ Accepts responsibility for behavior
- ✓ Gets easily frustrated
- ✓ Is disruptive in class
- _____ Has problems getting along with adults
- _____ Lies
- _____ Steals

**Attention/Organization/Activity Concerns:**
- ✓ Has problems beginning/completing work
- ✓ Loses work or materials
- _____ Appears overactive
- ✓ Is easily distracted
- ✓ Problems maintaining attention
- ✓ Lacks motivation
- _____ Is inactive
- ✓ Needs repeated directions

**Attendance Concerns:**
- _____ Frequently absent
- _____ Frequently tardy

**Medical/Cognitive Concerns:**
_____ Vision
_____ Hearing
_____ Speech/Language
_____ Motor skills

_____ Short/long-term memory
_____ Oral directions
_____ Written directions
✓ Reversal of letters/numerals

**Daily Work Habits Concerns:**
✓ Homework
✓ Test grades/scores

_____ Class participation
✓ Note taking

**Other Concerns:** _____
_____
_____
_____

**Summary of student's strengths and weaknesses:**

William's biggest strength is his ability to solve math problems with no written language. Once words are involved most often times William looses the meaning of what he needs to do. Reading and interpretation are his biggest downfalls.

**Interventions you have used:**
✓ Student conferences
✓ Notes/calls to parents
_____ Involve Social Worker
✓ Tutoring (peer/volunteer)
_____ Changed schedules
_____ Modify methods
✓ Change in grouping
✓ Behavior management techniques
_____ None

_____ Adjust workload
_____ Parent conferences
_____ Disciplinary reports
_____ Changed text/materials
_____ Consultation with specialist
✓ Consultation with colleagues
_____ Other: _____
_____
_____

**Have you had contact with the parent/guardian about this concern?**  (Yes)  No
by phone ✓  in-school conference ✓

**Any other relevant information (If appropriate, please provide child's work samples and test scores.)**

William's mother stated that his medication for (ADD) had been changed. (Possible facts) also that he has an IEP. (unseen)

# INTERIM PROGRESS REPORT

**ASSUMPTION CATHOLIC SCHOOL**
220 Highview Place, S.E.
Washington, D.C. 20032
202-562-7070

| | |
|---|---|
| STUDENT'S NAME | ~~W____ T____~~ |
| CLASS · GRADE | Ms Batista · 4th |
| DATE | 9/30/05 |

**NOTICE TO PARENTS:** This report offers an opportunity for better understanding of the student's current achievement. Please study the comments below in order that steps can be taken to bring about progress, where needed, by the end of the period.

---

**SUBJECT:** Religion  **TEACHER:** Ms Batista

**RECENT PROGRESS:**
☐ EXCELLENT  ☐ GOOD  ☐ IMPROVING  ☐ NEEDS IMPROVEMENT

**PRESENT STATUS:**
☐ EXCELLENT  ☐ GOOD  ☒ AVERAGE  ☐ BELOW AVERAGE

**RECOMMENDATION (S):**
☐ CONTINUED GOOD WORK  ☒ INCREASED PREPARATION AND STUDY  ☐ BETTER WRITTEN WORK
☐ MORE SERIOUS APPROACH  ☐ INCREASED CLASS PARTICIPATION  ☐ ADDITIONAL HELP NEEDED

1st test 75

☐ ~~____~~ works well in class - needs to prepare for tests

---

**SUBJECT:** Math  **TEACHER:** (2)

**RECENT PROGRESS:**
☐ EXCELLENT  ☐ GOOD  ☐ IMPROVING  ☐ NEEDS IMPROVEMENT

**PRESENT STATUS:**
☐ EXCELLENT  ☐ GOOD  ☐ AVERAGE  ☒ BELOW AVERAGE

**RECOMMENDATION (S):**
☐ CONTINUED GOOD WORK  ☒ INCREASED PREPARATION AND STUDY  ☒ BETTER WRITTEN WORK
☒ MORE SERIOUS APPROACH  ☐ INCREASED CLASS PARTICIPATION  ☐ ADDITIONAL HELP NEEDED

☐ minimal assignment inconsistent grades

---

**SUBJECT:** English  **TEACHER:** (3)

**RECENT PROGRESS:**
☐ EXCELLENT  ☐ GOOD  ☐ IMPROVING  ☐ NEEDS IMPROVEMENT

**PRESENT STATUS:**
☐ EXCELLENT  ☐ GOOD  ☐ AVERAGE  ☒ BELOW AVERAGE

**RECOMMENDATION (S):**
☐ CONTINUED GOOD WORK  ☒ INCREASED PREPARATION AND STUDY  ☒ BETTER WRITTEN WORK
☒ MORE SERIOUS APPROACH  ☐ INCREASED CLASS PARTICIPATION  ☐ ADDITIONAL HELP NEEDED

☐ missing 2 assignments low test score

---

**SUBJECT:** Reading  **TEACHER:** (3)

**RECENT PROGRESS:**
☐ EXCELLENT  ☐ GOOD  ☐ IMPROVING  ☐ NEEDS IMPROVEMENT

**PRESENT STATUS:**
☐ EXCELLENT  ☐ GOOD  ☐ AVERAGE  ☒ BELOW AVERAGE

**RECOMMENDATION (S):**
☐ CONTINUED GOOD WORK  ☒ INCREASED PREPARATION AND STUDY  ☒ BETTER WRITTEN WORK
☒ MORE SERIOUS APPROACH  ☐ INCREASED CLASS PARTICIPATION  ☐ ADDITIONAL HELP NEEDED

☒ missing 2 assignments needs to apply himself

---

**SUBJECT:** Spelling  **TEACHER:** (2)

**RECENT PROGRESS:**
☐ EXCELLENT  ☐ GOOD  ☐ IMPROVING  ☐ NEEDS IMPROVEMENT

**PRESENT STATUS:**
☐ EXCELLENT  ☐ GOOD  ☐ AVERAGE  ☒ BELOW AVERAGE

**RECOMMENDATION (S):**
☐ CONTINUED GOOD WORK  ☒ INCREASED PREPARATION AND STUDY  ☐ BETTER WRITTEN WORK
☐ MORE SERIOUS APPROACH  ☐ INCREASED CLASS PARTICIPATION  ☐ ADDITIONAL HELP NEEDED

☐ incomplete constant practice and review

---

**SUBJECT:** Science  **TEACHER:** (3) Ms Parker

**RECENT PROGRESS:**
☐ EXCELLENT  ☐ GOOD  ☐ IMPROVING  ☐ NEEDS IMPROVEMENT

**PRESENT STATUS:**
☐ EXCELLENT  ☐ GOOD  ☐ AVERAGE  ☐ BELOW AVERAGE

**RECOMMENDATION (S):**
☐ CONTINUED GOOD WORK  ☒ INCREASED PREPARATION AND STUDY  ☒ BETTER WRITTEN WORK
☒ MORE SERIOUS APPROACH  ☐ INCREASED CLASS PARTICIPATION  ☐ ADDITIONAL HELP NEEDED

☐ missing incomplete test scores checked and take test 93

---

PARENTS' COPY — WHITE          SCHOOL COPY — YELLOW          OFFICE COPY — PINK

WR-11

### DISTRICT OF COLUMBIA
### PUBLIC SCHOOLS
### *Office of Special Education*
825 North Capitol Street, N.E., 6th Floor
Washington, D.C. 20002-4232
202-535-2983, fax: 202-727-6308
www.k12.dc.us

## CERTIFICATE OF NO RECORDS

**CASE NAME: W_____ D. R_____ 11**
**D.O.B:** ___96

I, the undersigned, am the Custodian of Records for DC Public Schools, Division of Special Education Central Office records.

I certify that a thorough search of our central files, conducted under my supervision and direction, revealed no records for:

W_____ D. R_____ 11

It is important to note that records for the student may exist under another spelling, another name or another classification. However, the information you furnished to our office, to the best of our knowledge, produced no such records on this student at this time.

**DATE:** 1/25/06          **SCHOOL:** Assumption Catholic Sch.
**SIGNATURE:** _Gregory Brown_          **TITLE:** Records Specialist

94

WR-12

📁 **FILE**

# Law Offices,
## Christopher N. Anwah, PLLC
### Attorneys and Counselors at Law

Christopher N. Anwah, Esq.
    (DC, MD, NJ)
Fatmata Barrie, Esq.
    (DC, FL)
Georgina A. Oladokun, Esq.
    (MD)
Tamika Jones, Esq.
    (DC)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

April 3, 2006

**By Fax: (202) 673-6557**

Ms. Gloria Everett
Early Childhood Social Worker
DCPS Care Center
925 Rhode Island Avenue, N.W.
Washington, D.C. 20001

        RE:     William D. R█████
        DOB:   █████/96

Dear Ms. Everett:

I am writing because Ms. Wanda Richardson has informed me that you provided her with a letter of invitation for an MDT/IEP meeting for W█████, her son, to be scheduled on Friday, April 7, 2006. However, that date poses a schedule conflict for both Ms. Richardson and her Advocate. I am proposing **Monday, April 24, 2006 @ 2:00 p.m. or Thursday, April 27, 2006 @ 1:30 p.m.** to schedule W█████ MDT/IEP meeting. I am requesting that you provide me with a notice of confirmation by Friday, April 7, 2006 by close of business. If you have any questions, please contact me at either (202) 270-9156 or (202) 626-0040.

Thank you for your prompt attention and cooperation regarding this matter.

Sincerely,

Annie R. Pressley, J.D.
Education Advocate for William D. Richardson

cc: Client's file

95

# Law Offices,
## Christopher N. Anwah, PLLC
**Attorneys and Counselors at Law**

Christopher N. Anwah, Esq.
   (DC, MD, NJ)
Fatmata Barrie, Esq.
   (DC, FL)
Georgina A. Oladokun, Esq.
    (MD)
Tamika Jones, Esq.
    (DC)

**Carpenter's Building**
1003 K Street, N.W.
 Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
**Email: chrisanwahfirm@chrisanwahfirm.com**

## FACSIMILE COVER LETTER

DATE:
    April 03, 2006

TO:
    Ms. Gloria Everett - Social Worker

COMPANY
    DCPS Shaw Care Center

FAX NUMBER:
    (202) 673-6557

FROM:
    Annie R. Pressley, J.D. - Education Advocate

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET  2

MESSAGE REQUEST CONFIRMATION FOR MDT MTG FOR W█████ R██████

If there is any problem with this transmission, please call as soon as possible at (202) 626-0040

### *** CONFIDENTIALLY NOTE ***

The pages accompany this facsimile transmission contain information from the CHRISTOPHER ANWAH, ESQ. law offices which is confidential or privileged, or both. The information is intended to be for the use of the individual or entity named on this cover letter. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately at (202) 626-0040 so that we can arrange for the retrieval of the original documents at no cost to you.

96

**HP Officejet 6210**
Personal Printer/Fax/Copier/Scanner

**Log for**
Dr. Annie Pressley
2026260048
Apr 03 2006 10:12PM

**Last Transaction**

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Apr 3 | 10:11PM | Fax Sent | 6736557 | 0:50 | 2 | OK |



# Law Offices,
## Christopher N. Anwah, PLLC
**Attorneys and Counselors at Law**

Christopher N. Anwah, Esq.
    (DC, MD, NJ)
Fatmata Barrie, Esq.
    (DC, FL)
Panya Monford, Esq.
    (MD)
Tamika Jones, Esq.
    (DC)

**Carpenter's Building**
1003 K Street, N.W.
 Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: **chrisanwahfirm@chrisanwahfirm.com**

January 22, 2006

**By Fax: (202) 574-5829**

Mr. Christopher Kelley
Principal
Assumption Catholic School
220 High View Place, S.E.
Washington, D.C. 20032

              RE:    W██████ D. R█████ II
              DOB:  ██████/96

Dear Mr. Kelley:

Our office has been retained by Ms. Wanda Richardson to represent her son, W██████ D. R█████ II, regarding his special education services and placement at Assumption Catholic School ("Assumption"). Therefore, we are requesting a copy of W██████ cumulative file, special education file, and disciplinary files which are in the custody and control of Assumption. In addition to the requested files, please provide us copies of the following documents:

1.    A copy of W██████ report cards for the 2003/04 and 2004/05 school years;
2.    A copy of W██████ IEPs for the past two (2) school years;
3.    A copy of W██████ attendance records for the past two (2) school years;
4.    A copy of W██████ teachers's anecdotal notes for the past two (2) school years;
5.    A copy of W██████ Stanford Nine scores for the 2003/04 and 2004/05 school years;
6.    A copy of any and all, including in- and out-of-school, suspensions for the past two (2) school years;

98

Page 2 - Mr. Christopher Kelley - Principal, Assumption Catholic School
January 22, 2006 - Document Request for W███ D. R████████ II - DOB: ████/96

5. A copy of any behavioral modification plan and/or intervention measures reports addressing W█████ academics and placement at Assumption for the past two (2) school years;

6. A copy of all MDT/SEP and MDT/IEP notes and evaluations which have determined W█████ eligibility, and ineligibility, to receive special education and related services for the past two (2) school years;

7. A copy of all complaints made by Ms. Richardson requesting assistance with W█████ special education services and placement at Assumption for the past two (2) school years;

8. A copy of all trackers forms and/or progress notes for each related service that W█████ has been entitled to for the past two (2) school years, along with specialized instructions;

9. A copy of any notes, memorandums, documents, reports, and determinations which relates to W█████ disability, academics, behavior, and placement at Assumption for the past two (2) school years which would have impacted upon him receiving extensive special education and related services, or not.

As you know, "Each participating agency shall permit parents, and his/her representative, to inspect and review any education records relating to their children that are collected, maintained, or used by the agency . . . without unnecessary delay and before any meeting regarding an IEP, or any hearing." Therefore, we have attached a copy of a Release of Records, signed by Ms. Richardson authorizing our office to receive and to review the requested documents pertaining to her son. Also, please forward all future correspondence regarding any meetings, teacher/parent conferences, resolutions, due process hearing, and, any other matters pertaining to W█████ through our office prior to contacting our client.

If you have any questions, you may contact the undersigned staff personnel at either (202) 626-0040 or (202) 270-9156 and she will assist you with any additional information you may need to process this document request for W█████ D. R████████ II.

Thank you for your prompt attention and cooperation regarding these matters.

Sincerely,

Annie R. Pressley, J.D.
Education Advocate for W█████ D. R████████ II

Attachment: (1)
        Release

cc:   1.   Assistant Superintendent, DCPS's Special Education Division
      2.   Client's file

99

# Law Offices,
## Christopher N. Anwah, PLLC
**Attorneys and Counselors at Law**

Christopher N. Anwah, Esq.
   (DC, MD, NJ)
Fatmata Barrie, Esq.
   (DC, FL)
Georgina A. Oladokun, Esq.
   (MD)
Tamika Jones, Esq.
   (DC)

**Carpenter's Building**
1003 K Street, N.W.
 Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: **chrisanwahfirm@chrisanwahfirm.com**

## FACSIMILE COVER LETTER

DATE:
   January 22, 2006

TO:
   Mr. Christopher Kelley - Principal

COMPANY
   Assumption Catholic School

FAX NUMBER:
   (202) 574-5829

FROM:
   Annie R. Pressley, J.D. - Education Advocate

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET __4__

MESSAGE RE: DOCUMENT REQUEST FOR W████ D. R███████ II

If there is any problem with this transmission, please call as soon as possible at (202) 626-0040

### *** CONFIDENTIALLY NOTE ***

The pages accompany this facsimile transmission contain information from the CHRISTOPHER ANWAH, ESQ. law offices which is confidential or privileged, or both. The information is intended to be for the use of the individual or entity named on this cover letter. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately at (202) 626-0040 so that we can arrange for the retrieval of the original documents at no cost to you.

100

**HP Officejet 6210**
Personal  Printer/Fax/Copier/Scanner

**Log for**
Dr. Annie  Pressley
2026260048
Jan  22  2006  8:00PM

**Last Transaction**

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Jan  22 | 7:57PM | Fax  Sent | 5745829 | 2:28 | 4 | OK |

101

# Law Offices,
## Christopher N. Anwah, PLLC
### Attorneys and Counselors at Law

Christopher N. Anwah, Esq.
(DC, MD, NJ)
Fatmata Barrie, Esq.
(DC, FL)
Georgina A. Oladokun, Esq.
(MD)
Tamika Jones, Esq.
(DC)

**Carpenter's Building**
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

## FACSIMILE COVER LETTER

DATE:
January 22, 2006

TO:
Asst Superintendent for Spec Ed Div. via DCPS Supervisor of Records

COMPANY
D.C. Public Schools

FAX NUMBER:
(202) 727-6308

FROM:
Annie R. Pressley, J.D. - Education Advocate

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET  4

MESSAGE:  DOCUMENT REQUEST FOR W█████ D. R████████ - DOB: █████/96

If there is any problem with this transmission, please call as soon as possible at (202) 626-0040

### *** CONFIDENTIALLY NOTE ***

The pages accompany this facsimile transmission contain information from the CHRISTOPHER ANWAH, ESQ. law offices which is confidential or privileged, or both. The information is intended to be for the use of the individual or entity named on this cover letter. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately at (202) 626-0040 so that we can arrange for the retrieval of the original documents at no cost to you.

102

**HP Officejet 6210**
Personal  Printer/Fax/Copier/Scanner

Log for
Dr. Annie Pressley
2026260048
Jan  22  2006  8:20PM

---

## Last Transaction

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| Jan  22 | 8:18PM | Fax  Sent | 7276308 | 1:48 | 4 | OK |

103

WR-14

📁 **FILE**

# Law Offices,
## Christopher N. Anwah, PLLC
### Attorneys and Counselors at Law

Christopher N. Anwah, Esq.
    (DC, MD, NJ)
Fatmata Barrie, Esq.
    (DC, FL)
Panya Monford, Esq.
    (MD)
Tamika Jones, Esq.
    (DC)

**Carpenter's Building**
1003 K Street, N.W.
 Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

May 11, 2006

**By Fax: (202) 671-6557**

Ms. Gloria Everett
Social Worker
DCPS Child Care Center
925 Rhode Island Avenue, N.W.
Washington, D.C. 20001

        RE:    W████ R█████
        DOB:  ██/██/96

Dear Ms. Everett:

I am writing in regards to the MDT Eligibility Meeting Notes that were written for W████ on May 10, 2006. I notice at the top of the page where the signatures are located that you wrote in that Ms. Mataba Huston participated by via of telephone. I do not recall having a telephone on the table, and I don't recall anyone speaking via teleconference during the meeting. Therefore, I am requesting that you resubmit another copy of the MDT eligibility notes without Ms. Huston's name on the notes no later than **Monday, May 15, 2006 by close of business**. As you know, after the meeting is over, no additional notes are to be added to the MDT notes or names. If you have any questions, you may contact me at either (202) 626-0040 or (202) 270-9156.

Thank you for your prompt attention and cooperation regarding this matter.

Sincerely,

Annie R. Pressley, J.D.
Education Advocate for W████ R█████

cc:    Client's file

104

# Law Offices,
## Christopher N. Anwah, PLLC
**Attorneys and Counselors at Law**

Christopher N. Anwah, Esq.
    (DC, MD, NJ)
Fatmata Barrie, Esq.
    (DC, FL)
Georgina A. Oladokun, Esq.
    (MD)
Tamika Jones, Esq.
    (DC)

**Carpenter's Building**
1003 K Street, N.W.
 Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
**Email: chrisanwahfirm@chrisanwahfirm.com**

## FACSIMILE COVER LETTER

DATE:
    May 11, 2006

TO:
    Ms. Gloria Everett - Social Worker

COMPANY
    DCPS Child Care Center

FAX NUMBER:
    (202) ~~674-6557~~ 442-5517

FROM:
    Annie R. Pressley, J.D. - Education Advocate

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET __2__

MESSAGE __REQUEST CORRECTED COPY OF MDT ELIGIBILITY NOTES FOR__
____ W████ R████

If there is any problem with this transmission, please call as soon as possible at (202) 626-0040

### *** CONFIDENTIALLY NOTE ***

The pages accompany this facsimile transmission contain information from the CHRISTOPHER ANWAH, ESQ. law offices which is confidential or privileged, or both. The information is intended to be for the use of the individual or entity named on this cover letter. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this facsimile in error, please notify us by telephone immediately at (202) 626-0040 so that we can arrange for the retrieval of the original documents at no cost to you.

105

**HP Officejet 6210**
Personal  Printer/Fax/Copier/Scanner

**Log for**
Dr. Annie  Pressley
2026260048
May  11  2006  6:28PM

---

**Last Transaction**

| Date | Time | Type | Identification | Duration | Pages | Result |
|------|------|------|----------------|----------|-------|--------|
| May  11 | 6:27PM | Fax  Sent | 4425517 | 0:51 | 2 | OK |

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION BRANCH**

**SOCIAL WORK EVALUATION REPORT**

Student's Name: William R██████ II _____     DOB: ███/96 Age: 9 ____

SS#: _███████ _____     Student ID#: 9119990 _____

Parent/Guardian: Wanda Richardson _____

Address: 4321 3rd Street SE #302, Washington, DC 20032 _____

Home Phone: (202) 561-0574 or 316-4207 ___ Work Phone: _____

Emergency: () _____

School: Assumption ___ Grade: 4th ___ Teacher: Ms. White _____

Referral Source: CARE Center ___ Primary Language: English _____

Date of Interview: 02/09/06 _____ Social Worker: Gloria T. Everett, LICSW. _____

Person(s) Interviewed: Wanda Richardson ___ Relationship to Student: mother _____

Reason for Referral:
Reports Reviews: _____
Services Currently Being Received From Community Agencies: Na
Social Work Services: Service Provider: _____
Where: 301-577-8152 ___ Phone: () Psychological Services: Service Provider: WATS _____
Where: _____ Phone: ( ) _____
Speech and Language Services: Service Provider: _____
Where: _____ Phone: ( ) _____
Legal Services: Service Provider: _____
Where: _____ Phone: ( ) _____
Other Services: Service Provider: _____
Where: _____ Phone: ( ) _____

                                        Form - 7 Revised

                    1 of 10

NAME: W█████ R████████
DOB: ████/96
SOCIAL WORKER: Gloria T. Everett, LICSW

## I. FAMILY DATA

Household Composition:

| Name | Age | Relationship | Education | Occupation |
|------|-----|--------------|-----------|------------|
| **W█████ R████████ II** | **9** | **Student** | | |
| Jiell Richardson | 13 | Sister | 8th grade | |
| Jasmine Richardson | 10 | Sister | 2nd gr. Sp. Ed. | |
| Foster Child | 2 | Cousin | | |
| Foster Child | 6 (m) | Cousin | | |
| | | | | |

Family Members/Significant Others not in household-Phone, # if available

| Name | Age | Relationship | Phone # | Occupation |
|------|-----|--------------|---------|------------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Form - 7 Revised

108

NAME: W███ R████ II
DOB: _____ /96
SOCIAL WORKER: Gloria T. Everett, LICSW.

**Family Relationships and Living Situation:**

Student is the youngest and only boy in an intact family of three biological children. The family also includes two female cousins placed in the home from Child & Family Services Kinship Program. The family presently resides in a 3 bedroom apt. The mother spoke of being homeless in the past and though pleased with her current housing, is looking forward to moving into larger accommodations given the size of her increased family.

W█████ father is currently incarceration since 2004 and according to the mother; the father has a history of recidivism. He also has a history of drug involvement and psychiatric concerns. The mother shared that because of these factors, she does not perceive W█████ father as having developed a stable relationship with his son. However, W█████ will say just the opposite. The mother indicated that W█████ idolizes his father.

Ms. Richardson spoke openly of the family's difficult history and her history of mental illness, hospitalizations and current medication regime for stabilization of everyday activities. In addition, Ms. Richardson talked about her children's educational needs and mental health issues. Ms. Richardson expressed sadness about abandonment of the children by their father and on going marital discord; Pervasive unemployment by both parents even though Ms. Richardson has an undergraduate degree and has been employed as an elementary school teacher, she is unable to work.

As it relates to W█████, he began at age 3years to receive psychological services at the Washington Assessment Treatment Services and at age 5 years qualified for SSI Benefits as an emotional disturbed child. W█████ in Kindergarten began receiving special education services as an emotional disrupted child. It should be noted that W█████ younger sister attends a full time program for student who are diagnosed as ED. According to the mother, W█████ is vocal to imaginary people, engages in self mutilating of his ears, and is phobic about public eating, all of these in addition to his educational difficulties. Ms. Richardson indicated that despite the family's struggles, W█████ has a positive relationship with all family members.

Has child experienced any traumatic events, such as the death of a close relative, divorce, family crisis, or relocation?

___✓___ Yes:    ___ No: If yes, explain below:

The father has a history of incarceration and mental health issues which has impacted his availability to his family. The family has experienced homelessness and repeated hospitalization of the mother.

NAME: W█████ R██████ ll
DOB: ████/96
SOCIAL WORKER: Gloria T. Everett, LICSW

## II. DEVELOPMENTAL AND MEDICAL HISTORY

Did the mother experience any health problems/complications during the pregnancy?

___√___ Yes ___No___ if yes, explains:
Mother developed gestational diabetes and hypertension

Was there any substance/alcohol abuse?

_____ Yes ___√___ No   if yes, explain below:

Birth Weight:  13.12 lbs          Age of mother at birth: 34

Did any of the following occur during the birth process?
___ Premature          ___ Transfusion          ___√___ Caesarean Section

___ Breech Birth        ___ Prolonged Labor  ___ Oxygen Problem

___ Fetal Distress       ___ Blood Incompatibility (Rh factor)

Other birth problems and/or concerns:

110

NAME: W█████ R██████ II _____
DOB: ███/96 _____
SOCIAL WORKER: Gloria T. Everett, LICSW _____

## II. DEVELOPMENTAL AND MEDICAL HISTORY (Cont'd)

List completion of developmental milestones with reference to age.
The mother shared that W█████ reached all developmental milestones at expected age.

Please check below any illnesses or problems the child has had and age of onset.

___ Physical Disability _____ Frequent Colds __    √ ___ Allergies

___ Speech Problems _____ Eye Problems ____ Ear Problems

___ Frequent Sore Throats _____ Asthma _____ Dietary Problems

___ Headaches ___ Seizures _____ Epilepsy

___ Heart Disease _____ Diabetes _____ Bed-wetting

___ Serious Accident _____ Temperature _____ Lead Poison
     Or Injuries             above 104

___ Operations _____

√ ___ Other:

Describe any of the problems checked above:
W█████ has eczema and uses medication to control this condition

5 of 10

111

NAME: Wi̅̅̅̅ R̅̅̅̅ll _____
DOB: ▓▓/96 _____
SOCIAL WORKER: Gloria T. Everett, LICSW _____

## MEDICAL HISTORY  (Cont'd)

How would you rate the child's general health?

__√__ Excellent__Good___ Fair___ Poor

Date of last physical? _____By Whom? _____

Where? _____

Vision: _____                          Hearing:_____

Has the child ever been hospitalized?    _____ Yes:  __√__ No    how long?

Age at the time, ____        Reason(s)
Is the child in treatment and/or receiving medication at present?   __√__ Yes __No
    1.  27mg daily of concerta
    2.  0.1mg. daily Clonadine


Date  of  next    appointment / Name of Physician:


Psychiatric History?   __√__ Yes  _No_

Individual therapy weekly since age 3 years. Medication monitoring from WATS

 Release of information obtained?   No __√____ Yes __


Referral to:


Form - 7 Revised

NAME: W███ R███ II
DOB: ███96
SOCIAL WORKER: Gloria T. Everett, LICSW

## III.    SIGNIFICANT SOCIAL PERSONAL FUNCTIONING

Self Help Skills:

W█████ self-help skills are appropriate according to his mother.


Independent Travel: W█████ is able to travel independently in his community.


Household Chores/Responsibility:

W█████ is responsible for picking up and putting things back in place.

Study Habits:
W█████ has experienced a great deal of difficulty developing appropriate study habits.


Vocational Interest Expressed/Jobs Held:    W█████ has expressed an interest in acting.


Student Interest and Leisure Activities:

Student enjoys drawing, dancing and playing contact sports.


Form - 7 Revised

7 of 10

113

NAME: W████ R███████ ll
DOB: ███/96
SOCIAL WORKER: Gloria T. Everett, LICSW

## IV. SOCIAL/BEHAVIORAL CHARACTERISTICS

√ Consistent short attention span

___ Frequent/Sudden changes in mood

√ Rocking

√ Difficulty with organization

___ Temper tantrums

___ Head Banging

___ Difficulty understanding questions or directions

___ Unreasonable Fears

___ Day dreaming

√ Difficulty using numbers

√ Poor self-control

___ likes to be in control

___ Difficulty telling time

___ unusually aggressive towards others

___ Sleepwalking

___ Gets ideas quickly

___ unusually demanding

___ Nightmares

√ Avoids homework
___ gets along with peers

___ Lack of motivation

___ Enjoys being read to

___ frequently tells lies

___ Prefers to play alone

___ Avoids reading

√ Needs constant approval or assurance

√ Difficulty making/keeping friends

___ Enjoys reading and activities

___ Cooperative

___ Difficulty completing jobs

___ Outgoing

___ Uncooperative

√ Difficulty with change in routine

___ Self-confident

___ Over-active

___ Excessive watching of television/video games

___ Strong-willed

___ Under-active

√ Creative

___ Excessive inconsistency in behavior

___ Bites Nails

√ Athletic

___ Unusually shy and withdrawn

___ thumb sucking

√ Artistic

___ Musical

___ Inappropriate Sexual concerns

√ Self injurious

___ Alcohol usage

___ Drug

114

NAME: W████    R████ II
DOB: ████/96
SOCIAL WORKER: Gloria  T.  Everett, L.I.C.S.W.

## SOCIAL/BEHAVIORAL CHARACTERISTICS(Cont'd)

According to the mother, W████ has had an eventful school history with ADHD and emotional disturbance in kindergarten.

## SCHOOL HISTORY

Schools Attended/Grades:

| | |
|---|---|
| Thomas Pullen Performing Arts School | Kg. |
| Valley View | ½ year for 1st. grade |
| Long Fields | ½ year for 1st grade to 2nd grade |
| Ann Beers | 2nd grade |
| Assumption Catholic | 3rd grade |

Retention/Attendance Concerns:
  Na

School Related Services Received:
According to the mother, student received 504 Services (transportation) to assure his attendance as a kindergarten student.

Form - 7 Revised

9 of 10

115

Name: W_____ R_____ II _____
DOB: _____/96 _____
SOCIAL WORKER: Gloria T. Everett, LICSW _____

## SCHOOL HISTORY (Cont'd)

School Adjustment (Include Onset of Problems):

    Student continues to struggle with academic and behavioral concerns

Does your child enjoy School?
    According to the mother, she does not know if W_____ enjoys school

Do you feel that your child is making progress?

    The mother shared that W_____ has not demonstrated sufficient academic progress.

What does your child do well?
    According to Ms. Richardson, W_____ is an emerging actor and dancer.

How do you think the school can help your child?

    The mother wants assistance in identifying W_____ academic needs.

Has your child had any evaluation that the school may be unaware of: NONE

Educational ___   Psychology Speech _____OT/P.T. _When _____

                       Form 7 Revised

Name: W█████ R████████ II _____
DOB: █████/96 _____
SOCIAL WORKER: Gloria T. Everett, LICSW _____

W█████ is an only boy in an intact family of three biological children. He has experienced a variety of traumatic events since age 3 years when he began mental health therapy and identified as ED at age 5 years. Since this time, W█████ has struggled in school with both academic and behavioral difficulties.

W█████ home environment has severely impacted his emotional stability as the family has dealt with the abandonment of both parents through repeated hospitalization of the mother for psychiatric treatment, the father's recurring incarcerations, homelessness, and protracted periods of unemployment by the parents.

At this time, W█████ continues to experience poor academic adjustment and his mother requested the current evaluation process to ensure W█████ is provided an appropriated educational program.

117



# Central Assessment Referral and Evaluations (C.A.R.E.) CENTER

**Office of Special Education**
**(Located at Shaw Junior High School)**
**925 Rhode Island Avenue, NW**
**Washington, DC 20001**
**(202) 671-0882**



## PSYCHOLOGICAL REPORT REVIEW

| | |
|---|---|
| Name: Richardson II, William | School: Assumption RC School |
| Date of Birth: ████/1996 | Teacher: Ms. White |
| Age: 9 years, 7 months | Grade: 4.4 |
| Sex: Male | ID: 911990 |
| Date of Testing: 01/09/2006 | Examiner: Yvonne E. Rojas |

## Reason for Referral:

William is a 9-year-old student at the Assumption Catholic School. He was referred for a review of a previous psycho-educational report, an educational assessment update, and a clinical evaluation. A review of the psycho-educational assessment that was conducted by DCPS School Psychologist, Anthony White, on August 20, 2004, was done and a summary is given in this report. The current referral statement indicated that William is performing well below average in all subject areas except for math. Standardized Achievement tests conducted by the school in 12/9/05 Terra Nova CAT Achievement Test revealed scores all below average. The referral statement included "William has low self esteem, poor attention and concentration, and often exhibits mood changes with anger".

## Background Information:

The classroom observation report that was completed by the school counselor was reviewed along with other school reports. William behaviors as described by the counselor during her recent classroom observation, and William behavior during two assessment sessions with this writer seemed different from the behaviors described by his parent and teacher. An initial evaluation conducted by clinical psychologist, Stephen Thornton, Ph.D., when he was 3-1/2 years old revealed that William suffered from Attention Deficit-Hyperactive Disorder and Oppositional Defiant Disorder.

William mother reported she suffered from Gestational Diabetes and William weighed 13lbs.12ozs., at birth. William mother, Mrs. Wanda Richardson inferred that William larger size than his Day Care peers and his consumption of strawberry milk while at Day Care might have caused his aggressive behavior at that early age. She described him as "flipping" his playmates. William was reported to pluck his ear until it bleeds, wanders off and bangs on the table. William father is currently incarcerated. At the time of his

W███ R██████ II
2/09/06

2

incarceration, the family became homeless. W████ has two sisters. W█████ mother reported that W████ demonstrates anger toward his sisters, but not toward her. One of his sisters has been diagnosed as schizophrenic and attends a program for the Emotionally Disturbed. W█████ spoke about his older sister's

academic accomplishment with pride. W██████ mother reported he has a poor relationship with his sister who is enrolled in the ED program and blocks his door at nights. Mrs. Richardson described his behavior as paranoid. Mrs. Richardson stated that her husband was abusing PCP when W████ was conceived.

The Behavior Assessment System for Children, Second Edition Parent, Teacher and Self Rating Scales were given to obtain information regarding W█████ current behavior and to assess his need for further evaluation.

## Assessment Procedures and Information Sources:

Psycho-educational Report Review
School Records Review
Woodcock-Johnson III Tests of Achievement 01/09/06
Behavior Assessment System for Children 2nd Edition 01/09/06
BASC II Teacher Rating Scales (TRS)
BASC II Parent Rating Scales (PRS)

## Assessment Results and Interpretation

## Review of Psycho-educational Evaluation dated 8/20/04:

## Cognitive Functioning:

W████ completed a psycho-educational evaluation when he was 8 years and 2 months old. Findings were that his overall cognitive ability based on the Wechsler Intelligence Scale for Children 3rd Edition, (WISC-III), is in the Average range, WISC-II Full Scale IQ = 92. W█████ verbal reasoning abilities were reported to be in the Average range, much better developed than his nonverbal reasoning abilities, and above those of approximately 66% of his peers. His Verbal IQ = 106; (90% confidence interval = 100 – 111). W██████ nonverbal reasoning abilities were reported to be in the Borderline range and better than those of approximately 8% of his peers (Performance (nonverbal) IQ = 79; ( 90% confidence interval = 74 -88). W████ achieved his best performance among the verbal reasoning tasks in the Comprehension subtest that required him to understand and provide oral solutions to everyday problems that deal with conventional standards of social behavior, and social judgment (Comprehension scaled score = 13, 84%ile). On the Similarities subtests, also an area in which his performance was noteworthy, W████ was required to abstract meaningful concepts and relationships between word pairs (Similarities scaled score = 13, 84%ile).

W████ performed less well on the Arithmetic subtest that required him to mentally solve problems that required numerical reasoning abilities, attention, concentration and short term memory (Arithmetic scaled score = 9, 37%ile). Among the nonverbal subtests, the Coding required W█████ to associate and draw a series of symbols to match a series of shapes. This is a timed test and W████ was required to quickly scan and provide visual information (Coding scaled score = 10, 50%ile). The other nonverbal items required W█████ to manipulate colored blocks to form designs, to arrange pictures in a required order, and put puzzle pieces together to form objects or animals. These subtests require short-term visual-memory, attention or visual-motor coordination. Performance on these nonverbal subtests was in the low range.

William Richardson II
2/09/06                                                             3

### Academic Functioning (Review)

William was administered the Woodcock Johnson-III Tests of Achievement. His overall academic skills were estimated to be in the low average range, with as grade equivalent of 2.1. His fluency with academic tasks is average, his performance in math calculation is average, his performance is low average in reading words in isolation, and his performance on the spelling subtest is in the low average range. Perceptual-motor skills were reported to be within normal limits for his age level.

Findings were that William did not meet the criteria for special education services as a learning-disabled student. His academic skills were found to be commensurate with his cognitive abilities.

### Other:

In reviewing William records Mr. Anthony White, School Psychologist reported that Stephen Thornton, Ph.D., clinical psychologist at Washington Assessment and Therapy Services on 12/14/99 when he was 3-1/2 years old, evaluated William. Dr. Thornton reported William cognitive abilities to be in the average range (FSIQ = 92), as measured by the Wechsler Preschool and Primary Scale of Intelligence-Revised (WPPSI-R). A diagnosis of Attention Deficit-Hyperactivity Disorder, and Oppositional Defiant Disorder. A diagnosis of Bipolar Disorder was deferred.

### Current Assessment Results and Interpretation:

### Behavioral Observation:

William was pleasant, cooperative and attentive. His mood was calm, his sensorium was clear, and there no indications of the presence of mood disorder. He denied delusions or hallucinations. He presented as a bright, articulate young boy. There were no indications of defiance, or hostile behavior, and he was compliant. He attempted all the material that was presented to him and worked to the best of his ability. The Woodcock-Johnson-III was the instrument used for his academic reassessment. Results of the Woodcock-Johnson are considered a valid representation of his current academic abilities.

### Academic Re-evaluation:

*Woodcock-Johnson III Tests of Achievement*
Compuscore for the WJ III, Version 2.0
Norms based on grade 4.4

| CLUSTER/Test | Raw | GE | EASY to DIFF | | RPI | PR | SS(68% BAND) | AE |
|---|---|---|---|---|---|---|---|---|
| BROAD MATH | – | 4.0 | 3.0 | 5.2 | 85/90 | 40 | 96 (93–99) | 9–6 |
| MATH CALC SKILLS | – | 3.6 | 2.6 | 5.0 | 82/90 | 30 | 92 (88–96) | 9–1 |
| ACADEMIC SKILLS | – | 3.0 | 2.6 | 3.6 | 51/90 | 14 | 84 (81–87) | 8–4 |
| ACADEMIC APPS | – | 3.9 | 2.9 | 5.6 | 86/90 | 42 | 97 (94–100) | 9–5 |

Form A of the following achievement tests was administered:

| Letter-Word Identification | 41 | 2.9 | 2.6 | 3.3 | 25/90 | 16 | 85 | (82–88) | 8–2 |
|---|---|---|---|---|---|---|---|---|---|
| Calculation | 14 | 3.5 | 2.8 | 4.4 | 75/90 | 29 | 92 | (87–97) | 9–0 |
| Math Fluency | 51 | 3.9 | 1.9 | 6.2 | 88/90 | 38 | 95 | (92–98) | 9–4 |
| Spelling | 26 | 2.8 | 2.3 | 3.6 | 53/90 | 20 | 87 | (83–91) | 8–1 |
| Passage Comprehension | 28 | 3.7 | 2.8 | 5.3 | 83/90 | 39 | 96 | (92–100) | 9–0 |
| Applied Problems | 33 | 4.4 | 3.6 | 5.4 | 90/90 | 51 | 100 | (96–105) | 10–1 |
| Writing Samples | 10–C | 2.8 | 1.8 | 6.8 | 83/90 | 24 | 89 | (81–98) | 8–6 |

## Test Results:

W██████ academic skills as measured by the Woodcock-Johnson –III Academic Achievement Tests are low average to average. W██████ overall academic skills are within the low average range. His ability to apply academic skills is within the average range compared to others at his grade level. When compared to others at his grade level, W██████ performance is average in mathematics and Math calculation skills. His performance in language arts is in the low average range.

## The Broad Math Cluster .

The cluster provides a comprehensive measure of math achievement including problem solving, number facility, automaticity, and reasoning, and includes Test 5: Calculation, Test 6: Math Fluency and Test 10: Applied Problems.

Test 5: Calculation, measures the ability to perform math calculation. It required W██████ to write single numbers, to perform addition, subtraction and multiplication, division, and combinations of these basic operations. The calculations have negative numbers, percents, decimals and fractions. The calculations were presented in a traditional problem format, and W██████ was not required to make decisions about what operations to use or what data to include. He obtained a standard score of (92) that is in the Average range.

Test 10: Applied Problems required W██████ to listen to the problem, recognize the procedure to follow, and then perform simple calculations. The problems sometimes include extraneous information, and W██████ was required to decide the appropriate mathematical operations, as well as which numbers to include in the calculation. He obtained a standard score of (100) that is in the Average range.

Test 6: Math Fluency. W██████ was presented with a series of simple arithmetic problems that has a 3-minute time limit. He was required to solve simple addition, subtraction, and multiplication facts quickly. He obtained a standard score of (95) that is in the average range.

## Academic Skills Cluster

The Academic Skills cluster is a measure of reading decoding, math calculation, and spelling of single-word responses providing an overall score of basic achievement skills. It is a measure of Test 1: Letter-Word Identification, Test 7: Spelling and Test 5: Calculation.

Test 1: Letter-Word Identification measures W██████ word identification skills. The initial items required W██████ to identify letters and to pronounce words correctly. The items become increasingly difficult as the words selected on the test appear less frequently in written English. W██████ was not required to know the meaning of the words. He obtained a standard score of (85) that is in the Low Average range.

William Richardson II
2/09/06

5

**Test 7:** Spelling measures prewriting skills, to produce upper and lower case letters, and the ability to write orally presented words correctly. The items become increasingly difficult as the words become more difficult. William obtained a standard score of (87) that is in the Low Average range.

**Test 5:** Calculation described above is in the Average range.

## Academic Applications Cluster

The Academic Application cluster is a combination of Test 9: Passage Comprehension, Test 10: Applied Problems, and Test 11: Writing Samples. These tests require the application of academic skills to academic problems.

**Test 9:** Passage Comprehension involves symbolic learning, or the ability to match a pictographic representation of a word with an actual picture of the object. Some of the items are presented in multiple-choice format and require the person to read a short passage and identify missing key words that make sense in the context of the passage. The items become increasingly difficult by removing pictorial stimuli and by increasing passage length, level of vocabulary and complexity of word meanings and sentence structure clues. William obtained a standard score of (96) which is in the average range.

**Test 11.** Writing Samples measure skills in writing responses to a variety of demands. William was required to write sentences that are evaluated for quality of expression. The items become increasingly difficult, increase in length, and level of vocabulary, grammatical complexities, and level of abstract concepts. William was not penalized for errors in spelling or punctuation. He obtained a standard score of (89) that is in the Low Average range.

## Behavior Rating Scales

BASC-2

Ms. White, 4th grade teacher, Mrs. Wanda Richardson, William's mother, used the Teacher Rating Scales (TRS), Parent Rating Scales (PRS) and Self Rating Scales and a Self Rating Scale (SRS) done by William have two scales that are relevant to the school setting: Learning Problems and Study Skills. Scale Scores in the Clinically Significant range suggest a high level of maladjustment. Scores in the At-Risk range may identify a significant problem that may not be severe enough to require formal treatment or may identify the potential of developing a problem that needs careful monitoring.

### BASC-II Score Classification

| Adaptive Scales | Clinical Scales | T-Score Range |
|---|---|---|
| Very High | Clinically Significant | 70 and above |
| High | At Risk | 60 – 69 |
| Average | Average | 41 – 59 |
| At Risk | Low | 31 – 40 |
| Clinically Significant | Very Low | 30 and below |

## Externalizing Problems

The scales on the Externalizing Problems composite on the child and adolescent levels include Hyperactivity, Aggression, and Conduct Problems. This composite is characterized by disruptive-

122

behavior problems such as aggression, hyperactivity, and delinquency. Externalizing Problems generally tend to be more constant than Internalizing Problems, are generally more obvious, and carry a less favorable prognosis. A central characteristic of the Externalizing Problems composite is the students' disruptive activities against both peers and adults that bring them to the attention of teachers and health care professionals. They are often unresponsive to adult direction, and have problematic relationships with peers. The feature has been referred to as "under-controlled" behavior. W██████ Externalizing Problems composite-scale T score is 77, with a 90 percent confidence-interval range of 74-80 and a percentile rank of 96. These scores are in the Clinically Significant classification range.

W██████ T score on Hyperactivity, is 74 and has a percentile rank of 96. This T score falls in the Clinically Significant range, and usually warrants follow-up. W██████ teacher reports that W██████ engages in a high number of behaviors that are adversely affecting other children in the classroom. He is reported as often being restless and overactive, and he may have difficulty controlling his impulses. The Hyperactivity scale assesses the hyperactivity and impulsivity aspects of Attention Deficit Hyperactive Disorder (ADHD). Item behaviors include fiddling with things, interrupting others, being overactive, and having poor self-control. Children diagnosed with ADHD also  demonstrate problems with aggression, learning, conduct disorders, depression, and social skills.

W██████ T score on Aggression is 72 and has a percentile rank of 95. This T score falls in the Clinically Significant range, and usually warrants follow-up. W██████ teacher reports that W██████ displays a high number of aggressive behaviors and may be reported ass being argumentative, defiant, and/or threatening to others. Aggression is the tendency to do physical or emotional harm to others or their property. The Aggression scale assesses both physical and verbal aggression, and behaviors such as arguing, name-calling, verbally threatening others, breaking others possessions and hitting others.

W██████ T score on Conduct Problems is 81 and has a percentile rank of 98. This T score falls in the Clinically Significant range, and usually warrants follow-up. W██████ teacher reports that W██████ often engages in rule-breaking behavior, such as cheating, deception and/or stealing. The Conduct Problem scale is similar to the delinquency or antisocial behavior scales from other instruments and measures socially deviant  and disruptive behaviors that are characteristic of Conduct Disorder. Behaviors include cheating in school, stealing, truancy, lying, running away from home, and alcohol and drug use.

## Internalizing Problems

The Internalizing Problems composite consists of the Anxiety, Depression, and Somatization scales. This composite include scales that are not marked by acting-out behavior, and is referred to as "over-controlled" behavior. Students with internalizing problems typically are not disruptive of other's activity. They tend to monitor their own actions to excess and to be compliant, their problems may easily go unnoticed. Although such behaviors are not disruptive, peer relationships may be adversely affected by the presence of internalizing symptomatology.

W██████ T score on Anxiety is 69 and has a percentile rank of 95. This T score falls in the Clinically Significant range, and follow-up may be necessary. W██████ teacher reports that he sometimes displays behaviors stemming from worry, nervousness, and fear.

W██████ T score on Depression is 77 and has a percentile rank of 97. This score falls in the Clinically Significant range, and usually warrants follow-up. His teacher reports that he is withdrawn and pessimistic, and sad. Scores in this range usually warrant an assessment of vegetative symptoms (e.g., weight gain or loss, fatigue, etc.). Suicidal tendencies should also be explored.

123

W████ T score on Somatization is 50 and has a percentile rank of 66. W██████ teacher reports that W████ complaints of health-related problems are about the same degree as others of his age.

**School Problems** composite include Attention Problems and Learning Problems.

W████ T score on Attention Problems is 62 and has a percentile rank of 86. This T score falls in the At Risk range, and follow-up may be necessary. W██████ teacher reports that he has difficulty maintaining necessary levels of attention at school. The problems experienced by W████ might disrupt academic performance and functioning in other areas.

W████ T score on Learning Problems is 66 and has a percentile rank of 91. This T score falls in the At Risk classification, and follow-up may be necessary. W██████ teacher reports that W████ has difficulty comprehending and completing schoolwork in a variety of academic areas.

The Parent Rating Scale Summary indicates relatively high ratings compared with the general population and are clinically significant. The Behavioral Symptoms Index composite-scale T score is 85, with a 90 percent confidence-interval range of 81-89 and a percentile rank of 99. Scale summary information for Hyperactivity, Aggression, Depression and Attention Problems represent negative or undesirable characteristics that cause impaired functioning in home, school, peer relationships or community contexts.

W████ T score on Atypicality is 81 and has a percentile rank of 98. This score falls in the Clinically Significant range. W████ mother reports that W████ frequently engages in behaviors that are considered strange or odd, and he generally seems disconnected from or unaware of his normal surroundings, (e.g., acting confused, being out of touch with reality, saying things that don't make sense).

W████ T score on Withdrawal is 71 and has a percentile rank of 96. This T score falls in the Clinically Significant range. W████ mother reports that he is generally alone, has difficulty, making friends and is unwilling to join group activities.

W████ T score of Adaptability is 39 and has a percentile rank of 15. This T score falls in the At Risk classification range. W████ mother reports that W████ has difficulty adapting to changing situations, and that W████ takes longer to recover from difficult situations than most others at his age.

W████ T score on Social Skills is 39 and has a percentile rank of 16. This T score falls in the At Risk category. W████ mother reports that W████ has difficulty complimenting others and making suggestions for improvement in a tactful and socially acceptable manner.

W████ T score on Leadership is 44 and has a percentile rank of 29. W██████ mother reports that W████ demonstrates a typical level of creativity, ability to work under pressure, and an ability to bring others together to complete a work assignment.

W████ T score on Functional Communication is 43 and has a percentile rank of 25. W████ mother reports that W████ generally exhibits adequate expressive and receptive communication skills, and that W████ is usually able to seek out and find new information when needed.


2/09/06                                                                              8

**Student Response Scale**

Williams scores are within normal range for Adaptive and Clinical Scales with a T score of 44 in Attention and Hyperactivity and a percentile rank 30. Self Esteem, Interpersonal Skills and Self Reliance range from T scores of 50 to 59. William rated his Sense of Inadequacy yielding a T score of 39 and a percentile range of 13 that is in the At Risk category.

Williams T score of 45 on Attitude toward School is in the average range of Clinical Significance and his attitude toward teachers has a T score of 55 with a percentile rank of 74 that is in the average range.

<u>Summary and Recommendations:</u>

Williams overall cognitive ability according to previous evaluations on the WPPSI-R and the WISC-III indicate a Full Scale IQ of 92, within the Average range. Current academic achievement test results indicate Academic Skills in the low average range (84) and Academic Application skills in the average range (97). Williams performance is average in Mathematics, and math calculation skills, and low average in reading words in isolation and spelling. He is having difficulty with phonics. Based on the current test data, William does not meet the criteria for special education service as a learning-disabled student. His academic skills are commensurate with his cognitive abilities.

In terms of his Executive Functioning William teacher reports that William has difficulty controlling and maintaining his behavior and mood. His rating yielded as T score of 74 and a percentile rank of 97. This score falls within the Clinically Significant range and usually warrants follow-up. Williams mother reports that William has a tendency to become easily upset, frustrated, and angered in response to environmental change and has difficulty controlling and maintaining his behavior and mood. His T score is 89 with a percentile rank of 99. The Executive Functioning content scale measures the ability to control behavior by planning, anticipating, inhibiting, or maintaining goal-directed activity, and by reacting appropriately to environmental feedback in a purposeful, meaningful way. Both William mother and teacher report Resiliency T scores of 29, and 30, with a percentile rank of three, indicating that William has difficulty overcoming stress and adversity.

On the Self Report Williams responses seem typical for his age and sex. However, he omitted some items including the following:

- Even when I am alone I feel some one is watching me.
- I hear voices in my head that no one else can hear.
- I worry when I go to bed at night.

Williams family history may be affecting him socially and emotionally. He is currently in counseling at the Washington Assessment and Therapy Services Center. A current progress report is required to determine his treatment status. His mother reported he has not been maintained on medication.

<u>Recommendations:</u>

- Convene a multidisciplinary team to review William assessment results and make recommendations for Educational programming.
- Continue home study program involving reading, spelling and vocabulary building.
- Follow-up current clinical treatment to determine if further assessment is indicated.

125

William Robinson II
2/09/06

9

Yvonne E. Rojas, M.A.
School Psychologist Lisc. DCPS

WK-17

### DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### WASHINGTON, D.C.

### MULTIDISCIPLINARY TEAM (MDT)
### Eligibility Meeting Notes

MDT

MEETING DATE: 5/10/06

STUDENT: _____    SCHOOL: Assumption

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION Parent/Guardian |
|---|---|---|
| Wanda M Richardson | | |
| Gloria T. Everett | Gloria T Everett | LEA |
| Nим White | | General Ed Teacher |
| YVONNE ROJAS | Yvonne Rojas | School Psychologist |
| Annie R. PRESSLEY | Annie R Pressley | Edu. Advocate |
| Nataba Huston | VIA telephone | SP Ed Teacher |

The purpose of meeting was stated + all members signed MDT form

According to the mother _____ behaviors are impacting his availability for learning. His school is acting by clowning him out of the classroom due to his disruptive behaviors has impacted his self esteem.

According to the teacher, his grade level skills are below grade level. He has poor motor ability spelling is poor as well as memory. Math skills are better, but he needs to work harder. His behaviors are out of Central. 2nd grade reading comprehension math 2nd - 3rd grade level. Spelling 2nd grade.

THE PARENT ☒ IS PRESENT ☐ IS NOT PRESENT AT THE MEETING

AFTER A REVIEW OF THE ASSESSMENTS, IT IS DETERMINED THAT _____ II

☐ IS ELIGIBLE FOR SPECIAL EDUCATION AND RELATED SERVICES
    ☐ TEAM WILL COMPLETE IEP
    ☐ TEAM WILL SCHEDULE IEP MEETING
    ☐ ADDITIONAL ASSESSMENT WILL BE ORDERED

☒ IS NOT ELIGIBLE FOR SPECIAL EDUCATION
    ☐ STUDENT IS REFERRED BACK TO THE TAT
    ☐ ADDITIONAL ASSESSMENT WILL BE ORDERED

DISTRICT OF COLUMBIA PUBLIC SCHOOLS    07-02-2001    DIVISION OF SPECIAL EDUCATION    MDT MEETING NOTES    APPENDIX - A

127

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, DC**

**CONTINUATION MEETING NOTES**

MEETING TYPE: _____                              Page: 2 of 2

Student: ████ █████    School: ████████    Date: 10/10/06

████ was referred for counseling & was seen 2X monthly in groups. Mr. Bessmore. ██████ WATS ████ also has mentor since about April 06 weekly & Dr. Vent Thomasen for medication Concerta 1X per day A.M. before school & ~~Clon~~ Clonidine 0.1 mg P.M. at night since about 3 years).

The teacher shared that ████ often does not complete classwork.

The education advocate is requesting a psych evaluation & report. The student is in therapy at this time & parent has refused to provide this information. According to parent in a previous contact, she was advised to not provide med & psyc. information to DCPS.

The MDT found ████ not eligible for special education. No IEP was written.

The mother was requested to sign a medical release form which will ~~be~~ mailed to her home. DCPS will request from his medical providers information related to current treatment. When DCPS receives new information, an MDT will review this information in an effort to determine student's educational needs.

128

5/10/06                                Annie R Pressley
                                       Education Advocate

W____ D. R_____ ▓ — DOB: ▓▓/96
                          4th grade

MDT/IEP — Review eval + eligible for Spe ED.

~~Psyc~~ ~~ED~~
Parent — W____ has a lot of problems in behavior in
the classroom — affects his ability to learn —
spends more time out of the classroom than
in — He is sitting out in the hall has been
alienated from the classroom — he often sent
to hall for behavior — he wanders — he is never
where he is told to be — he has loud
outbursts and his self-esteem is low b/c
he is not able to control himself.

Teacher: W____ is below academic level —
unable to do cursive — handwriting at the
beginning of second grade level — memory
for letter and recalling, as well as note
taking is difficult. Math is very difficult
for solving math calculations. He can
do math from seeing it after repetition.
He is often defiant — destroys property —
has problem with following direction.
Teacher gave W____ tutoring, extra
time to complete assignments. Referral was
_____ to Ms. Welch (SW) to determine

129

therapy that were warranted - FBA or BIP - but those evaluations were not done. SW saw W[redacted] 3 x month - no progress notes + and the info is confidential. Mother spoke with SW re academics - recommend a mentor (male prospective) has not helped for team a month. The intervention measure has not help W[redacted] b/c reading comprehension he is so behind. Student is two grade level behind. Student take concerta 1 x daily before school, + Clonidine O. + mg at night after school for 3 yrs - dosage has changed, + group therapy with WATTS. His spelling and phonics are 2 grade level. After he does not complete class assignment. He usually does not do the work b/c he is not in class for behavior issues and being uncooperative.

School Psychologist - W[redacted] has low self-esteem, poor attention and concentration, and often exhibits mood changes with anger." W[redacted] is afraid of his sister who is bipolar and schizophrenic after displays paranoidia. W[redacted] started Assumption 3 years ago, W[redacted] has been having outbursts for the last 3 years to present. Psychologist did not find the eligible for special education although the teacher reported negative social behavior. Advocate and parent is recommending and requesting a psychiatric evaluation and clinical. Parent informed the MDT that the student's psychiatrist evaluation would not do evaluation w/o paying for them. Advocate requested independent evaluations, i.e. Psycho-ed, clinical and psychiatric and O CPS has refused. There are behavior issues, DCPS wants to provide SOW in the student's neighborhood school. Parent disagree.





# LAW OFFICES OF
## CHRISTOPHER N. ANWAH, PLLC

**Attorneys and Counselors at Law**

Christopher N. Anwah, Esq.
   (DC, MD, NJ)
Fatmata Barrie, Esq.
   (DC, FL)
Georgina A. Oladokun, Esq.
   (MD)
Tamika N. Jones, Esq.
   (DC)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwahfirm.com

## FACSIMILE COVER LETTER

**DATE:** 07/28/06

**TO:** Stephanie Ramjohn Moore, Esq.

**COMPANY:** OGC

**FAX NUMBER:** 202-442-5098

**FROM:** Fatmata Barrie, Esq.

**RE:** W̶█████ R̶████████ Disclosure     *Part II = WR-10 to WR-17*

**TOTAL NUMBER OF PAGES INCLUDING COVER SHEET** ~~08~~ 38

**MESSAGE:**          Part I = WR-01 to WR-09

131

TRANSMISSION VERIFICATION REPORT

TIME : 07/28/2006 17:18
NAME : CHRISTOPHER ANWAH PL
FAX : 2026260048
TEL : 2026260040
SER.# : BROF5J290803

| | |
|---|---|
| DATE,TIME | 07/28 16:55 |
| FAX NO./NAME | 4425097 |
| DURATION | 00:23:03 |
| PAGE(S) | 71 |
| RESULT | OK |
| MODE | STANDARD ECM |

**DATE:** 07/28/06

**TO:** Stephanie Ramjohn Moore, Esq. 2

**COMPANY:** OGC

**FAX NUMBER:** 202-442-5098

**FROM:** Fatmata Barrie, Esq.

**RE:** W[redacted] R[redacted] Disclosure

**TOTAL NUMBER OF PAGES INCLUDING COVER SHEET** 68

**MESSAGE:** Part I = WR-01 to WR-09

```
┌─────────────────────────────────────────┐
│     TRANSMISSION VERIFICATION REPORT     │
└─────────────────────────────────────────┘

                        TIME  : 07/28/2006 17:32
                        NAME  : CHRISTOPHER ANWAH PL
                        FAX   : 2026260048
                        TEL   : 2026260040
                        SER.# : BROF5J290803
```

```
┌──────────────────────────────────────────────────────────────┐
│  DATE,TIME              07/28  17:22                           │
│  FAX NO./NAME           4425097                                │
│  DURATION               00:09:22                               │
│  PAGE(S)                36                                     │
│  RESULT                 OK                                     │
│  MODE                   STANDARD                               │
│                         ECM                                    │
└──────────────────────────────────────────────────────────────┘
```

**MESSAGE:**       Part I = WR-01 to WR-09

**TOTAL NUMBER OF PAGES INCLUDING COVER SHEET** 38

Prt II = WR-10 to WR-17

**RE:** William R. _____ Disclosure

**FROM:** Fatmata Barrie, Esq.

**FAX NUMBER:** 202-442-5098

**COMPANY:** OGC

**TO:** Stephanie Ramjohn Moore, Esq.

**DATE:** 07/28/06

TRANSMISSION VERIFICATION REPORT

```
                              TIME : 07/03/2006 10:52
                              NAME : STUDENT HEARINGS OFF
                              FAX  : 2024425556
                              TEL  : 2024425432
                              SER.# : BROH3J608601
```

```
DATE,TIME           07/03  10:52
FAX NO./NAME        96260048
DURATION            00:00:27
PAGE(S)             01
RESULT              OK
MODE                STANDARD
                    ECM
```

# District of Columbia Public Schools
### *State Enforcement & Investigation Division*
## STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
PHONE: (202) 442-5432
FAX: (202) 442-5556



## HEARING NOTICE

MEMORANDUM VIA: [X] FACSIMILE [ ] MAIL [ ] HAND DELIVERY

TO:    Parent (or Representative): _F. BARRIE_    Fax No.: _626-0048_

LEA Legal Counsel: _S. RAMJOHN-MOORE_

RE:    _R_____), W_____ and (LEA) DOB: ___/96_
                Student's Name

FROM:  **SHARON NEWSOME**
       Special Education Student Hearing Office Coordinator

DATE SENT: _7/3/06_

•••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

The Student Hearing Office received your Request for Due Process Hearing or Mediation for the above named student on
_6/5/06_ . Please be advised that the hearing has been scheduled for:

DATE: _8/4/06_

TIME: _1:00 PM_

134

# STATE EDUCATION AGENCY
# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) ) | BEFORE A SPECIAL EDUCATION |
| R████████ II, W.                    Petitioner | ) ) ) | HEARING OFFICER |
| Vs. | ) ) | |
| DCPS | ) | DISTRICT OF COLUMBIA |
| Attending Assumption Catholic School | ) | |
| Respondent | ) | PUBLIC SCHOOLS |

## SCHEDULING MEMORANDUM

1. A due process complaint notice and request for due process hearing has been received by the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process hearing, the Local Educational Agency shall convene a resolution meeting with the parent(s) and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint **within 15 calendar days of receiving notice of the parents' complaint**. The meeting shall include a representative of the Local Educational Agency who has decision-making authority. The Local Education Agency is responsible for scheduling the resolution meeting in consultation with the parent. **The Student Hearing Office does not schedule or participate in resolution meetings**.

2. The complaint notice was filed on **June 5, 2006**

3. The deadline for the resolution meeting is **June 20, 2006** unless the parent and Local Educational Agency agree in writing to waive such meeting, or agree to refer the case to a mediator for mediation.

## RESPONSE TO THE COMPLAINT

A. ***Prior Written Notice Not Issued by the Local Educational Agency***. If the Local Educational Agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, the Local Educational Agency shall, **within 10 days of receiving the complaint**, send to the parent a response that shall include:

  1. An explanation why the Local Educational Agency proposed or refused to take action raised in the complaint;
  2. A description of other options that the IEP Team considered and the reasons why those options were rejected;
  3. A description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and

Rev'd. 7/6/05

4.    A description of the factors that is relevant to the agency's proposal or refusal

B.    Prior written notice, if not already provided to the parent, must be sent by the Local Educational Agency to the complaining party no later than **June 15, 2006**.

C.    _Deficiency Notice._    A complaint notice shall be deemed sufficient unless the party receiving the notice notifies the Student Hearing Office and the complaining party in writing, <u>within 15 days of receiving the notice of the complaint</u>, that the complaint does not satisfy the notice requirements specified in 20 U.S.C. 1415(b)(7)(A).

D.    The deadline for filing a deficiency notice is **June 20, 2006**.

## DUE PROCESS HEARING

Pursuant to 20 U.S.C. § 1415(f)(1)(B)(ii) if the Local Educational Agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all applicable time lines for scheduling a due process hearing will commence. A final hearing officer's decision must be issued within 45 days from the expiration of the 30-day resolution period.

## QUESTIONS AND INFORMATION

The staff with the Student Hearing Office does not provide legal advice. The parties should consult with legal counsel or other representative to answer any legal questions about your rights, duties, and responsibilities under the law. The school or the Local Education Agency responsible for scheduling the meeting will provide information about the time, date, and location of the resolution meeting.

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 442-5693

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

# Time Sensitive Materials Attached

**Prompt Attention: Attorney: Fatmata Barrie, Esq.**
**Parent: Wanda Richardson**

Telephone Number: **(202) 626-0040**
Fax Number: **(202) 626-0048**

Pages: **3**
Date: **June 5, 2006**

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: **W█████ R█████████ II**
School:   **Attending Assumption Catholic School**

The Complaint Intake Unit is responsible for providing parties with
information notice that a Due Process Complaint has been filed with the
Student Hearing Office.  If you have questions about the attached Notice,
please contact the Complaint Intake Unit at (202) 442-5253.  Otherwise, if
you have questions about the content of the compliant you should contact
your legal counsel for further advice.

**Thank You**

The document(s) accompanying this telecopy transmission contains confidential information that Is legally privileged.  The information is intended only for use of the individual or entity named Above, if you are not the intended recipient you are hereby notified that any disclosure, copying, Distribution or the taking of any action in reliance of the contents of this copied information is Strictly prohibited.  If you receive this telecopy in error, please immediately notify us by telephone For return of the original document to us.

137

TRANSMISSION VERIFICATION REPORT

```
TIME  : 06/06/2006 07:31
NAME  : SEID OMPC
FAX   : 2025353215
TEL   : 2024425493
SER.# : BROG5J311077
```

```
DATE,TIME          06/06  07:30
FAX NO./NAME        96260048
DURATION            00:00:56
PAGE(S)             03
RESULT              OK
MODE                STANDARD
                    ECM
```

Complaint Intake Unit
825 North Capitol Street, NE- 8th Fl.
Washington, DC 20002
(202) 442-5693

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
State Enforcement & Investigation Division
For Special Education Programs

# Fax

## Time Sensitive Materials Attached

**Prompt Attention: Attorney: Fatmata Barrie, Esq.**
**Parent: Wanda Richardson**

Telephone Number: **(202) 626-0040**          Pages: **3**
Fax Number: **(202) 626-0048**                Date: **June 5, 2006**

---

**Please find attached a copy of a Scheduling Memorandum regarding:**

Student: W███████ R███████ II
School:  **Attending Assumption Catholic School**

The Complaint Intake Unit is responsible for providing parties with information notice that a Due Process Complaint has been filed with the Student Hearing Office.  If you have questions about the attached Notice, please contact the Complaint Intake Unit at (202) 442-5253.  Otherwise, if you have questions about the content of the compliant you should contact your legal counsel for further advice.

**Thank You**

138

*State Education Agency for the District of Columbia*
*State Enforcement and Investigation Division (SEID)*
*Special Education Programs*



# Due Process Complaint Notice

- The form is used to give notice of a due process complaint to the **District of Columbia Public Schools, District of Columbia Public Charter Schools (DCPS or LEA) and/or** parents with respect to any matter relating to the identification, evaluation, or educational placement of a child with a disability, or the provision of a free appropriate public education to that child. **A party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of the Individuals with Disabilities Education Improvement Act (IDEIA).**

- The due process complaint must describe an alleged violation that occurred not more than two (2) years before the date that the parent or school system knew or should have known about the alleged action that is the basis of the complaint.

- Notice must be provided to the Student Hearing Office of the DC Public Schools, 825 North Capitol Street, NE, 8ᵗʰ Floor, Washington, DC 20002; fax number 202/442-5556.

- Unless the other party agrees, the party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that are not raised in this Due Process Complaint Notice. Therefore, please be thorough in providing the information requested.

- Prior to the opportunity for an impartial due process hearing, the Local Educational Agency (LEA) shall convene a meeting (called a "Resolution Session") with the parent(s) unless the parent(s) and the Local Educational Agency agree in writing to waive this meeting. You will be contacted by a representative of the Local Educational Agency to schedule the meeting. **The Student Hearing Office does NOT schedule resolution meetings.**

- Mediation is also available to all parties as an alternative to a resolution meeting or a Due Process Hearing.

## A. INFORMATION ABOUT THE STUDENT:

Student Name  W████ D. R████ II          Birth Date: ████96

Address:  4321-3ᴿᴰ STREET, S.E., #302, WASHINGTON, D.C. 20032

Home School:  P.R. HARRIS EC

Present School of Attendance:  ASSUMPTION CATHOLIC SCHOOL

Is this a charter school?  NO          (If yes, you must also provide a copy of this notice to the charter school principal or director)

Parent/Guardian of the Student: _____

Address (if different from the student's above): _____

1

Phone/Contact Number:  (202) 561-0574        Fax Number (if applicable): _____

**B.    Individual Making the Complaint/Request for Due Process Hearing:**

Name:    WANDA RICHARDSON

Complete Address:    4321-3RD STREET, S.E., #302, WASHINGTON, D.C. 20032

Phone: (h)  (202) 561-0574      (w) _____    (Fax) _____    (e-mail) _____

Relationship to the Student:

X      Parent                    Legal Guardian          ☐    Parent Surrogate

☐      Self/Student      ☐      Local Education Agency (LEA)    ☐    Parent Advocate

**C.    Legal Representative/Attorney (if applicable):**

Name:    Fatmata Barrie, Esq.  (Law Offices, Christopher N. Anwah, PLLC)

Address:    1003 K St. NW #565 Washington, DC  20020

Phone: (w)  202-626-0040        (Fax) 202-626-0048        (e-mail) _____

Will attorney / legal representative attend the resolution session?    **X** Yes          ☐ No

**D.    Complaint Made Against (check all that apply):**

**X** DCPS school (name of the school if different from page one) _____
☐ Charter school (name of the charter school if different from page one) _____
☐ Non-public school or residential treatment facility (name) _____
☐ Parent

**E.    Resolution Session Meeting Between Parent and LEA:**

I understand that it is my right to have a resolution meeting to resolve this complaint.  I also understand that I may voluntarily waive this right if I choose.  (Note:  All parties must agree to waive the resolution meeting to avoid having this meeting.)

☐ I wish to waive the Resolution Session Meeting

**F.    Mediation Process:**

2

SEID DPCN Rev'd. 7/12/05                                    W████ R████████ ████/96

IDEA requires that any time a party requests a due process hearing, mediation should be offered at no cost to the parent. Both parties can request mediation as an alternative to the Resolution Session Meeting or as an alternative to a Due Process Hearing. Please check all that apply:

☐    I am requesting mediation as an alternative to the resolution session meeting.

☐    I am requesting mediation and a due process hearing.

☐    I am requesting mediation only at this time.

## G.    Facts and Reasons for the Complaint:

In accordance with the Individuals with Disabilities Education Improvement Act (IDEIA), please complete the following questions. Provide complete details about all the facts supporting your claims. (You may attach additional pages if needed):

1.    What is the nature of the problem, including the facts relating to the problem that will need to be addressed at a Resolution Session meeting, a Mediation Conference, and/or a Due Process Hearing?

    A.    An MDT eligibility meeting was held on 5/10/06 and the student was erroneously found ineligible for special education services although there was sufficient evidence for William to be found eligible for services under the IDEA. DCPS has failed to honor the "child find" statute under the IDEA and to evaluate William for all suspected disabilities by not completing all appropriate evaluations, that is, the psycho-ed, social history, clinical, occupational therapy, and psychiatric evaluation as requested by the Advocate and Parent

    B.    DCPS has failed to convene an MDT/IEP meeting to develop the student's IEP for the upcoming school year and to provide an appropriate placement based on the evidence provided in the student's file, teacher's observation, parent's observation, and the psychological report review dated 1/9/06.

    C.    DCPS has failed to afford Ms. Richardson an opportunity to participate in a placement meeting to determine an appropriate placement of parent's choice. DCPS also failed to inform the parent of her due process rights prior this year. Therefore, denying the student a FAPE.

    D.    DCPS has failed to provide student compensatory education for denial of FAPE for the past two school years because it has failed to convene an MDT meeting to provide all of the necessary and appropriate evaluations, IEP, related services, and placement to address his multiple disabilities for which he is entitled under the IDEA.

2.    To the extent known to you at this time, how can this problem be resolved?

    A.    DCPS to fund a placement of parent's choice.

    B.    DCPS to fund independent psycho-ed, social history, occupational therapy, clinical, and psychiatric evaluations and any other evaluations which the independent evaluations recommend.

    C.    DCPS to convene an MDT/IEP meeting to discuss the independent assessments at the placement of parent's choice and to develop the student's IEP for the 2006/07 school year.

    D.    DCPS to provide all appropriate related services, including transportation.

    E.    DCPS to convene an MDT meeting to discuss the amount of comp education owed to student and develop a comp education plan to determine the amount, form and delivery of the comp education.

    F.    DCPS to pay reasonable attorney fees.

3

3.    Issues presented:

A.    Whether DCPS denied W████ a Free and Appropriate Public Education (FAPE) when it failed to complete a psycho-ed, social history, occupational therapy, clinical, and psychiatric evaluations in a timely manner?

B.    Whether DCPS denied W████ a Free and Appropriate Public Education (FAPE) when it failed to convene an appropriate MDT meeting to discuss and to develop an appropriate IEP for the 2005/06 school year and failed to make an appropriate determination for special education?

C.    Whether DCPS denied W████ a Free and Appropriate Public Education (FAPE) when it failed to provide student with appropriate related services, especially transportation services in an appropriate manner?

D.    Whether DCPS denied W████ a Free and Appropriate Public Education (FAPE) when it failed to afford parent an opportunity to fully participate in a placement meeting?

E.    Whether DCPS denied W████ a Free and Appropriate Public Education (FAPE) when it failed to provide him with the needed compensatory education for the past and present denial of FAPE for over two (2) years?

## H.    Estimated amount of time needed for the hearing: _____

Note:   In the absence of a specified amount of time, the SHO schedules hearings in two hour blocks of time and will allocate two hours to conduct the hearing.  Please indicate if you believe more than two hours will be needed.

## I.    Accommodations and Assistance Needed:

Please list any special accommodations you may require for a Resolution Session Meeting/Mediation Conference/Due Process Hearing.

- Interpreter (please specify the type)
- Special Communication (please describe the type) _____
- Special Accommodations for Disability (please be specific) _____
- Other _____

## J.    Waiver of Procedural Safeguards:

☐ I (parent/guardian) waive receiving a copy of the procedural safeguards at this time.

## K.    Parent Signature and Affirmation:

I affirm that the information provided on this form is true and correct.

_____        _____
Signature of Parent or Guardian                      Date

4

SEID DPCN Rev'd. 7/12/05

W████ R█████ ─█████96

**L.**  <u>Signature of Attorney / Legal Representative</u>:

06/05/06

_____
Legal Representative / Advocate                          Date

**M.**  <u>Signature of LEA Representative (if hearing requested by LEA)</u>:

_____
Representative of LEA                                            Date

Mail, fax or deliver this complaint notice to:
State Enforcement and Investigation Division
For Special Education Programs  (SEID)
Student Hearing Office (SHO)
825 North Capitol Street, NE, 8th Floor
Washington, DC  20002
Fax number: 202/442-5556

5

143



# LAW OFFICES OF
# CHRISTOPHER N. ANWAH, PLLC

Attorneys and Counselors at Law

Christopher N. Anwah, Esq.
   (DC, MD, NJ)
Fatmata Barrie, Esq.
   (DC, FL)
Georgina A. Oladokun, Esq.
   (MD)
Tamika N. Jones, Esq.
   (DC)

Carpenter's Building
1003 K Street, N.W.
Suite 565
Washington, D.C. 20001
Phone: (202) 626-0040
Fax: (202) 626-0048
Email: chrisanwahfirm@chrisanwhafirm.com

## FACSIMILE COVER LETTER

**DATE:** 06/05/06

**TO:** SHO

**COMPANY:** SHO

**FAX NUMBER:** 202-442-5556

**FROM:** Fatmata Barrie, Esq.

**RE:** William D. R█████ Due Process Complaint

**TOTAL NUMBER OF PAGES INCLUDING COVER SHEET** __06__

**MESSAGE:**

DC PUBLIC SCHOOL SYSTEM 2006 JUN -5 AM 11:50

144

DISTRICT OF COLUMBIA PUBLIC SCHOOLS

DEPARTMENT OF SPECIAL EDUCATION

HEARING OF

W███████ R███████████

August 29, 2006

Before David Smith,
Hearing Examiner

Transcribed by
LEGAL PERSONNEL, INC.
(301) 277-5711

<u>APPEARANCES</u>

Hearing Examiner David Smith

Stephanie Ramjohn-Moore, Attorney Advisor, District of Columbia Public Schools

F. Barrie, Attorney for the Mother

Gloria Everett, Social Worker; Case Manager at the Care Center

Yvonne Rojas, School Psychologist at the Care Center

Alice Wilson, Clinical Social Worker and School Counselor at Assumption Elementary School

Derrick Marryshaw, Ph.D., Child-Family Psychologist and an Educational Advocate

David Clark. District Director for Area Schools of Washington, D.C. and Northern Virginia

Wanda Marie Richardson, Mother of W███████ R███████

<div align="center">

1                        <u>PROCEEDINGS</u>

</div>

2          HEARING EXAMINER SMITH:  Good afternoon.  I'm David Smith.  We're

3    here for the administrative hearing of W█████ R█████████; date of birth is █████, 1996.

4    Today is August 29, 2006.  The sign-in sheet is going around.  I ask counsel to state the

5    names for the record, please.

6          MS. MOORE:  Stephanie Ramjohn (phonetic) Moore, Attorney Advisor, District

7    of Columbia Public Schools

8          MS. BARRIE:  F. Jocelyn Pont (phonetic) Barrie, Attorney for the mother.

9          HEARING EXAMINER SMITH:  Due process rights, Ms. Barrie?

10         MS. MS. BARRIE: Waive the reading of.

11         HEARING EXAMINER SMITH:  Okay.  And let's see, we're here on the – it

12   was filed on June the 5th, 2006 and I guess the case came up initially on August the 4th –

13   it was continued to today.  Is that right?

14         MS. MS. BARRIE:  Yes, Sir.

15         HEARING EXAMINER SMITH:  I have disclosures from both parties dated

16   August – or July 28, 2006 from the parent and August 22, 2006 from DCPS.  Any

17   objections?

18         MS. MOORE:  No objections.

19         HEARING EXAMINER SMITH:  Okay.  All the documents are to be admitted as

20   part of the Record.  Let's see.  I don't think I have any preliminary – other preliminary

21   matters.  Counsel, anything?  Or are you ready to – do you have opening statements?

22         MS. MOORE:  We're ready.

23         HEARING EXAMINER SMITH:  Okay.  Ms. Barrie?

<div align="center">

3

</div>

1    MS. BARRIE:  We're here because DCPS has failed to provide W███

2    R████████with appropriate services.  They failed to provide him with appropriate public

3    education and that on May 10th of '06, DCPS convened an eligibility meeting and found

4    him ineligible for special education services.  However, the meeting notes – according to

5    the meeting notes that DCPS completed this student should have been found eligible for

6    special education services.  Parent's Exhibit – the Meeting Notes, Parent's Exhibit No.

7    17.  In the meeting notes, the MDT indicated that, in fact, according to the teacher, his

8    grade level skills are below grade level.  He has poor motor abilities; spelling is poor, as

9    well as memory.  And his behavior is out of control and that he is reading on a second

10   grade level and – or rather, a second grade comprehension and so is his spelling.  It went

11   further to say that W█████ also has – I'm sorry – that the teacher shared that W███

12   often does not complete his class work and at that time we requested a new evaluation

13   and we also requested a psychiatric evaluation to be completed for W█████.

14       The MDT found out W█████ was not eligible for special education services, and

15   they requested that the parent sign medical release form, which she did; and – so they can

16   get documents or medical records from the doctor.  As of yet, we don't know whether or

17   not the DCPS has followed their recommendation or their request as far as we see,

18   providing documentation from the doctor.  Additionally, DCPS's separate evaluation that

19   was done on January 9 of '06 which is Parent's Exhibit No. 16.  It clearly indicates that

20   the student is in extreme need of services.  In fact, they indicated that in '99 he was

21   diagnosed with Attention Deficit Hyperactivity Disorder, a position of defined disorder,

22   and a diagnosis of bi-polar disorder was deferred.   He is – that's on page three (3) of the

23   psychological evaluation.  On page seven (7) of the evaluation, it indicates the school

1    problems – which include attention problems and learning problems.  It indicated that

2    W███ experienced disruptive academic performance and functioning in other areas

3    including academics and that his T score in learning problems is 66, and that it falls at the

4    risk classification and follow up may be necessary.  And it also indicated the parent's

5    teacher – the parent-teacher – our rating skill summary which indicates that summary of

6    information for hyperactivity, aggression, depression and attention problems represent

7    negative and undesirable characteristics that's – I'm sorry – that caused impaired

8    functioning in home, school, peer relationships and community context.  And in that

9    score, they indicated that he falls in the clinically significant range.  And his T score

10   withdrawal – they indicated also falls in the clinically significant range and his score for

11   adaptability, his T score falls in an at-risk classification.

12        Almost every category, including communications – look on page seven (7) –

13   indicates that the student falls in the clinically significant range, which, according to their

14   own summarization, meaning that he has difficulty controlling and maintaining his

15   behavior and mood, and this is page eight (8) of the Summary and Recommendations.

16   They indicated that, in fact, in his self report, he indicated that -- even when I am alone I

17   feel someone is watching me.  I hear voices in my head that no one else can hear.  I worry

18   when I go to bed at night. – And their own documentation, their own evaluation clearly

19   indicates that the student is in extreme need of services and yet, DCPS, at the end of this

20   eligibility meeting, determined him to be ineligible for special education services.  We'll

21   have Dr. Marryshaw testify to the fact that in reviewing this document and meeting with

22   the student and interviewing the student, it is his belief that the student is in desperate

23   need of services as an ED student, that he needs to be provided with special education

1    services, and that he needs to be provided with the placement that can provide him with

2    the restriction that he needs.

3          Dr. Marryshaw will go over the social work evaluations completed by D.C. Public

4    Schools, that goes into the student's family history of emotional and mental problems,

5    which includes his parents and himself, and that his behaviors at school even going back

6    to 2004 was a problem, and this was done by D.C. Public Schools. DCPS has been aware

7    as far back as 2004 that the student has had and continues to have behavior problems in

8    school and as a result his grades are affected. His psychiatric evaluation from 2004 also

9    shows that at the time he was also below level and that is Parent's Exhibit No. 5. No. 4 is

10   the psychiatric educational evaluation from 2004 -- social work evaluation – I'm sorry.

11   And he has one from July – February 9 of '06 which is Parent's Exhibit 15, which also

12   goes into detail in reference to his behavior issues and the family history. Parent's

13   Exhibit No. 7 is his report card which clearly indicates all his failing grades and merely

14   due to his behavior issues and his lack of focus and his lack of following directions. As a

15   result, he should have been found eligible for special education services but he was not.

16   On Parent's Exhibit No. 8, the Office of Special Education Care Center form completed

17   in reference to – I believe referring him for special education it clearly indicates, on the

18   first cover page, of Parent's Exhibit No. 8, that he's performing well below average in all

19   subjects, except for math.

20         His standardized test scores are below average, low self esteem, poor attention

21   and concentration, more challenges with anger often exhibited. It went on to provide

22   documentation of medication that he is taking, Conserter (phonetic) and it went on to

23   indicate difficulties in reading and language arts as well as social skills, and there are a

1    myriad of issues that the student has, classroom observation of his behavior in the class

2    room and the attempts that teacher has made to settle him down, or settle the class down

3    and the lack of progress.  And as a result, DCPS should have provided – should have

4    found him eligible.  They should have determined him to be in need of special education

5    services as an ED student.  The teacher referral report indicates that he in fact was below

6    average in reading comprehension, written expression, math reasoning, social studies,

7    science and it's – it continues on.  The Hearing Officer – we urged to him also to make

8    sure he looks good at the documentation.  The social emotional behavior concerns has

9    been –has sudden mood changes, exhibits poor self-control, lack of consistency in

10    performance, gets easily frustrated, is disruptive in the classroom and this is Parent's

11    Exhibit No. 9.  The student referral form that was completed on September 29, of '05 by

12    his teacher, Ms. White.  And he has attention problems, he has problems beginning and

13    completing work, loses work materials --

14         MS. MOORE:  This is opening?

15         MS. BARRIE:  -- and a myriad of documents.

16         MS. MOORE:  Or is this Argument?

17         HEARING EXAMINER SMITH:  Okay.  Go ahead.

18         MS. MS. BARRIE:   So just the point here to some documentation within the

19    disclosure to – that would support the testimony you will hear today by Dr. Marryshaw,

20    by Ms. Wilson, who was his counselor at Assumption (phonetic) Catholic School to

21    address the issues that the student needs.

22         MS. MOORE:  Hearing Officer, it is the position of the District of Columbia that

23    this student was not found eligible for special education services.  This is in accordance

1   with his psycho-educational evaluation, page three (3).  Findings did not meet the criteria

2   for special education services as a learning disabled student.  His academic skills were

3   found to be commensurate with his cognitive ability.  So based upon his ability, his

4   cognitive ability currently, his scores were commensurate with that.  In addition, Hearing

5   Officer, on May 10th, 2006, the multi-disciplinary team met, which included the parent,

6   Ms. Everett, the LEA representative from D.C. Public Schools, Ms. White, the General

7   Education teacher, Yvonne Rojas, the school psychologist, Annie Presley, the Parent's

8   representative, and Ms. Houston, the special education teacher, at which time they

9   determined that the parent, and I'm reading from page two (2) of the Continuation of

10  Meeting Notes, needed to submit information regarding the therapy and the medication

11  the student was receiving to DCPS.

12          In the past, she had refused to provide that information and on the 10th, DCPS

13  indicated that they will request this medical release form from the parent and that it will

14  be mailed to their home.  DCPS has not received any current medical information from

15  the parent and cannot make a determination of an emotional disturbance because it is to a

16  marked degree over a period of time, these behaviors – and there has to be an indication

17  of it, and the evaluator found no indication of this behavior and it's written within her

18  evaluation.  In a previous hearing, Hearing Officer Seymour DuBow (phonetic)

19  dismissed this matter as, again, the parent at that time, of that hearing, and that was in

20  May, that the parent was to provide this information, and still, today, August 29th, 2006,

21  the care center still does not have this information.  And that is preventing a

22  determination from anything other than learning disabled.  And he's not learning

23  disabled.

8

1          They have Gloria Everett, the Care Center, represented here to speak on what

2     transpired at that May 10th, 2006 meeting and also available is Ms. Rojas, the school

3     psychologist who was also in attendance at that meeting and did the psychological

4     evaluation.

5          HEARING EXAMINER SMITH:  Okay.  Did you get someone on the phone that

6     was going to --?

7          MS. MOORE:  Ms. Everett.  This is Ms. Everett.

8          HEARING EXAMINER SMITH:  Okay.

9          MS. MOORE:  Hmmm?

10         MS. MS. BARRIE:    She will have to introduce herself.

11         HEARING EXAMINER SMITH:  Okay, yes.  The witness, please...

12         MS. WILSON:  My name is Alice Wilson.   I'm a clinical social worker and I am

13     a school counselor at Assumption Catholic School.

14         MS. MOORE:  Thank you.

15         HEARING EXAMINER SMITH:  Okay.  And you are witness for you, or –

16         MS. WILSON:  For the student.

17         HEARING EXAMINER SMITH:  For the student.  Okay.

18         MS. MOORE:  Ms. Everett, are you there?  Hello?  Okay.  I'm going to put you

19     on speaker now and the Hearing Officer will swear you in.

20         HEARING EXAMINER SMITH:  Hi, Ms. Everett.  I'm David Smith, the

21     Hearing Officer.  Can you hear me?

22         MS. EVERETT:  Is it --

23         HEARING EXAMINER SMITH:  You have to take it off speaker, Ms. Everett.

9

1        MS. EVERETT:  I'm ready, I can hear you.

2        HEARING EXAMINER SMITH:  Okay.  Do you swear and affirm to tell the

3    truth, the whole truth and nothing but the truth in the testimony that you are about to give

4    in this hearing?

5        MS. EVERETT:  Yes I do.

6        HEARING EXAMINER SMITH:  Okay.

7        MS. MOORE:  Ms. Everett, are you in the room by yourself?

8        MS. EVERETT:  Ms. Rojas.

9        MS. MOORE:  Okay.  Can you send Ms. Rojas out of the room until it is time for

10    her testimony?

11        MS. EVERETT:  Okay.  She has now left the room.

12        MS. MOORE:  Thank you.

13        HEARING EXAMINER SMITH:  Okay.

14        MS. MOORE:  Ms. Everett, what is your current position with MDCPS

15    (phonetic)?

16        MS. EVERETT:  Social worker, case manager at the Care Center.

17        MS. MOORE:  And what does the Care Center stand for?

18        MS. EVERETT:  It stands for assessment and referral.  Students who are

19    attending private and religious schools in the District of Columbia and in need of

20    assessments are referred to the Care Center.  When the parents come in we do an intake

21    and during the intake process is determined what the child needs based on what the

22    parent is saying.  She brings in information.  That parent brings information from the

10

1    school or medical doctor.  Once that information is provided then that child is referred to

2    a team, and this child was referred to my team.

3        MS. MOORE:  And when was that student referred to your team?

4        MS. EVERETT:  My team back in December of '05.

5        MS. MOORE:  And what transpired from the time of the referral?

6    .    MS. EVERETT:  The case was given to me.  I contacted the mother to make her

7    aware that I was the person who would be calling her, who would be arranging for her

8    child to be tested.  Also, to ask the mother if there were any – if there were any

9    information she thought was appropriate for us to have.  And once the parent indicates

10   that their information – that I feel that is appropriate, and I ask the parent to give us that

11   information.  And that's what I did to Ms. Richardson – asked her to provide me with

12   information so -- [telephone ring]

13       MS. MOORE:  I'm not answering.

14       HEARING EXAMINER SMITH:  Just go ahead.

15       MS. MOORE:  Ms. Everett, can you still hear me?

16       MS. EVERETT:  Yes, I can.

17       MS. MOORE:  Okay.

18       MS. EVERETT:  From the times that Ms. Richardson came –

19       MS. MOORE:  Um-hum.

20       MS. EVERETT:  -- gave educational information and to complete a social history

21   and to do a clinical if warranted.

22       MS. MOORE:  And did you complete the evaluations?

23       MS. EVERETT:  All those evaluations were completed.

1        MS. MOORE:  And they were again?  Ms. Everett?

2        MS. EVERETT:  Yes.

3        MS. MOORE:  What were they again?

4        MS. EVERETT:  Review of the psychological.

5        MS. MOORE:  Um-hum.

6        MS. EVERETT:  Updated educational goals.

7        MS. MOORE:  Um-hum.

8        MS. EVERETT:  Social history.

9        MS. MOORE:  Um-hum.

10        MS. EVERETT:  And complete a clinical evaluation.

11        MS. BARRIE:  If I may, may I ask that she pick up the phone because there's a

12    break in some of the things she says.

13        MS. EVERETT:  Hello?

14        MS. MOORE:  It's better if you have the phone to your ear when you're

15    testifying.

16        MS. EVERETT:  Okay.

17        MS. MOORE:  Now.  You say the clinical is warranted previously.  Is that still

18    the same testimony?

19        MS. EVERETT:  Yes.

20        MS. MOORE:  Okay.  Did you meet on this student?

21        MS. EVERETT:  Yes I did.

22        MS. MOORE:  How many times?

23        MS. EVERETT:  How many times did I meet with the –

1      MS. MOORE:  How many times did the MDT meet on this student?

2      MS. EVERETT:  Okay.  We met one time on the student.

3      MS. MOORE:  Okay and what time was that?

4      MS. EVERETT:  That was in May, when we completed the MDT and the IEP

5  meeting.

6      MS. MOORE:  Um-hum.

7      MS. EVERETT:  And that was shortly after we had gone to a hearing on this case.

8  And it was determined then that since the MDT meeting was pending, and we met on

9  May 10th.

10      MS. MOORE:  Um-hum.

11      MS. EVERETT:  In the hearing it was determined that since a MDT meeting was

12  pending, that we would go to the table, review the evaluation, complete an IEP if

13  warranted.  And that was done on May 10th.

14      MS. MOORE:  Now, at the time of that due process hearing, did you request

15  further psychological information from the parent?

16      MS. EVERETT:  Yes I did.

17      MS. MOORE:  And had you received it at the time of the hearing?

18      MS. EVERETT:  No I had not.

19      MS. MOORE:  Had you requested that information again at the MDT meeting on

20  May 10th, 2006?

21      MS. EVERETT:  Ms. Richardson at the table indicated that -- it was requested at

22  that time -- Ms. Richardson indicated that she would provide that information.  She had

23  some concerns that she would not be able to ask for directly.  I explained to Ms.

1    Richardson that I would send her a release of information form, that if she completed that

2    and send it back to me that I then would go forth to seek this information.  This is

3    information that had been requested prior to coming to the MDT meeting.

4         MS. MOORE:  And have you received that information?

5         MS. EVERETT:  No I have not.

6         MS. MOORE:  Have you received the release form that you sent to her in the

7    mail?

8         MS. EVERETT:  No I have not.

9         MS. MOORE:  Has the parent contacted you since that time of the meeting?

10        MS. EVERETT:  No she has not.

11        MS. MOORE:  Has the student come back to the Care Center seeking additional

12    evaluations at that time?

13        MS. EVERETT:  No he has not.

14        MS. MOORE:  I have no further questions at this time, but Ms. Barrie may have

15    some questions for you and the Hearing Officer may have some questions.

16        MS. EVERETT:  Okay.

17        HEARING EXAMINER SMITH:  Okay.  Ms. Barrie?

18        MS. MS. BARRIE:  Ms. Everett?  Can you hear me?

19        MS. EVERETT:  No – there's some static.

20        MS. MS. BARRIE:  Pull this in.  Okay.  Can you hear me?  Hello?

21        MS. EVERETT:  Hello.

22        MS. BARRIE:  Can you hear me?

23        MS. EVERETT:  I can hear you now.

1       MS. BARRIE:  Okay.  Isn't it true that on April the 24th, the applicant personally

2 wrote you a letter informing you that in fact the parent was not refusing to provide you

3 with the documentation, but that, in fact, he was evaluated when he was three (3) years

4 old, and that she didn't have any up to date documentation.

5       MS. EVERETT:  No, I have never received that letter.

6       MS. BARRIE:  And you said you mailed the form to the parent, correct?

7       MS. EVERETT:  That's correct.

8       MS. BARRIE:  Do you have any proof of mailing to the parent?

9       MS. EVERETT:  I sent two letters out to the parent.  One was to have her to sign

10 saying that she received and another one through the general mail.

11       MS. BARRIE:  Okay.  So, and you sent it certified.

12       MS. EVERETT:  Yes.  The certified letter came back undelivered.  The regular

13 mail did not come back.

14       MS. BARRIE:  To the same address.

15       MS. BARRIE:  Now, when you did the psychological evaluation – when the

16 psychological evaluation was completed, is it not true that –

17       MS. EVERETT:  Please discard the papers.  It's hard for me to hear.

18       MS. BARRIE:  Is it not true that you represented previously that the

19 psychological evaluation covers the emotional portion of the evaluation?

20       MS. EVERETT:  Yes.

21       MS. BARRIE:  Okay.  So the BASK (phonetic) would cover – in DCPS's

22 estimation would cover the need for determining emotional disability.

23       MS. EVERETT:  It would certainly – yes.

1          MS. BARRIE:  So in reality, to make that determination, you don't really need in

2     DCPS's view any further documentation.

3          MS. EVERETT:  No, that's not true.

4          MS. BARRIE:  Okay.  So if the BASK can determine the ED, why was it not

5     done at the meeting?

6          MS. EVERETT:  In this case, the mother indicated that the child was seeing a

7     psychiatrist and already had a diagnosis.  We needed that information to substantiate that

8     this was so.  I offered he was seeing a psychiatrist and we didn't get that information.

9          MS. BARRIE:  Isn't it true that – and you said DCPS never received information

10    as far as the diagnosis is concerned, correct?

11         MS. EVERETT:  That's correct.

12         MS. BARRIE:  And what diagnosis are you talking about?

13         MS. EVERETT:  The fact is that her child was seeing a psychiatrist.  She

14    indicated that to me.  And I asked her at that time if she would please provide us the

15    information with regard to the services that he was receiving.

16         MS. BARRIE:  Okay.  What is this – my question is, what is seeing a psychiatrist

17    have to do with this BASK determination as far as ED is concerned.

18         MS. EVERETT:  If the child is already diagnosed, we tend to support the

19    diagnosis or not support the diagnosis.

20         MS. BARRIE:  Um-hum.

21         MS. EVERETT:  In this case, the mother indicates he's been seeing a psychiatrist

22    for quite a while.

23         MS. BARRIE:  Um-hum.

1          MS. EVERETT:  And that there was a diagnosis and medication.

2          MS. BARRIE:  That's what I'm saying.  What diagnosis does she tell you there

3    was?

4          MS. EVERETT:  She said he was emotionally disturbed.

5          MS. BARRIE:  Did you review the IEP from Maryland?

6          MS. EVERETT:  Yes, I did.

7          MS. BARRIE: Okay.  Do you remember what diagnosis was on that IEP, what

8    classification?

9          MS. EVERETT:  No I don't.

10         MS. BARRIE:  Not the –

11         MS. EVERETT:  Are you talking to me?

12         MS. BARRIE:  I'm sorry?

13         MS. EVERETT:  Are you talking to me?

14         MS. BARRIE:  No – what the question?

15         MS. EVERETT:  Yes.  You asked me did I –?

16         MS. BARRIE:  Do you remember the civilian classification and the Maryland

17    IEP?

18         MS. EVERETT:  No, I don't remember offhand.

19         MS. BARRIE:  I would like to point the Hearing Officer to Parent's Exhibit No.

20    2.  The Maryland IEP, the diagnosis that classified him as ED.  Now, when you – when

21    the team made the decision that he did not qualify for special education services, did you

22    at all take into consideration the IEP from Maryland?

23         MS. EVERETT:  Yes we did.

1       MS. BARRIE:  And, what – why did you disregard the Maryland IEP?

2       MS. EVERETT:  We didn't disregard it.  Our psychologist did up to date testing –

3       MS. BARRIE:  Um-hum.

4       MS. EVERETT:  And based on her up to date testing, that was not indicated.

5       MS. BARRIE:  During the meeting, did you discuss the – I'm assuming you

6 reviewed the evaluation itself.  Correct?  The up to date evaluation our psychologist did.

7       MS. EVERETT:  Yes.

8       MS. BARRIE:  Okay.  Is there any particular reason or did the fact that his T

9 scores were all in the clinicalistic range or at risk range.  Did any of that make any impact

10 to you and the team at all?

11       MS. EVERETT:  You're going to have to repeat that.

12       MS. BARRIE:  On the evaluation was that was completed by the psychologist.

13       MS. EVERETT:  By DCPS?

14       MS. BARRIE:  Correct.

15       MS. EVERETT:  Okay.

16       MS. BARRIE:  Did the fact that the summary indicated that all his T scores fell in

17 the clinicalistic significant range or at minimum, at risk range.  Did that make any impact

18 at all to the team and the team's decision?

19       MS. EVERETT:  It did.

20       MS. BARRIE:  In what way?

21       MS. EVERETT:  Understand that her report was only one instrument that causes

22 us to have a full discussion on a student's needs.  The psychologist at the table talked to

23 the mother about those scores and she gave very different answers than what she had

1    given on the BASK.  And at the time that she responded to those questions, she

2    mentioned the fact that - oh, he used to do this, sometimes he does that, he's not doing it

3    anymore -.

4            MS. BARRIE:  Okay. And you're saying that's what she said at the meeting.

5            MS. EVERETT:  That's what she said at the meeting.

6            MS. BERRY:  And the Meeting Notes reflect what happens at the meeting,

7    correct?

8            MS. EVERETT:  Miss -- the psychologist indicated that in her write-up, couldn't

9    find that.

10            MS. BARRIE:  So at the meeting, you tell -- your testimony is that the parent

11    indicated that her son did not have those problems?

12            MS. EVERETT:  Some of the responses to the psychologist's questions were "he

13    doesn't do that anymore, he used to do that, sometimes does it."

14            MS. BARRIE:  I'm sorry.

15            HEARING EXAMINER SMITH:  That's all right.

16            MS. BARRIE:  Give me a minute.  I'm sorry.   Okay.  So, when you -- when the

17    determination -- so you're saying that the report is only one instrument.  Did you not

18    complete the social work evaluation?

19            MS. EVERETT:  I did the social work evaluation.

20            MS. BARRIE:  Well I'm saying, did you not review it at the meeting?

21            MS. EVERETT:  Yes I did.

22            MS. BARRY:  Okay.  So you had one and one.

23            MS. EVERETT:  Yes.

19

1          MS. BARRIE:  Okay.  Then my question to you is if you felt that it was because

2    one instrument when the request was made for further testing by the parent's advocate,

3    why was it not completed?

4          MS. EVERETT:  The parent advocate made requests for further testing?

5          MS. BARRIE:  According to the meeting notes, yes.

6          MS. EVERETT:  Okay, she asked for psychiatric.

7          MS. BARRIE:  Um-hum.

8          MS. EVERETT:  The point was the child was already seeing a psychiatrist.

9          MS. BARRIE:  Um-hum.

10         MS. EVERETT:  I therefore asked for that report.  This was a psychiatrist that has

11    been seeing the child for several years.

12         MS. BARRIE:  Um-hum.

13         MS. EVERETT:  Who the child was familiar with.  And therefore that seemed the

14    appropriate person to request the psychiatric from.  If he's in on-going treatment, I didn't

15    see a need for us to try to ask for a new person, but to get the information from the person

16    the child was already in treatment with.

17         MS. BARRIE:  When you received the certified mail back –

18         MS. EVERETT:  Yes.

19         MS. BARRIE:  Did you contact the mother to say that you received mail back?

20         MS. EVERETT:  I did not.  I sent out two letters.  One was through regular mail.

21    That did not return.  And the other one was for the registered mail, and that did return.

22         MS. BARRIE:  So my – was there any particular reason why the form was not

23    given to the mother at the meeting to sign?

20

1    MS. EVERETT:  I asked the mother prior to the meeting, to provide me with that

2    information.  And she did not provide it.  I called her and asked her – to remind her – and

3    at that time she told me she was advised to not to give – share that information with

4    DCPS.  I wrote to the Advocate stating just that, and again asked would they reconsider,

5    and provide us with current psychiatric medical information to help us to determine the

6    appropriate educational need for this child.  I have asked for that information repeatedly.

7    MS. BARRIE:  Okay.  My question is simply this:  At the meeting, why did you

8    not give the parent the form to sign to get the documents from the doctors if you felt it

9    was such – it was so important.

10    MS. EVERETT:  At the meeting, I didn't have the form.  That was something the

11    mother said, the reason I said I would send her the form because she felt at that time she

12    wouldn't be able to get it without some assistance.  And at that time I offered to send her

13    that form, and that she send it back to me and I would help her to get the information.  I

14    wasn't aware at the time what became to me that she felt some hesitation about asking for

15    medical report on her son.

16    MS. BARRIE:  Isn't it true that a parent informed the team that in fact the

17    psychiatrist would not do a full blown testing without the parent having to pay for it?  Is

18    that not true?

19    MS. EVERETT:  I have no knowledge of that.

20    MS. BARRIE:  At the meeting.  Was it not stated?

21    MS. EVERETT:  I have no knowledge of that.  The child's been going to the

22    psychiatrist for several years.

23    MS. BARRIE:  Uh-hum.

21

1    MS. EVERETT:  The assumption would be that there is a psychiatric report

2    already.  And that's what we were trying to determine.  What was it that the psychiatrist

3    had that he could share with us, that the mother was willing to let him share with

4    ourselves that we can make an appropriate determination.

5    MS. BARRIE:  But did you know that once a parent makes a request from the

6    school system for evaluation, the school system must then provide the evaluation to the

7    parent, because in fact, wasn't that true that we asked for independent testing to be done

8    if DCPS is unable to complete the evaluation?

9    MS. EVERETT:  The person who asked for the psychiatric evaluation was the

10    Advocate.  When I asked her if she had any complaints – [phone rings]

11    MS. MOORE:  Continue.

12    MS. EVERETT:  When I asked her for supportive documentation that she's given

13    to ask for a psychiatric independent evaluation, there was no response to that question.

14    At that time, the psychologist at the table who is a qualified professional in the area was

15    not requesting a psychiatric evaluation, but was requesting a psychiatric that would

16    already have been done since the mother said there was a diagnosis from the psychiatrist

17    – that the child had been seen for several years.

18    MS. BARRIE:  So you actually felt that you needed a psychiatric from a

19    psychiatrist.

20    MS. EVERETT:  I didn't ask for a psychiatric.  I asked for information that the

21    psychiatrist had.  I didn't specifically say, "send me a psychiatric report" –

22    MS. BARRIE:  -- Um-hum.

22

1    MS. EVERETT:  I said please provide me with medical and psychological

2    information from your son's treating therapist.  I did not say a psychiatric.  Whatever was

3    going on with this child and his therapist, I asked for a report.

4    MS. BARRIE:  But the team felt he needed more.

5    MS. EVERETT:  We needed medical and psychological information from the

6    treating therapist.

7    MS. BARRIE:  So if he didn't have a treating therapist, what would you do?  And

8    he still had all these issues that he discussed on May 10th of '06.  What if he didn't have a

9    treating therapist?

10    MS. EVERETT: Well, are you asking me to speculate?

11    MS. BARRIE:  Yes.

12    MS. EVERETT:  Okay.  If he didn't have a treating therapist –

13    MS. BARRIE:  -- Uh-hum.

14    MS. MOORE:  I would object to this question as it is conjecture and Ms. Everett

15    is a social worker and she's not a magician nor is she a fortune teller, and she can only

16    speak about what transpired in this instance.  Not "what if, could have should have would

17    have, whatever."

18    HEARING EXAMINER SMITH:  No.  It causes speculation.  Sustained.

19    MS. BARRIE:  Okay.

20    JUDGE SMITH:  Objection sustained.

21    MS. BERRY:  Okay.  You conducted this meeting and you wrote the notes,

22    correct, Ms. Everett?

23    HEARING EXAMINER SMITH:  Yes, I did.

1        MS. BARRIE:  Now, when this meeting – was there ever a discussion as far as

2    ED is concerned at this meeting?

3        MS. EVERETT:  That was – we had that – I had that discussion with the mother

4    prior to the meeting.  That was the reason I asked for – the mother indicated that the child

5    was apparently in treatment and on medication.  And at that point, I asked for

6    documentation.

7        MS. BARRIE:  Did the mother not tell you that she didn't have the information

8    and that because she was in a situation where she did not have a home, and her insurance

9    had switched therapists, it was difficult for her to receive that information?

10        MS. EVERETT:  I had none of that information shared with me by the mother.

11        MS. BARRIE:  So at the meeting, itself, you never discussed the ED disability.

12    Just previously with the mother.

13        MS. EVERETT:  Just what?  I'm sorry.

14        MS. BARRIE:  At the meeting itself in May, you never had a discussion with the

15    team in reference to the ED disability.

16        MS. EVERETT:  He did not have a ED disability.

17        MS. BARRIE:  Okay.  Did you have a discussion at the MDT meeting in

18    reference to an ED disability?

19        MS. EVERETT:  The mother stated that the child was seeing the social worker at

20    the school.  The social worker did not provide us with information.  We talked about my

21    social history and we also spoke about the psychologist's evaluation.

22        MS. BARRIE:  Okay.  So what you're saying is you consider the ED disability at

23    the May 10th, '06 meeting.

24

1          MS. EVERETT:  Yes we did.

2          MS. BARRIE:  Is there any particular reason why it is not in the meeting notes?

3          MS. EVERETT:  What was in the meeting note is that before we're going to call

4    a child "emotionally disturbed" [phone rings]

5          MS. MOORE:  Just continue.

6          MS. EVERETT:  Okay.  If he's seeing two professionals, and none of that

7    information is at the table, we're not in a position to call this child "emotionally

8    disturbed."  There was no one who was treating him at the school and then he had a

9    psychological and psychiatrist outside the school.  None of that information was made

10   available to us at the table or prior to coming to the table.  [phone ringing]

11         HEARING EXAMINER SMITH:  Go ahead, Ms. Everett.

12         MS. EVERETT:  I'm sorry.

13         HEARING EXAMINER SMITH:  Go head and continue.

14         MS. EVERETT:  Okay.

15         MS. BARRIE:  I believe at the meeting you also discussed the different

16   medications that he's on.

17         MS. EVERETT:  We noted it.

18         MS. BARRIE:  Right.  And in the meeting in – an evaluation that was done by

19   your psychologist – wasn't there a referral made to the fact that in 1999 he was

20   determined to be ADHD?  Did that discussion take place at the meeting?

21         MS. EVERETT:  You know when you rattle papers I can't hear everything that

22   you're saying.

23         MS. BARRIE:  Okay.  Did the discussion take place as far as ADHD disability?

25

1        MS. EVERETT:  A discussion of his ADHD?

2        MS. BARRIE:  Uh-hum.

3        MS. EVERETT:  No.  I don't remember ADHD ever coming up.

4        MS. BARRIE:  So in all reality, the only disability actually considered was LD,

5    correct?  Learning disabled.

6        MS. EVERETT:  We, based on the psychologist's testing, he was not determined

7    to be LD.  We had no other information for any of the diagnosis.  The mother was

8    requested to please provide us with information.  We're willing to come back to the table

9    as soon as she did.  Medical information never came back to us.   Clinical psychological

10    information never returned to us.  We had no new information to go back to the table.

11        MS. BARRIE:  Did you say clinical psychological information?  Was a clinical

12    psychological done on the student?

13        MS. EVERETT:  I said no clinical or psychological information that we requested

14    from outside came to us.

15        MS. BARRIE:  But isn't it true that you had represented previously – you talked

16    about the previous hearing that the BASK – when we requested a clinical the BASK

17    covers the clinical?

18        MS. EVERETT:  Yes.

19        MS. BARRIE:  Okay.  And if the BASK that covers the clinical is what is

20    supposed to make a determination for ED, I don't understand your testimony in that you

21    needed another psychological, or clinical information on the student.

22        MS. EVERETT:  A child who is seeing a psychiatrist for many years – that is

23    extremely important.  And if we are going to DCPS and ask to evaluate or determine

26

1    appropriate placement, that is significant information that was missed.  We asked to have

2    that information brought to us so we could come back to the table, review it, and we

3    would amend the IEP as appropriate.  We're still waiting for that.

4          MS. BARRIE:  Did you have anyone from his attending school attend this

5    meeting?

6          MS. EVERETT:  What school?  His attending school?

7          MS. BARRIE:  Um-hum.

8          MS. EVERETT:  His teacher was there.

9          MS. BARRIE:  His teacher was there?

10          MS. EVERETT:  Yes.

11          MS. BARRIE:  Okay.  And the teacher gave you all the information as far as his

12    behavior in the school, correct?

13          MS. EVERETT:  Yes, he did.

14          MS. BARRIE:  Okay.  And I assume you had his report card?

15          MS. EVERETT:  We didn't have his report card at the time.  The teacher was

16    there.  She gave us copies of his work.

17          MS. BARRIE:  Uh-hum.

18          MS. EVERETT:  He talked about his behavior.

19          MS. BARRIE:  Uh-hum.

20          MS. EVERETT:  Sometimes he's able to complete work.  In fact, he showed us

21    the paper where he made an "A."

22          MS. BARRIE:  Uh-hum.

23          MS. EVERETT:  And then on another paper, he didn't do quite as well.

1          MS. BARRIE:  Uh-hum.

2          MS. EVERETT:  She talked about "sometimes he does not do his work and there

3     are other times that he does."

4          MS. BARRIE:  Uh-hum.  Now, what criteria do you use in determining ED

5     disability?  Can you tell me?  Are you able to tell me?

6          MS. EVERETT:  We need to have documented assessments, diagnosis, to

7     determine if the child is ED.  The ED has to impact him educationally.  It has to have a

8     significant impact on him as occasionally, that is, he... therefore he's not available for

9     learning.  He's two (2) to three (3) years below his grade level.  That would help us to

10    determine if the ED classification was appropriate.

11         MS. BARRIE:  So the fact that his teacher indicated that his behavior was out of

12    control and that his – that he is below grade level, and indicated as such in the meeting

13    notes, that did not affect anything at all for D.C. Public Schools.

14         MS. EVERETT:  He said that he's having problems in his work but he did not

15    indicate he was below, significantly below, grade level.

16         MS. BARRIE:  Okay.  Can I point you to the first page of the MDT Meeting

17    Notes that you wrote?

18         MS. EVERETT:  Sure.   Okay.

19         MS. BARRIE:  Okay.  W████ is going into the fifth grade.

20         MS. EVERETT:  The fifth grade.

21         MS. BARRIE:  Uh-hum.   Now, can you read that last paragraph on our first page

22    of the MDT Meeting Notes?

23         MS. EVERETT:   43 (phonetic) of his grade level skills are below grade level.

28

1  MS. BARRIE:  Uh-hum.

2  MS. EVERETT:  He had poor motor ability, spelling is poor, as well as memory.

3 Math skills are better, but he needs to work harder.

4  MS. BARRIE:  Uh-hum.

5  MS. EVERETT:  Do you want me to continue?

6  MS. BARRIE:  Yes, please.

7  MS. EVERETT:  Okay.  His behavior far out of control.  Second grade reading

8 comprehension.  Math, second to third grade levels.  Spelling, second grade.

9  MS. BARRIE:  And your testimony was that you look at a student that's

10 anywhere between two (2) to three (3) grade levels below.

11  MS. EVERETT:  Right.

12  MS. BARRIE:  So W▇▇▇ actually falls right into that category, correct?

13  MS. EVERETT:  He was in the third grade when we evaluated him – what grade

14 was it?

15  MS. BARRIE:  Fourth.

16  MS. EVERETT:  Fourth grade?

17  MS. BARRIE:  Uh-hum.

18  MS. EVERETT:  Okay.

19  MS. BARRIE:  So he falls pretty much into that category that you testified about,

20 correct?

21  MS. EVERETT:  That was the teacher's report.

22  MS. BARRIE:  Isn't that what we use at meetings?  Isn't that very important, the

23 teacher's report?

29

1        MS. EVERETT:  That's very important.  Yes, it is.  When I get a classroom

2    observation with the teacher she said just the opposite.  I had a discussion with the

3    teacher when I go to class on observation, she said just the opposite.

4        MS. BARRIE:  Okay.  When you have the classroom observation of the teacher

5    she said, "Opposite?"

6        MS. EVERETT:  I can't hear you.

7        MS. BARRIE:  You said she said the opposite, when he had the –

8        MS. EVERETT:  Right.

9        MS. BARRIE:  Can you hear me?

10       MS. EVERETT:  Yes.

11       MS. BARRIE:  Okay.  You said when you met with the teacher she said the

12   opposite of what she said at the meeting?

13       MS. EVERETT:  Well, she didn't say the exact opposite; she said there were

14   some problems with W█████ because sometimes he doesn't finish his work.  It wasn't

15   that he didn't know it, but sometimes he didn't finish his work.

16       MS. BARRIE:  Uh-hum.  Well at the meeting, did you correct the teacher or

17   remind her of what she said to you?

18       MS. EVERETT:  No, I didn't.

19       MS. BARRIE:  Okay.  Your indulgence real quick, please.  Okay.

20       HEARING EXAMINER SMITH:  Ms. Barrie, how much time do you think you

21   are going be?  I just realized – let's go off the record for a second.

22                          [OFF THE RECORD]

23                          [ON THE RECORD]

30

1          HEARING EXAMINER SMITH:  Okay, back on the record.

2          MS. BARRIE:  Okay.  No.  That's fine.  I'm done with Ms. --

3          MS. EVERETT:  Okay.

4          MS. BARRIE:  -- Ms. Everett.

5          MS. MOORE:  I have just two follow up, well maybe three (3) questions, Ms.

6     Everett.  Can you hear me?

7          MS. EVERETT:  Yes.

8          MS. MOORE:  Okay.  My first one is, Ms. Everett, what is the address that you

9     have for the Richardson home?

10         MS. EVERETT:  4321 Third Street, S.E., Apartment 302, zip code, 20032.

11         MS. MOORE:  And that's in Washington, D.C., correct?

12         MS. EVERETT:  Yes.

13         MS. MOORE:  I'd like to note, Hearing Officer, that's the address given on the

14    Due Process Complaint notice, so that is the address Ms. Everett sent both the certified

15    and the regular mail letter to.  In addition, let's go back to what you were just talking

16    about with Ms. Barrie.  You were talking about factors concerning emotional disturbance.

17         MS. EVERETT:  Yes.

18         MS. MOORE:  Is the team going to find the disability of emotional disturbance

19    based upon one (1) factor, or all of the factors?

20         MS. EVERETT:  All of the factors.

21         MS. MOORE:  And are any of the factors more significant than any other of the

22    factors?


31

1        MS. EVERETT:  One that is extremely significant is the child who's been in

2   treatment for several years.  That is information that is pertinent to developing a program

3   for a child.

4        MS. MOORE:  And that unusual for a student that doesn't attend DCPS school

5   for – to get a clearer picture of the student – is it unusual to request anecdotal

6   information, and other medical information from the parent?

7        MS. EVERETT:  Is it unusual?  --

8        MS. MOORE:  Yes.

9        MS. EVERETT:  -- No.

10       MS. MOORE:  And is this something that you do customary with other students

11  at the care center?

12       MS. EVERETT:  Definitely.

13       MS. MOORE:  And why is it so important, Ms. Everett?

14       MS. EVERETT:  It's important that we do a comprehensive evaluation before

15  you label a child, and especially one that's emotionally disturbed.  A child who has been

16  in treatment for as long as the mother said, and who she said who is currently in

17  treatment, that person is the one who would give us insight that we probably could not

18  get from the mother during my social history interview and certainly a psychologist is not

19  going get when she evaluates the child.  So the doctor who treats the child is the

20  significant part of, I would say, the MDT team.  And that would be someone who would

21  give us the diagnosis, tell us the medication the child is on and what the medications are

22  used for.  It does not mean that he's ED because of his medication.  It could be for high

23  blood pressure or whatever.  That's something we didn't know.  We're talking about a

1    child who's been in treatment for years, and who has been in treating with the same

2    psychiatrist or psychologist would be as the mother indicated.

3        MS. MOORE:  You also talked about the conflicting information that the parent

4    gave concerning her questions in her BASK questionnaire.

5        MS. EVERETT:  Right.

6        MS. MOORE:  And the anecdotal information she gave at the meeting.  Why

7    were you concerned about that?

8        MS. EVERETT:  Well, the concern is, if a child is – if the mother describes the

9    child one way to one person on the team, and if that's a true picture of the child, that's a

10   description that should always be given to the entire team members.  That did not appear

11   to be the case.  And therefore, there was discussion around the table from the

12   psychologist to the mother.  You indicated on the BASK that the child – I can't

13   remember exactly what it was – yelled out loud.  I-I 'm not going to go back.  I don't

14   want to speculate about that.  But the mother would say, "Well he used to do that.  Well

15   sometimes he does that.  He's not doing that anymore."  That was a concern.  If it's the

16   same information that you answer to on the BASK but in a discussion at the table, that

17   information sort of changed.

18       MS. MOORE:  Okay.  I have no further questions for you, but the Hearing Officer

19   and Ms. Berry may have some further questions.

20       MS. EVERETT:  Okay.

21       HEARING EXAMINER SMITH:  I don't believe I have any questions, Ms. –

22       MS. EVERETT:  Okay.

33

1        HEARING EXAMINER SMITH:  So I think you have a – you know, okay.

2    Thank you very much.

3        MS. EVERETT:  You're quite welcome.

4        MS. MOORE:  Thank you.

5        MS. BARRIE:  Thank you.

6        MS. MOORE:  Can you get Ms. Rojas for me, please?

7        MS. EVERETT:  Hold on, please.

8        MS. MOORE:  Thank you.

9        HEARING EXAMINER SMITH:  Let me go take care something.

10       MS. MOORE:  Okay.  How long do you think you'll be?

11       HEARING EXAMINER SMITH:  Fifteen (15).

12                    [OFF THE RECORD]

13                    [ON THE RECORD]

14       HEARING EXAMINER SMITH:  Okay.  We're back on the record.

15       MS. MOORE:  Hello?  Hello?

16       MS. ROJAS:  Hello?

17       MS. MOORE:  I'm sorry.  I'm going to put you on speaker now.  Can you hear

18    me?

19       HEARING EXAMINER SMITH:  I'm David Smith, Hearing Officer.

20       MS. ROJAS:  Hold on.  Let me put the receiver – do you want me to keep the

21    receiver?

22       MS. MOORE:  Yes.  Keep the receiver to your ear.

23       MS. ROJAS:  Okay.

1          HEARING EXAMINER SMITH:  Okay.  Can you hear us okay now?

2          MS. ROJAS:  I can hear you fine.

3          HEARING EXAMINER SMITH:  Okay, thank you.  I'm David Smith, Hearing

4    Officer, and I'm going to swear you in to testify.

5          MS. ROJAS:  Okay.

6          HEARING EXAMINER SMITH:  Do you swear and affirm to tell the truth, the

7    whole truth and nothing but the truth in the testimony that you're about to give at this

8    hearing?

9          MS. ROJAS:  I do.

10         HEARING EXAMINER SMITH:  Okay.

11         MS. ROJAS:  Excuse me.  Would you tell me your name again?

12         HEARING EXAMINER SMITH:  David Smith.

13         MS. ROJAS:  Smith.  Thank you.

14         HEARING EXAMINER SMITH:  Okay.

15         MS. MOORE:  Ms. Rojas?

16         MS. ROJAS:  Yes.

17         MS. MOORE:  What is your current position with MDCPS?

18         MS. ROJAS:  I'm a school psychologist.

19         MS. MOORE:  And where do you currently work?

20         MS. ROJAS:  I work at the Care Center.

21         MS. MOORE:  And are you familiar with a student by the name of W██████

22    R███████, II?

23         MS. ROJAS:  That's right.  I do.

1          MS. MOORE:  Okay.  And, were you in attendance at an MDT meeting that took

2    place on May 10th, 2006?

3          MS. ROJAS:  Yes.

4          MS. MOORE:  And what was the determination of the teen at that time?

5          MS. ROJAS:  At that time we determined that W████ did not qualify for special

6    education services as a learning disabled student.

7          MS. MOORE:  And what else did you determine at that time?

8          MS. ROJAS:  Basically, the question was about his learning ability.  There was a

9    request for clinical evaluations and psycho-educational re-evaluation.

10          MS. MOORE:  And what was the team's determination, the MDT'S

11    determination?

12          MS. ROJAS:  Okay, so the psychological re-evaluation was done -  the psycho-

13    educational and the determination was that there was no need at that time for a clinical

14    assessment because the child was already receiving therapy with a clinical psychologist

15    and we needed to know what was his current psychological status to determine if he

16    needed further assessment or continued treatment.

17          MS. MOORE:  Now, you performed the psychological evaluation, correct?

18          MS. ROJAS:  That's right.

19          MS. MOORE:  And what were your findings?

20          MS. ROJAS:  Okay.  I did – okay, are we talking about the psycho-educational,

21    meaning the academic skills.

22          MS. MOORE:  The academic skills.  Then you can go into the psycho-

23    educational functioning.

36

1        MS. ROJAS:  Okay.  Basically, on his academic re-evaluation, I did the Whitcoult

2    (phonetic) Johnson III which gives the compu (phonetic) score and the average score is

3    like in the broad math, his average was fourth grade, and my calculation is that he has a

4    3.6 and academic skills he was in the third grade level and academic application, 3.9.

5    This also has a standard score.  And his standard scores ranged from 2 to 97 with one low

6    score at 84, which was below average.  Basically, you need a standard deviation about

7    one and one-half (1 ½) to determine if there's a learning disability.  And with that low

8    score of 84, one and a half would probably place him about 104 which is above the IQ

9    level that he had which was 92, in the average range.  That range is from 90 to 109.  So

10   there was no need to do any further assessments in terms of learning disability because it

11   showed that he was not within that range.

12        MS. MOORE:  Now what do those scores mean, those 3.9's and those 4.0's?  Is

13   that referring to grade level?

14        MS. ROJAS:  Those were his grade levels.

15        MS. MOORE:  Okay.  And he was currently in what grade when you tested him.

16        MS. ROJAS:  He was in the 4th grade.

17        MS. MOORE:  So he was in the 4th grade and making a 3.6 and a 4 in some

18   instances and a 3.9 in some instances.  That's right.  Those were his cluster scores.

19        MS. MOORE:  Um-hum.

20        MS. ROJAS:  Now, the test also gives separate scores for each subtest, and those

21   scores appeared to be a little lower but then many of these scores are combined to give

22   you the cluster which is the average.  And basically, that's what we look at to determine

23   if there is really any learning disability per se.  However, with all his subtest scores again,

37

1    they range from 85 to 100, and while some of the grade levels appear to be low -- [phone

2    rings]

3         MS. MOORE:  Continue.

4         MS. ROJAS:  Is that you?  Okay.  Level without medication was 2.9 which is

5    almost a third grade level, which is not that much lower.  And his other score – okay, he

6    also had a 2.9 in spelling, which gave him an 87 standard score.  Again, that was not far

7    enough below what is expected in terms of the standard deviation and looking at all these

8    scores, and then again, boys usually don't do that well in spelling.  However, it was one

9    of his lowest scores.  He had a 4.4 grade level in applied problems with 100 standard

10   score.  So actually, this boy's result were pretty good.

11        MS. MOORE:  Now, were there any other disability classifications considered by

12   the team.

13        MS. ROJAS:  Okay.  For example, I did test him for – to see if there were any

14   behavior problems, because there was the request for clinical evaluation.  Okay?

15        MS. MOORE:  Um-hum.

16        MS. ROJAS:  In the past, really there was no diagnosis of emotional problems.

17   What he had when he was tested at a very early age, as a matter of fact, he was I think

18   three and one-half (3 ½) years old when he first saw the psychologist.  I think he saw a

19   Doctor Thornton, Stephen (phonetic) Thornton from the what services – Washington

20   Investment in Therapy Services when he was 3 ½..  And the diagnosis was attention

21   deficit hyperactivity disorder, an oppositionally (phonetic) defined disorder.  Now, what

22   the mother described to me when I asked her about his behavior at that early age, she said

23   that he was born thirteen (13) pounds so he was always very big.  And when he went to

1    pre-school, he got – well, what was reported as fights – really was not his intentional

2    behavior problem.  But he was so big that he would flip the other kids because they were

3    much smaller.  So when he was playing with them, actually, his intention was playful, but

4    you know, other children were being hurt or something to that effect.  And she does not

5    tell me that, you know, he was having emotional problems from that time.  That's what

6    she described.  And as a matter of fact, the psychologist who saw him, who also did the

7    WITSI (phonetic) which is the pre-school equivalent to the Wesleyan Intelligence Scale.

8    He also got a 92 at the time which was within the average range.

9          MS. MOORE:  Prior to your meeting with the MDT on May 10, 2006, did you

10   receive any clinical information or anecdotal information from any therapist?

11         MS. ROJAS:  No.

12         MS. MOORE:  Did you receive any clinical or anecdotal information from any

13   counselors?

14         MS. ROJAS:  The school counselor showed a report that – of an observation that

15   she did in the classroom.

16         MS. MOORE:  Um-hum.   And when did she show this to you?

17         MS. ROJAS:  When I went over there to test him.

18         MS. MOORE:  And when was this?

19         MS. ROJAS:  This was in January, probably about the 9th of January, 2006.

20         MS. MOORE:  But at the May 10th, 2006 meeting, did you have any other

21   information?

22         MS. ROJAS:  The only other information I had was the results of the BASK that I

23   had done to determine whether or not further clinical assessment should be requested.

1    But I had information from an interview with the mother at the time when she filled out

2    the rating scale.

3             MS. MOORE:  Did the team determine that they needed any further information?

4             MS. ROJAS:  Well, we requested reports from the treating psychologist, because

5    supposedly he was receiving medication, but the mother, during the interview I had with

6    her at the Care Center, told me that she had taken him off the medication because she

7    didn't like the effects of the medication, when she was taking him back to the clinic to

8    see if he needed to be re-medicated.    I also asked about copies of the report from the

9    clinical psychologist so that we can see what was his current status.  You know, was he

10   making any progress, what was he being treated for, and you know, do we need to do a

11   further assessment.  Because the treating psychologist should be the one to determine

12   whether or not he needed further treatment or whether or not he needed to increase the

13   number of days of therapy or whether he needed to be sent back to the psychiatrist to

14   check on medication, and things like that.  The treating psychologist at this point is the

15   one who would determine that rather than referring him to someone else for a clinical

16   assessment. If he already had a clinical assessment and was being treated, it would be

17   redundant to send him for another clinical.  What would be the purpose of another

18   clinical at that point?  So my request that we receive documentation from the treating

19   clinical psychologist so that we can determine his current psychological status and to go

20   from there.

21             MS. MOORE:  And did you make this request clear to the parent?

40

1       MS. ROJAS:  Yes.  I made that clear to the mother when she was here.  During

2   the MDT, a Ms. – the social worker – reiterated this, and correspondence was sent out to

3   the mother on more than one –

4       MS. BARRIE:  Hear-- Objection.

5       MS. ROJAS:  -- occasion as I recall.

6       MS. MOORE:  Hold on, hold on one second.

7       MS. BARRIE:  Objection, on the basis of that she's indicating something that

8   obviously came from the Care Center as opposed to her.  We should make it here-say.

9       HEARING EXAMINER SMITH:  Well –

10      MS. MOORE:  But she's part of the Care Center Team.

11      HEARING EXAMINER SMITH:  Okay.  Why don't you just ask her knowledge

12  of that?

13      MS. MOORE:  Okay.  Ms. Rojas, what knowledge do you have that request –

14  correspondence – was sent to the parent?

15      MS. ROJAS:  I saw the copy of the letter that was sent.  I discussed with Ms.

16  Everett to try to provide this information to me.  As a social worker, she is the one who

17  would send out the correspondence.  As a psychologist on the Team, I would request

18  what I needed.  And then she would see that, you know, the correspondence goes out and

19  then she records the correspondence.  You know, that's not my role.

20      MS. MOORE:  Is this enough foundational information?

21      HEARING EXAMINER SMITH:  Yes.

22      MS. MOORE:  Then you may answer the – then your answer to the previous

23  question that correspondence was sent out repeatedly, I guess, is now part of the Record.

41

1          MS. ROJAS:. Yes.

2          MS. MOORE:  I have no further questions for you at this time, but Ms. Berry or

3    Mr. Smith may have some questions for you.

4          HEARING EXAMINER SMITH:  Ms. Barrie?

5          MS. BARRIE:  What are your qualifications?

6          MS. ROJAS:  Excuse me?

7          MS. BARRIE:  Your qualifications.

8          MS. ROJAS:  I have a master's degree in psychology.  I have more than thirty

9    (30) years of experience.  Most of them in colleges.

10         MS. BARRIE:  So you're not a clinical psychologist.

11         MS. ROJAS:  I'm not a clinical psychologist, I'm a school psychologist.

12         MS. BARRIE:  You completed – said – you indicated "I completed the BASK."

13         MS. ROJAS:  Yes.

14         MS. BARRIE:  Okay.  In this type of the evaluation, would you normally make a

15    determination as to ED disability?

16         MS. ROJAS:  Based on the BASK, I would not make an ED determination.  It

17    would have to be as a result of several different pieces of information.  That would

18    include the interview with the parent.  It would include the data from the intelligence test

19    and the data from the achievement test.

20         MS. BARRIE:  Do you know the standards of –

21         MS. ROJAS:  Excuse me.  And other information from the school and from the

22    social history.

23         MS. BARRIE:  Do you know the standards of making an ED determination?

1          MS. ROJAS:  Yes.

2          MS. BARRIE:  Okay.  Can you tell it to us?

3          MS. ROJAS:  Well, one of them is the student's inability to learn that cannot

4    really be explained by either intellectual or sensory or health factors.  Before a student

5    can be determined to have an emotional disturbance, we have to have at least one of these

6    conditions.  One of them is an inability to maintain a satisfactory interpersonal

7    relationship either with the student's peers or with his teachers.  You need some more?

8          MS. BARRIE:  So –

9          MS. ROJAS:  Or inappropriate type of behaviors.

10          MS. BARRIE:  Okay.

11          MS. ROJAS:  Or inappropriate types of behaviors.

12          MS. BARRIE:  Okay.  And during the meeting on May the 10th of '06, do you

13    remember the teacher providing information as far as a student's behavior and the

14    student's academics?

15          MS. ROJAS:  Yes, yes.

16          MS. BARRIE:  In the meeting notes, it indicates that the teacher stated that his

17    behavior is out of control and that he has poor grades in class.  In fact, he was functioning

18    on the second grade level on most and second and third in math.  Would that not fall into

19    the category of failure not explained by intellect?  Because according to your testimony,

20    he was functioning close to grade level in the standardized testing, correct?

21          MS. ROJAS:  Right.

43

1    MS. BARRIE:  Okay, so would that not fall into the category of – not being --

2    there is no explanation, at least no intellectual explanation as to why he is so far below in

3    the classroom?

4    MS. ROJAS:  Okay.  The teacher made some statements at the MDT meeting as

5    well as some of the statements in the rating scale.  But there were some conflicts in the

6    information – in the rating scale – so at the MDT meeting I questioned some specific

7    issues and then I found out that she was referring to behaviors that she has exhibited in

8    the past.  I think the year before.  But those behaviors were not current.  So in that case,

9    you know, if the behaviors were not current, how can she – or how can we determine that

10   the child is having emotional disturbance or emotional problems if the behavior we are

11   waiting to – or referring to with some behaviors that he exhibited in the past.  I was not

12   privy to any evaluation that was done the year before that might have indicated that he

13   had some emotional disturbance during that year.

14   MS. BARRIE:  So you didn't have his report card.  That –

15   MS. ROJAS:  Pardon?

16   MS. BARRIE:  You didn't have his report card?

17   MS. ROJAS:  I didn't have his – I don't remember seeing his report card.  But at

18   the meeting, the teacher brought some school work, and that school work ranged from A

19   to I think to C.  I don't have those reports in front of me now.  They might have been at

20   DIA (phonetic).  But it clearly showed inconsistent kinds of work habit.  You know, so

21   that some time he can – and the teacher, you know, she assured him that, "Yes," the A

22   that he had was work that he had done and that was the grade he obtained.  So if a child is

44

1   doing A and B and C, and he gets a D, that doesn't make him emotionally disturbed for

2   learning disabled.

3        MS. BARRIE:  But you did not have his report card.

4        MS. ROJAS:  Well, I didn't have his report card.  Well, I didn't have his report

5   card.

6        MS. BARRIE:  Okay.

7        MS. ROJAS:  So, you know, I don't know what transpired by the end of the

8   school year.  But, like I said, we take a lot of different things into consideration.  And

9   there were [was] some information that the mother gave, that, you know, raised some

10  questions as to what was happening in the classroom.

11       MS. BARRIE:  And did DCPS, well, did anyone ever give you the August 20th,

12  '04 psychological education evaluation report that was done at Ann Veers' Elementary

13  School?  Do you have that evaluation?  When he did the report and –

14       MS. ROJAS:  Done by Mr. Smith?

15       MS. BARRIE: By Anthony White.

16       MS. ROJAS: I'm sorry.  Mr. White, yes.

17       MS. BARRIE:  You have that.

18       MS. ROJAS: Yes.

19       MS. BARRIE:  Okay.  So you were aware that even going back to Ann Veers'

20  that indicated on the first page – that indicated on the first page that the teacher stated that

21  his limited social and emotional skills impacted his educational development?

22       MS. ROJAS:  That's what the psychologist said that that's what the teacher

23  stated.

45

1          MS. BERRY:  Right.

2          MS. ROJAS:  The psychologist did not make a determination of the emotional

3    disturbance.

4          MS. BARRIE:  Right.  But you were aware of that, correct?

5          MS. ROJAS:  I am aware of that report.

6          MS. BARRIE:  Okay.

7          MS. ROJAS:  I have not seen anywhere any diagnosis of emotional disturbance.

8    What I have seen is –

9          MS. BARRIE:  But then –

10          MS. ROJAS:  -- Hyperactive behavior.

11          ' MS. BARRIE:  But then you don't – we don't have any documents that will

12    provide that was done by a clinical psychologist, correct?

13          MS. ROJAS:  That's right.  We've asked for the documents.  Well, there is

14    something here from the clinical psychologist, who is the one, Dr. Blunton (phonetic)

15    who saw him and who, I assume was the person who has been seeing him but I don't

16    have the report to confirm that that's the person.  But he did not make a diagnosis of

17    emotional disturbance, either.

18          MS. BARRIE:  But when you refer to that document, was that not from 1999?

19          MS. ROJAS:  So since that time there has been no report that has been available

20    to me that stated anything about emotional disturbance.

21          MS. BARRIE:  So then my question to you is if there was a question mark, why

22    was that not recommended or referred for by the school system.

23          MS. ROJAS:  Why was not what recommended?

46

1    MS. BARRIE:  The clinical.  Clinical-psychological to be done by a clinical

2    psychologist.  To make an actual determination as far as emotional disturbance is

3    concerned.

4    MS. ROJAS:  I think that it has been what has been unprofessional of me to

5    request another clinical psychologist to see the child when the child has been in treatment

6    with one psychologist.  First, the psychologist has to let us know that he is no longer

7    treating the child, you know, and send us whatever he has progress notes or what have

8    you, up to the point at which he saw the child.  If you could just assume that what he is

9    doing is inappropriate and go and request someone else to do an assessment, would have

10    been inappropriate on my part.

11    MS. BERRY:  Was anyone asking you to make a determination that his therapist

12    was doing something inappropriate?

13    MS. ROJAS:  Well, look.  According to the question you just asked me, and I

14    have answered this before, I requested information from the treating clinical psychologist

15    –

16    MS. BARRIE:  Uh-hum.

17    MS. ROJAS:  -- So that I could see his current psychological status and to

18    determine if this child in fact needed an assessment or continued treatment.  And I never

19    received this.

20    MS. BARRIE:  So your determination that in your report you indicated that he

21    falls clinically significant range and also all the sub-sessions.

22    MS. ROJAS:  Right.  Yes.

23    MS. BARRIE:  Okay.

47

1    MS. ROJAS:  And like I said, and those were rating scales done by the teacher

2    and the parent.  And when I asked both of them, I definitely need them to explain some of

3    the issues.  For example, one of the things that checked very high was conduct disorder.

4    Conduct problem, which indicates that this child engages in rule breaking, acting out

5    behavior, cheating, deception, stealing, anti-social behavior, disruptive kind of behavior.

6    That's the kind of conduct we're talking about.  And when I asked them about this, their

7    explanation was completely different.  And then they said you know, like maybe in the

8    past summer.

9    MS. BARRIE:  And this all happened at an embassy meeting.

10    MS. ROJAS:  Yes.  You know, well, okay, that's fine.

11    MS. BARRIE:  So in reality, as a school psychologist, you can't really make a

12    determination as far as ED is concerned, correct?

13    MS. ROJAS:  Well, according to the current system, I can't.

14    MS. BARRIE:  You can do a clinical psychological evaluation?

15    MS. ROJAS:  I can't do a clinical psychological evaluation, but I can do

16    evaluations and determine if the child has emotional problems based on the criteria.

17    MS. BARRIE:  Uh-hum.

18    MS. ROJAS:  And if I think that the child has some emotional problem, I can then

19    make a referral for a consultation to psychologists all over the country.

20    MS. BARRIE:  So what testing would you perform to determine emotional

21    disturbance.

22    MS. ROJAS:  Well there are a number of instruments that we can use.  One is

23    which is the best, and some others would be the Reynolds (phonetic), a house re-person

48

1    (phonetic) test, kinetic family drawings, things like that that could give us some

2    additional information.  And raise some flags so that we can know that further assessment

3    is indicated.

4        MS. BARRIE:   Okay.   So you could have used the BASK that you used on here.

5    It could have been to determine whether a yea or nay the student is ED.

6        MS. ROJAS:  Well, in this case, because the child was in treatment, no further

7    instrument was used.

8        MS. BARRIE:  All right.  No more questions.

9        HEARING EXAMINER SMITH:  Any redirect?

10       MS. MOORE:  No, sir.

11       HEARING EXAMINER SMITH:  Okay, Ms. Rojas.  Thank you very much.

12   Appreciate your patience in waiting for us and have a good day with whatever's left,

13   okay?

14       MS. ROJAS:  All right.  Thank you.

15       MS. MOORE:   Thank you, Ms. Ross.  Bye-bye.

16       MS. ROJAS:  All right.  Thank you.  Bye-bye.

17       MS. MOORE:  Yes, sir.  We rest on the documents and the testimony of our

18   witnesses.

19       HEARING EXAMINER SMITH:  Okay.  Thank you.  Did you have some

20   telephone witnesses, you said –

21       MS. BARRIE:  Yes, I do.

22       HEARING EXAMINER SMITH:  Is there a time constraint, or –

23       MS. BARRIE:  Time constraint for Ms. Wilson right now.

1    HEARING EXAMINER SMITH:  Okay.  Raise your right hand, please.  Do you

2    swear and affirm to tell the truth, the whole truth and nothing but the truth in the

3    testimony that you are about to give in this hearing?

4    MS. WILSON:  I do.

5    HEARING EXAMINER SMITH:  Okay.  Why don't you – go down – or maybe

6    you can sit a couple of them –

7    MS. MOORE:  To this chair?

8    MS. BARRIE:  (inaudible), sir, in this.  Okay.  Is that yours?  Okay.  Ms. Wilson.

9    Can you state your name for the record, please?

10   MS. WILSON:  Alice Wilson.  And your occupation?  I'm the school social

11   worker at Assumption School.

12   MS. BARRIE:  Are you aware of W_____ R_____?

13   MS. WILSON:  Yes.

14   MS. BARRIE:  How do you know W_____?

15   MS. WILSON:  Well, he has been a student at Assumption in third grade and

16   fourth grade.

17   MS. BARRIE:  Are you aware of any academic or behavior problems that

18   W_____ had-has exhibited at Assumption.

19   MS. WILSON:  Yes.

20   MS. BARRIE:  What sort of behavior?

21   MS. WILSON:  Well, in third grade, at the beginning of the year, he had some

22   trouble getting along in the classroom and with other children.

23   MS. BARRIE:  Uh-hum.

1        MS. WILSON:  And he came to me a couple of times when he had gotten really

2    angry and the teacher had sent him to me, and we spent some time together and he sort of

3    settled down and went back to the classroom.  And he also spent some time with the

4    Principal and talked a little bit about the atmosphere, where he had gone to school before,

5    and the atmosphere in the current classroom and the teacher put together some strategies

6    for him, and his behaviors did improve during the year with a couple of flare-ups during

7    that year.

8        MS. BARRIE:  In December of '05, did you complete a referral form for special

9    education services?

10       MS. WILSON:  I did.

11       MS. BARRIE:  And this is Parent's Exhibit No. 8.  What was –?

12       MS. WILSON:  Actually, I coordinated.

13       MS. BARRIE:  You coordinated.

14       MS. WILSON:  Yeah.  So I do some of the things, some of the items, but there

15   are lots of items and I've distributed all the papers to all the different people who have to

16   complete their part.

17       MS. BARRIE:  So like you said, you are (inaudible) teacher.

18       MS. WILSON:  Collect them.

19       MS. BARRIE:  And people like that.

20       MS. WILSON:  Uh-hum.  Uh-hum.

21       MS. BARRIE:  Okay.  And they were completed by the necessary parties

22   provided to you.

23       MS. WILSON:  Right.

1        MS. BARRIE:  And when they're provided to you, what do you do with them?

2        MS. WILSON:  I get them altogether and get them to the Care Center.

3        MS. BARRIE:  To the Care Center.  And that's what you did.

4        MS. WILSON:  Uh-hum.  Uh-hum.

5        MS. BARRIE:  Okay.  So then if people right at the Care Center with this

6    document I'm showing, No. 8.

7        MS. WILSON:  Uh-hum.

8        MS. BARRIE:  You provided that to the Care Center?

9        MS. WILSON:  Right.

10       MS. BARRIE:  Okay.  So was that about the same time when you filled it out in

11   December of '05?

12       MS. WILSON:  Right.

13       MS. BARRIE:  Okay.

14       MS. WILSON:  Uh-hum.

15       MS. BARRIE:  And at that time there was a real concern for W████ and his

16   education?

17       MS. WILSON:  Yes.

18       MS. BARRIE:  Okay.

19       MS. WILSON:  Oh –

20       MS. BARRIE:  Go ahead.

21       MS. WILSON:  I'm sorry.  Well, there were a couple of things that had come to

22   our attention.  For one thing, in the spring of third grade, so that was the spring of '05, we

23   received his IEP from Prince George's County, and also some testing and some

52

1  evaluations from the previous school which was a D.C. public school. And there was in

2  particular a social work evaluation. And it was done in July of '04 and then a

3  psychological which you've been referring to. And then we also had his standardized

4  testing scores from the end of third grade which showed him way below average in

5  everything and just in low average in everything but spelling and just in low average on

6  spelling. So that would indicate a student who would be really struggling, especially

7  when he would be in a percentile of 4, 7, 12, 10, 6, and 5. And there were several scores

8  there. So it kind of gave us a sense of the frustration level that he may be dealing with.

9       MS. BARRIE: And this past school year in 2005-2006, did he exhibit the same

10  academic struggles?

11       MS. WILSON: There were some – yes. Academic struggles, for sure. His first

12  report card was of great concern. He failed all of his subjects except for physical

13  education and art, and so, all the academic subjects. And his conduct was poor. He had

14  had some conduct outbursts and had come to see me a few times, and then I met with

15  Mom.

16       MS. BARRIE: And that prompted you to do this?

17       MS. WILSON: Yes.

18       MS. BARRIE: December of '05?

19       MS. WILSON: Right.

20       MS. BARRIE: In your work with W█████ –

21       MS. WILSON: Uh-hum.

22       MS. BARRIE: What sort of environment do you believe W█████ should be in?

53

1          MS. WILSON:  Well, my sense of W███ is that he really does better either one

2    on one, where he seems to shine, and doesn't have to deal with the frustration of other

3    kids and performance demands.  Or in a small group that's performing near his – his

4    success level, because I don't think W███ was able to experience much academic

5    success last year.  And that will often make a child very frustrated and angry in the

6    classroom.  And we were not able to provide small group teaching for kids the way some

7    other schools are able to do.  We don't have the faculty or the resources.

8          MS. BARRIE:  Uh-hum.  Okay.  Did you participate in the meeting in May of

9    '06?

10         MS. WILSON:  No, I did not.

11         MS. BARRIE:  Were you invited by the Care Center?

12         MS. WILSON:  I was, but I wasn't able to go.

13         MS. BARRIE:  Okay.  So, the checks and information in this document as far as

14   his distraction and his following in the classroom, following direction –

15         MS. WILSON:  Uh-hum.

16         MS. BARRIE:  -- All those are accurate?

17         MS. WILSON:  Yes.  To my knowledge.

18         MS. BARRIE:  Okay.  Did anyone from the Care Center or from DCPS interview

19   you in reference to getting services for W███?

20         MS. WILSON:  I don't believe I was formally interviewed.  I did speak with Ms.

21   Rojas when she came to see W███.  Usually, I'm the point person, if someone comes to

22   do testing and I set her up in the room where she was going to see him, brought W███

23   to her and then after she saw him she spoke with me for a few minutes.

1          MS. BARRIE: Okay. So there was not actually an interview with the

2     psychologist.

3          MS. WILSON: I don't believe so. No.

4          MS. BARRIE: If you had been interviewed, would you have informed her of all

5     these behaviors and academic difficulties that W████ was exhibiting at the school?

6          MS. WILSON: Yes. I would have. Also, may I say something?

7          MS. BARRIE: Go ahead.

8          MS. WILSON: I was aware. I'm sorry.

9          MS. BARRIE: There's no question on the table.

10         HEARING EXAMINER SMITH: There is no question pending.

11         MS. WILSON: Oh, okay.

12         MS. BARRIE: That's fine. Did you know that DCPS had a problem with

13    determining his disability classification?

14         MS. WILSON: Yes, I did.

15         MS. BARRIE: Okay. Did they address it with you?

16         MS. WILSON: No.

17         MS. BARRIE: Okay. So, in your knowledge of W████, these behaviors

18    indicated have what been going on from the third and the fourth grade?

19         MS. WILSON: Yes.

20         MS. BARRIE: So it has been consistent behavior especially since the spring of

21    the third grade.

22         MS. WILSON: Yes.

1      MS. BARRIE:  Were you surprised that he was not found eligible for special

2  education services?

3      MS. WILSON:  Yes, I was.

4      MS. BARRIE:  Why?

5      MS. WILSON:  Well, we had information to indicate that very similar behaviors

6  have been going on for a long time and some of the evaluations have been done by DCPS

7  –

8      MS. BARRIE:  Uh-hum.

9      MS. WILSON:  -- within two years of this current evaluation.

10      MS. BARRIE:  Uh-hum.

11      MS. WILSON:  So I was quite surprised with all that information and with the

12  teacher's report on the behavior rating scale, and his grades.  And his performance on the

13  standardized test which we did provide.

14      MS. BERRY:  You did provide them with information.  Because you were the

15  point person.  That was your job to do.

16      MS. WILSON:  Uh-hum.  Uh-hum.

17      MS. BARRIE:  Okay, no more questions.

18      HEARING EXAMINER SMITH:  Okay.

19      MS. MOORE:  I have some questions.   Ms. Wilson?

20      MS. WILSON:  Yes.

21      MS. MOORE:  When did the student begin enrollment at Assumption?

22      MS. WILSON:  He entered the school in the beginning of the third grade which

23  would have been Fall 2004.

1       MS. MOORE:  And at the time that he was enrolled, did the parent inform you

2    that he had been previously in special ed?

3       MS. WILSON:  She did not inform me.  I'm not sure whether she informed the

4    principal.

5       MS. MOORE:  Does Assumption offer special education services?

6       MS. WILSON:  No, we don't.

7       MS. MOORE:  Okay.  Did you provide any anecdotal information on this student

8    to the MDT Team besides the January '06 observation?

9       MS. WILSON:  Well I did provide classroom observation.  That was that I

10   attached with the other papers which was done on – when was that done – December 12th.

11      MS. MOORE:  So December '05 was the classroom observation.

12      MS. WILSON:  Right.

13      MS. MOORE:  Okay.   You provided this referral form to the Care Center,

14   correct?

15      MS. WILSON:  Right.

16      MS. MOORE:  Is that what you testified to?

17      MS. WILSON:  Right.

18      MS. MOORE:  Have you attended MDT meetings in the past?

19      MS. WILSON:  Uh-hum.

20      MS. MOORE:  And you were concerned about W████ behaviors at

21   Assumption, correct?

22      MS. WILSON:  Right.

23      MS. MOORE:  But yet you chose not to attend the MDT meeting for W████.

57

1          MS. WILSON:  Well it wasn't that I chose not to.  I was not able to go.

2          MS. MOORE:  Okay.

3          MS. WILSON:  And Ms. White was able to go.

4          MS. MOORE:  But you didn't attend any MDT meetings on his behalf?

5          MS. WILSON:  That one meeting –

6          MS. MOORE:  No.  I mean any.

7          MS. WILSON:  - I believe was the only one.

8          MS. MOORE:  Have you attended any?

9          MS. WILSON:  I wasn't aware that there was more than just that one.

10         MS. MOORE:  Have you attended any?  Yes or no.  Have you attended any?

11         MS. WILSON:  No.

12         MS. MOORE:  Okay.  After the team made its determination in May 2006, did

13   you attempt to provide any additional information to the MDT Team or the Care Center?

14         MS. WILSON:  I was aware that they had made that determination when a

15   previous principal contacted me in August.

16         MS. MOORE:  But you have not provided any additional information.

17         MS. WILSON:  No.

18         MS. MOORE:  I have no further questions.

19         HEARING EXAMINER SMITH:  Okay.

20         MS. BARRIE:  May I come in?

21         HEARING EXAMINER SMITH:  Sure.

22         MS. BARRIE:  Were you ever asked for any additional information for W████?

23         MS. WILSON:  No.

58

1          MS. BARRIE:  By anyone from the Care Center?

2          MS. WILSON:  No.

3          MS. BARRIE:  By the psychologist?

4          MS. WILSON:  No.

5          MS. BARRIE:  Okay.  Are you aware of any other meetings besides the May 10th

6     of '06 meeting for W██████?

7          MS. WILSON:  No, I'm not.

8          MS. BARRIE:  Before May 10th, or after May 10th?  After the May 10th meeting?

9          MS. WILSON:  No.

10         MS. BARRIE:  No?

11         MS. WILSON:  Not until I was notified of this meeting.

12         MS. BARRIE:  If they had asked you for more information, if the Team or they

13    were not satisfied with the teacher's information, if they had needed more, would you

14    have provided it to them?

15         MS. WILSON:  Yes.

16         MS. BARRIE:  If they had contacted you.

17         MS. WILSON:  I would have.

18         MS. BARRIE:  Thank you.

19         HEARING EXAMINER SMITH:  Okay, Ms. Wilson.  Thank you very much.

20         MS. WILSON:  Thank you.

21         HEARING EXAMINER SMITH:  Appreciate your patience.   Do you have a

22    telephone witness?

23         MS. BARRIE:  Yes.

1          MS. BARRIE: Hello, Dr. Marryshaw? (Inaudible) Can you hear me?

2          DR. MARRYSHAW: Yes.

3          HEARING EXAMINER SMITH: Hello, my name is David Smith. I'm the

4   Hearing Officer and I am going to swear you in to testify, okay?

5          DR. MARRYSHAW: Yes.

6          HEARING EXAMINER SMITH: Do you swear and affirm to tell the truth, the

7   whole truth, and nothing but the truth in the testimony that you are about to give at this

8   hearing?

9          DR. MARRYSHAW: I do.

10         HEARING EXAMINER SMITH: Okay. Ms. Barrie?

11         MS. BARRIE: Can you state your name for the record, please?

12         DR. MARRYSHAW: My name is Derrick Marryshaw.

13         MS. BARRIE: And your occupation?

14         DR. MARRYSHAW: I am a child-family psychologist and an educational

15   advocate.

16         MS. BARRIE: Okay. What is your educational background?

17         DR. MARRYSHAW: I have a Bachelor's degree in psychology, a Master's

18   degree in educational psychology; I have a PhD in child developmental psychology.

19         MS. BARRIE: So you are a clinical psychologist?

20         DR. MARRYSHAW: No. I'm a child developmental psychologist.

21         MS. BARRIE: Okay.

22         DR. MARRYSHAW: And also licensed school psychologist in the District of

23   Columbia.

1     MS. BARRIE:  Have you ever worked for D.C. Public Schools before?

2     DR. MARRYSHAW: Yes I have.

3     MS. BARRIE:  In what capacity?

4     DR. MARRYSHAW: As a school psychologist.

5     MS. BARRIE:  How long did you work for D.C. Public Schools?

6     DR. MARRYSHAW: Excuse me.  I worked for D.C. Public Schools for a total of

7 four (4) years, with a gap of two (2) years in between.  I worked for two (2) years as the

8 Director of the ED program at Evans Junior High School in '99 and 2000, in which I was

9 Director of an ED program.  We had two (2) classes of ten (10) students, ED students

10 each, and each class had two (2) teachers.  And I did supervise the program and doing

11 [did] psychological testing in group therapy and MDT meetings and so forth.  And the

12 other two (2) years, '04 to '05, '03 to '04, '03 to '04,  I was a psychologist at Sharp

13 (phonetic) Health School doing mainly psychological testing, counseling and participated

14 in an IEPMDT meetings.

15     MS. BARRIE:  So have you been at meetings where it has been determined as to

16 when is 8 VD (phonetic)?

17     DR. MARRYSHAW:  Numerous meetings.

18     MS. BARRIE:  Are you aware of W█████ R████████?

19     DR. MARRYSHAW:  Yes I am.

20     MS. BARRIE:  Okay.  Have you reviewed his documents?

21     DR. MARRYSHAW:  Yes I have.

22     MS. BARRIE:  Have you met with the student?

1          DR. MARRYSHAW:  Yes I had an extensive interview with the student and the

2  parent.

3          MS. BARRIE:  What documents did you review in reference to W██████?

4          DR. MARRYSHAW:  I reviewed two (2) psycho-educational evaluations.  Well,

5  one psycho-educational evaluation dated 8-20-04, a psychological report/review dated 1-

6  9-06, MDT notes from 10-5-06, MDT notes to an evaluation plan from 12-14-05, report

7  card from the Assumption School, Fourth Grade report card 05-06 school year.  Two

8  social histories, observation notes from the Care Center which included a teacher report,

9  third grade report card and classroom observation, as well as his IEP, '04-'05 IEP from

10  Maryland.

11          MS. BARRIE:  In your review of these documents, what, if anything did you find

12  in reference to W██████ educational needs?

13          DR. MARRYSHAW:  I found to me based on a review of the records, interviews

14  with the parent and the student that the student, W██████, clearly meets the criteria for

15  Emotional Disturbed, the ED criteria under special education category.  And also, more

16  than likely, very possibly, other health impaired as well, based on his hyperactivity, and

17  how it impacts him in the classroom.

18          MS. BARRIE:  Did you see any documentation to support – or rather, what made

19  you believe that he is definitely ED and maybe (inaudible)?

20          DR. MARRYSHAW:  Okay.  A number of – quite a number of documentation.

21  First, if I could start with his IEP from Longfield Elementary School dated – review date

22  was 4-01-05.  In that IEP, he basically has no cognitive or I should say academicals.  His

23  primary disability is emotional disturbance (ED), and his goals, his IEP goals address

1    attentional and behavioral concerns. I believe it's WRO2 and about 2, 4, 5, 6 pages back,

2    where the goals and objectives begin. He has goals to address attentional concerns, and

3    goals to address behavioral concerns. Also in that IEP, about three pages from the last

4    page, there's the category that states "action proposed explanation of why proposed."

5    And in those explanations, the Team at that point felt that W██████ continued to require

6    special education services under the diagnosis of emotional disturbed. And they also felt

7    he needed additional evaluations to see if he needed to be in a more restricted

8    environment. They also indicated that he continued to be very unfocused and act

9    impulsively. So that's [inaudible] documentation. And given the fact that W████ left

10    that school in April of '05 and had no special education services, the entire '05-'06 year,

11    because he was at the Assumption Catholic School in which he didn't receive special

12    education.

13         One can – what I would, looking at the data, can assume that he probably

14    regressed or continued to have serious behavioral issues that would impact his learning.

15    And looking at the documentation it confirms that. The other documentation I looked at

16    that made this point – and if I could just digress for a second and say, when – when we

17    look at the law, I did to define emotional disturbance. It basically said that the condition

18    that one exhibits one or more  five characteristics, and that they occur for a long period of

19    time and they have an adverse impact on educational performance and W████ meets at

20    least three of those characteristics. The primary one that he meets is inappropriate types

21    of behavior or feelings under normal conditions. The other two secondary ones is an

22    inability to build and maintain satisfactory interpersonal relationships with peers and

23    teachers. And the third one is a general pervasive mood of unhappiness and depression.

1    Now I put them in order of priority, with the inappropriate types of behaviors and

2    feelings under normal conditions, because that one comes through so clearly in the

3    documentation. The one – the third one that talks of a pervasive mood of unhappiness. I

4    would say we would need some additional information to clearly rule that in or out. And

5    the second one, the inability to build or maintain satisfactory interpersonal relationships

6    with peers – I think that plays itself or it's confirmed again in the documentation. Now I

7    just wanted to just kind of lay that – how that idea defines that. But to continue, looking

8    at additional documentation, I take a look at a psychological report review. And that's

9    dated 1-0-06. And in that report, we see that W███ is pretty much in terms of the

10   cognitive and achievement area is functioning pretty much in the low average to average

11   range with some scores that fall close to the borderline range, but in general, is the low

12   average to average range. And that's not untypical with a student with emotional

13   disturbance. But if we look at his report card, he's failing all of his classes because the

14   emotional component is impacting his performance in the classroom. In this report, if we

15   turn to page – beginning on page 5, under behavioral rating scale, and we look at the

16   BASK II. which is a rating scale of behavioral internal and external problems relating to

17   behavior, and the evaluator has the classroom teacher, the parent complete those scales as

18   well as W███ did a self-report. And again, if we look at the chart on page 5, we see

19   that the evaluator states what score – what key score will place the student at in the

20   average, low, accurate (inaudible) clinically significant. If we turn to page 6, we see that

21   for the area of hyper-activity, W███ is clearly in the clinical significant area. To be

22   clinically significant you have to have a T score of 70. He has a T score of 74. Clinical

23   significant area and this is a teacher reporting now on how that hyperactivity is impacting

64

1    his classroom performance, what he does in the class. If we move on to the T score for

2    aggression, that score is 72. Again, clinically significant. And this is again impacting

3    what he does in the classroom – aggression, his tendencies to physical and emotional

4    harm to others, destroying property, and I mean, it's -- I'm not going to read all of what it

5    indicates.

6          The third scale in the externalizing problem that the teacher rated him was the

7    conduct problem. And again, very clinically significant, a score of 81, when all he need

8    is a score of 70 to be clinically significant. And although there is – he's significant.

9    When we look at internalizing problems, again, the teacher rating – these – how he is

10   internalizing problems and internalizing problems again and the value that describes it,

11   his problems that are not typically disruptive to others, but it negatively impact the

12   students and may impact the student's peer relationships. Now an internalizing score, the

13   T score for anxiety is 69. It's not in the clinically significant range which one more point

14   would put it there, but it's in the at risk range. That's something that needs to be

15   followed up on and monitored closely. For the depression, he has a score of 77. Again,

16   clinically significant. That's why I, again, looked at with the definition of under idea of

17   ED, I said, I put that as something he—we need to follow up on and do some more

18   assessment to see if this child is depressed. And then if we go on to the next page, page

19   7, in the area of symmaticization (phonetic) I find it not significant in which a student

20   with, say they have head related problems, or they're not feeling well, there's a way of

21   not participating in class or not attending school. That's not significant. So, if we look at

22   – just to summarize the teacher's ratings, he is significant in all three of the externalizing

23   problem areas and significant in the internalizing areas. And I want to emphasize the

65

1    teacher ratings because it directly impacts the child in the classroom setting.  If we move

2    on briefly to school problems, again, the T score for attentional problems is a 62, which is

3    not clinically significant but it's in the at-risk range and what that tells us is that the

4    serious problem that W█████ has in terms of ADHD – it's in the hyperactivity

5    component, and less so, in the attentional component, but both of them are a problem.

6    One is at-risk and one is clinically significant.  If we move on to the other T score,

7    learning problem 66, again, that's in the at-risk range.  And then we move on to the

8    parent rating scale.  The parent rate his atypical behavior.  First of all, his composite

9    scores, the harrow (phonetic) symptom index composite score T score is 85.  Again,

10    clinically significant.  And if we look at the sub-test atypical behavior, an atypical

11    behavior again ties into that characteristic under idea of inappropriate types of behavior

12    and feelings under normal circumstances.  And that's significant, 81.  Withdrawal, 71,

13    again significant, and for the other scores, the adaptability, social skills, leadership, and

14    functional communication, you, in terms of their significance, it's inverse.   Meaning, that

15    the higher the score is, means not significant, and the lower the score is means that it's

16    more significant.  So we have to look at those scores means that it's more significant.  So

17    we have to look at those scores in an inverse way.  So his adaptability T score of 39 – it

18    falls in the at-risk range.  Not in the significant range but it's something we have to look

19    at.  Social skill score again also falls at 39, fall in the at-risk range.  His leadership skills,

20    leadership, is 44, which falls into pretty much typical normal range, and functional

21    communication, 43, falls in the typical normal range.  So, looking at his scores, clearly,

22    this is a student, looking at these scores and looking at them comprehensively along with

23    his previous IEP in which he was an ED student, and keeping in mind that he went an

1    entire school year without receiving special education services, we see again that he

2    meets that criteria.  But, I want to go on to the MDT notes from the 5-10-06 meeting that

3    in which the classroom teacher, the classroom teacher states that W██████ is below

4    academic level, unable to do cursive handwriting, at the beginning of the second grade

5    level.  Some of it is difficult to read but some of it is pretty clear.  Mother says, even after

6    repetition, he is often if you go down to the middle of that paragraph, it says he is also

7    defiant, destroys property, has problems with following directions, teacher gave W██████

8    tutoring extra time to complete assignments, so that statement, being defiant, destroying

9    property, clearly, this student is having some serious difficulty in class that may cause

10   injury to himself or others.  If we turn the page and look at the school psychologist's

11   notes, it says, W██████ has low self-esteem, poor attention and concentration, often

12   exhibits mood changes with anger.  W██████ is afraid of his sister who is ED and

13   schizophrenic.  W██████ starts Assumption three years ago.  Has been – some of it is

14   difficult to read.  And the psychologist goes on to say – the psychologist did not find him

15   eligible for special education.  I can't understand that.  That's a contradiction.  And we

16   look at his report card.  He's failed all of his classes that year at school.  Given the data

17   all together, there's enough data that that team had available to them to clearly make a

18   decision that this student met the criteria for ED and also what I – if I was at that meeting

19   I would have suggested that we at minimum to a Connors (phonetic) rating scale to rule

20   out the attentional, the hyperactivity component to rule out the need for – or rule in – the

21   need for other health and care.  In addition to that, W██████ has a history of being on

22   medication for hyperactivity.  He has a family history of mental illness and to find that

23   this child does not meet the criteria for ED, I don't understand how the Team came to that

1    conclusion.  Even if the Team felt they needed additional information, what a Team

2    would do, so that we have enough information here to make a determination, and make

3    that determination when additional information – whey they obtain additional

4    information, re-convene the meeting and modify the IEP based on new information or

5    information that they did not have at the time.  But this team had enough information to

6    make a determination of emotional disturbance and provide the educational setting, small

7    classroom setting, with the therapeutic intervention in that setting to meet W████████

8    educational needs.

9         MS. BARRIE:  Dr. Marryshaw?

10        DR. MARRYSHAW:  Yes?

11        MS. BARRIE:  Have you ever been a member of the team of a student who has an

12   outside therapist?

13        DR. MARRYSHAW:  Children often have outside therapists that are emotionally

14   disturbed.  That's – that's general – pretty typical.

15        MS. BARRIE:  Okay.  If a student has an outside therapist, have you ever been in

16   a meeting where they need their evaluations or need that information, or, rather, neither

17   testing would not be completed unless it's completed by the therapist?

18        DR. MARRYSHAW:  No.  First of all, information from outside therapists are

19   important to have.  But a team should not make a decision when – only if there's not

20   enough data at the table, there's not enough information to make a determination of

21   eligibility, then you would say, "Well we need additional information."  It might be

22   additional testing, or data from an outside therapist, or medical doctor, or whatever.  But,

23   if you have enough information to make a determination, you should make that

1    determination when additional information or additional evaluation that the team is

2    requesting comes in.  Then you bring that information and if you have to modify the IEP,

3    you modify it.  So – and if a student needs an evaluation to – to complete an IEP or to

4    modify the IEP, the school system should complete that evaluation.  I think in addition to

5    finding him eligible as a student under the category of emotionally disturbed, the team

6    should have also recommended additional evaluation, including a psychiatric evaluation

7    and a Conner's rating scale.  And in addition to that, the psychological from 1-9-06 had

8    no projective testing.  Projecting testing can give you a lot of insights on student

9    behavior.

10        For example, on the self report of the BASK, the rating scale that we looked at for

11    this student that the parent completed one and the teacher completed one, well W█████

12    did a self-report.  And on his self-report he was fine.  He said he had no problems with

13    behavior, with self-esteem, with school or anything like that.  Because those are objective

14    questions and the student and the recipient tend to say, well, I'm not going to say I have a

15    problem here and there, but projective testing is a way to get information that the person

16    is not objectively giving out.

17        So there should have been three additional things that should have been

18    recommended at that meeting.  Projective testing, a Connors parent and teacher rating

19    scale and a psychiatric evaluation.  And that should have been requested after the student

20    was found eligible in IEP developed.  Once that testing was done, the Team should have

21    reconvened and reviewed that information to see if there's a need to modify the IEP.

22        MS. BARRIE:  Thank you.

23        DR. MARRYSHAW:  You're welcome.

69

1          HEARING EXAMINER SMITH:  Any cross?

2          MS. MOORE:  Yes.  Dr. Marryshaw?

3          DR. MARRYSHAW:  Yes?

4          MS. MOORE:  This is Stephanie Ramjohn Moore.  How are you?

5          DR. MARRYSHAW:  I'm fine, how are you?

6          MS. MOORE:  Fine, thank you.  I just have some questions for you for

7    clarification purposes.

8          DR. MARRYSHAW:  Go.

9          MS. MOORE:  And I have some others, too.  This IEP from Maryland, from

10   Longfield Elementary.  The IEP meeting date was actually April 1st, 2004.  I know that

11   you kept – were saying it was 2005, but if you look closely, that would have been the

12   review date a year from the development of the IEP.  So I think that's why that date is

13   there.

14         DR. MARRYSHAW:  Right.

15         MS. MOORE:  So in actuality, this IEP is from 2003-2004.

16         DR. MARRYSHAW:  No, that's incorrect.  Let me – I'm very familiar with

17   Maryland IEPs.

18         MS. MOORE:  Uh-hum.  Uh-hum.

19         DR. MARRYSHAW:  The IEP meeting was held on 4-1-04.

20         MS. MOORE:  Yes.

21         DR. MARRYSHAW:  Okay?

22         MS. MOORE:  Right.

1          DR. MARRYSHAW:  Then they reviewed the IEP at the – so – at 4-1-05, they

2    reviewed IEP.  And in reviewing that IEP, they had to make a determination and if you

3    look to like I said from the bottom of the IEP, the third page from the bottom, the Team

4    says this.  So, so, the IEP –

5          MS. MOORE:  What page are you referring to, sir?  What page?

6          DR. MARRYSHAW:  The page that says "action proposed."

7          MS. MOORE:  And what page is that?  Is that the last page?  What page is that?

8          DR. MARRYSHAW:  Yes, well, see.  Since there are no page numbers on it, it's

9    a little difficult.  That's why I said from the bottom – if you look from the bottom of the

10   IEP, the third page from the bottom.  And that's helpful.

11         MS. MOORE:  The bottom of the IEP.  The last page?

12         DR. MARRYSHAW:  Yes, that's right.  Semantically, it's – yes.  Yes.  The last

13   page.  If you look at the last page of the IEP and then count from the last page, the next to

14   the last, and then the third to the last page, at least in my package that's the way it looks.

15         MS. MOORE:  And it says, "Actions."  Okay, go ahead.

16         DR. MARRYSHAW:  Okay.  So –

17         HEARING EXAMINER SMITH:  What page is that again?

18         MS. MOORE:  This is -- I think it's this page, sir.  Uh-hum.

19         DR. MARRYSHAW:  So it says, in the meeting Ms. Linowski (phonetic) stated

20   that she is seeing some progress with W███████.  W██████is beginning to tell his teacher

21   about situations so forth and so on.  I'm going to just kind of go through.

22         MS. MOORE:  Right.

71

1      DR. MARRYSHAW: And I'm reading this to answer your question. "They will

2   be attending school in Washington, D.C. Throughout the meeting, Mom expressed

3   concerns about placement." And remember, he left – he-he – They are talking about how

4   he is going to school in Washington, D.C. He left that Maryland school in April of '05.

5   So they were reviewing this IEP in April of '05. So we're on the same page I assume.

6      Okay. So, even though the IEQ [P] was written in 4-1-04, at the end of that

7   annual review that they were doing for the IEP, that's – this – they were reviewing it.

8   And so let me continue. So, I – you –

9      MS. MOORE: But, but, but, but Dr. Marryshaw, I've already heard testimony

10  from the social worker at assumption that testified that he started in '04. So how could he

11  have started school in '04 and this IEP been reviewed in '05 if he was attending school

12  elsewhere?

13      DR. MARRYSHAW: Okay. W█████ started the Assumption School and clarify

14  for me if I'm correct – if I'm incorrect. W█████ started the Assumption School and in 9-

15  05, and he stayed there from 9-05 to 6-06 at the end of the school year.

16      MS. MOORE: No, sir. That's not in the testimony sent here today.

17      DR. MARRYSHAW: Well, like I said. I interviewed –

18      MS. MOORE: And if you note at the very page that you're referring to, in like a

19  handwriting, at the end of that very paragraph, it says "in addition an evaluation was

20  requested and was to be conducted before the end of this 2003-2004 school year.

21      DR. MARRYSHAW: Okay. If the dates of the IEP is incorrect, that, I mean, if –

22  I won't debate that. If testimony said it was '04, but the point of the matter is that my

23  position is that this student still had an IEP, even if was '04.

1          MS. MOORE:  Right.  And I haven't asked you a question, so may I continue?

2          DR. MARRYSHAW:  Okay.  Sure.

3          MS. MOORE:  Okay.  Great.  So that would mean that after he left Longfield

4    Elementary School, he did not receive any services at Assumption 2004, 2005, 2005,

5    2006.  Correct?

6          DR. MARRYSHAW:  Okay.

7          MS. MOORE:  Am I correct or no?

8          DR. MARRYSHAW:  I don't know.  It's based on what you're saying; it would

9    be two (2) years that he hasn't received services as opposed to one.

10         MS. MOORE:  Exactly.

11         DR. MARRYSHAW:  Okay.  That's even more –

12         MS. MOORE:  Exactly.  So, would – in your professional opinion it would be

13   detrimental to a student to not receive special education services for two (2) years?

14         DR. MARRYSHAW:  It definitely would be detrimental to a student to not

15   receive if he requires or needs special education services and not receive it.  Now, saying

16   that I know parents sometimes feel that different –

17         MS. MOORE:  I didn't ask you --

18         DR. MARRYSHAW:  -- school environments may be more appropriate for their

19   child.

20         MS. MOORE:  -- an additional question, Dr. Marryshaw.  I didn't ask you an

21   additional question.  It's either "yes" or "no."  Is the student – would it be detrimental to

22   a student who requires services not to receive them for two years.

73

1      DR. MARRYSHAW:  And to answer that question again.  I would say if a

2  student requires special education services, in this case, he definitely needs this services,

3  it would be, because that student would regress and sometimes parents do feel that a

4  different school setting may be helpful for their children.

5      MS. MOORE:  Now.  Also, in your professional opinion, if a child is being

6  treated currently by a psychologist, would that treating clinician's information be

7  important to an MDT Team's determination?

8      DR. MARRYSHAW:  That information would be – I think I answered that in my

9  statement before.  That information would definitely be important.  Any outside

10  information is important to have, but the Team should act on the information they have

11  and if they have sufficient information to make a determination, they should not wait for

12  other information to make a determination.  They should make a determination and when

13  new information comes, they can modify the student's IEP.

14      MS. MOORE:  What if the information that they currently have is insufficient, or

15  inaccurate?

16      DR. MARRYSHAW:  If the information is insufficient, then they should request

17  additional information before they make that decision but it's my position that the

18  documents that they have were sufficient and clearly accurate because those were the

19  teachers that were working with the student.  The report – the psychological report was

20  by an evaluator who evaluated the student, so I think, again, I believe clearly that there

21  was sufficient information and accurate information to make a determination of

22  eligibility.

23      MS. MOORE:  Were you at the May 10th, 2006 MDT meeting?

1          DR. MARRYSHAW:  I did extensive interview with the parent and the student

2    and reviewed the documentation –

3          MS. MOORE:  That's not the question.  I asked you, Dr. Marryshaw.

4          DR. MARRYSHAW:  No, I was not.

5          MS. MOORE:  Okay.  Would you agree that conflicting information that is not

6    consistent with testing would perhaps compromise data?

7          DR. MARRYSHAW:  Could you repeat that question again?

8          MS. MOORE:  Would you agree that conflicting information that does not

9    coincide with previous testing would compromise data?

10          DR. MARRYSHAW:  I – conflicting information would not necessarily

11    compromise the matter.  I think that when you make a decision, you have to

12    comprehensively look at all the data and then make a decision by the overwhelming

13    amount of the data that speaks to us a certain direction.  And to me, in reviewing the

14    records and the interview with the parent and the student, the data is very consistent.

15          MS. MOORE:  But did you attend the MDT meeting on May 10th, 2006?

16          DR. MARRYSHAW:  No.  But I reviewed the information from that meeting and

17    the information from this meeting is very consistent with all the other data which speaks

18    to the student that should be -- that is eligible as an emotionally disturbed student.

19          MS. MOORE:  But you –

20          DR. MARRYSHAW:  There was nothing conflicting in this data that would

21    conflict with that position.

22          MS. MOORE:  In your opinion.

75

1      DR. MARRYSHAW:  And if you could point out something that conflicts with

2   that, please do.  From those notes.

3      MS. MOORE:  I think I'll ask the questions, Dr. Marryshaw.  Thank you.

4      DR. MARRYSHAW:  Sure.

5      MS. MOORE:  I have no further questions.

6      HEARING EXAMINER SMITH:  Okay.  While you're doing that, let me, let me

7   – Dr. Marryshaw, you mentioned the docu—or the materials that you reviewed.  Could

8   you just go over those documents one more time?

9      DR. MARRYSHAW:  Yes, sir.  I reviewed two – one psycho-educational

10   evaluation that was dated 8-20-04.  I reviewed a psychological report with you that was

11   dated 1-9-06.  I reviewed the IEP from Maryland that was either IEP meeting date of 4-1-

12   04.  I reviewed two social histories, and the social histories don't have a date.  Never

13   seem to have a date on them.  At least one doesn't have a date on it.  The two social

14   histories, I also reviewed the MDT notes from 5-10-06.  I reviewed his IEP – 4th grade

15   IEP from the Assumption School.  I reviewed the Care Center observation, 3rd grade

16   report and classroom observation from the Care Center and – excuse me – and I also

17   reviewed the student evaluation plan dated 12-4-05 and the MDT notes from 12-4-05

18   along with an extensive interview of the parents and the student.

19      HEARING EXAMINER SMITH:  Okay.  Counsel, any further questions?

20      MS. MOORE:  I have no further questions.

21      HEARING EXAMINER SMITH:  Okay, thank you very much, Doctor.  I

22   appreciate your participation.

23      DR. MARRYSHAW:  Thank you, sir.

1   MS. BARRIE:  Thank you.

2 [LONG SILENCE]

3   MS. BARRIE:  Can you hear me?

4   MR. CLARK (phonetic) Yes, I can.

5   HEARING EXAMINER SMITH:  Mr. Clark, it's David Smith, the Hearing

6 Officer.  I'm swearing you in to testify.

7   MR. CLARK:  Yes, sir.

8   HEARING EXAMINER SMITH:  Do you swear and affirm to tell the truth, the

9 whole truth and nothing but the truth in the testimony that you are about to give in this

10 hearing?

11   MR. CLARK:  Yes, sir.

12   HEARING EXAMINER SMITH:  Okay.

13   MS. BARRIE:  Can you say your name and occupation for the Record, please?

14   MR. CLARK:  David Clark.  District Director for Area Schools of Washington,

15 D.C. and Northern Virginia.

16   MS. BARRIE:  Are you aware of W███████ R█████████?

17   MR. CLARK:  Yes I am, ma'am.

18   MS. BERRY:  Have you reviewed these documents?

19   MR. CLARK:  Yes I have.

20   MS. BARRIE:  Have you met with W█████?

21   MR. CLARK:  Yes, I have.  W█████ and his Mom.

22   MS. BARRIE:  Okay.  In reviewing his documents, do you believe we can

23  provide with a special ed benefit?

1   MR. CLARK:  Yes, we do, ma'am.

2   MS. BARRIE:  Have you reviewed his IQ from P.G. County?

3   MR. CLARK:  Dated 4-1-2004?

4   MS. BARRIE:  Yes.

5   MR. CLARK:  Yes, ma'am.

6   MS. BARRIE:  Okay.  Have you reviewed his psychological evaluations?

7   MR. CLARK:  Yes, one dated 8-20-04.   Hello?

8   MS. BARRIE:  Yes.

9   MR. CLARK:  Yes.

10   MS. BARRIE:  Did you review his social work evaluations?

11   MR. CLARK:  Yes, I did, ma'am.

12   MS. BARRIE:  What about his most recent psychological?  Review – it's called

13 Psychological Review.

14   MR. CLARK:  Dated 1-9-2006?

15   MS. BARRIE:  Correct.

16   MR. CLARK:  Yes, ma'am.

17   MS. BARRIE:  Okay.  In reviewing those documents, you still thought you can

18 provide him with services?

19   MR. CLARK:  Yes, we can, ma'am.

20   MS. BARRIE:  Can you describe your program for us, please?

21   MR. CLARK:  Our program is a –

22   MS. BARRIE:  Hello?

1          MR. CLARK:  Yes.  It's the small specialized base school that deals with students

2   with special needs, ma'am, one of them being ED, emotional disabled and LD, learning

3   disabled.

4          MS. BARRIE:  Do you deal with students who are ADHD?

5          MR. CLARK:  Yes we do, ma'am.

6          MS. BARRIE:  Can you describe your classroom setting?

7          MR. CLARK:  Our classroom setting is staffed by a teacher that is certified in

8   Special Education, a teacher's assistant, whose class size ranges between four to six

9   students in a classroom, computers with Internet access, each student has their own

10  individual work station.  Also at our program, we have four licensed clinical social

11  workers and also a full-time psychologist on staff to meet our student's needs, in addition

12  to related services such as speech and language therapy and occupational therapy.

13         MS. BARRIE:  Okay.  Are the teachers certified in special education?

14         MR. CLARK:  Yes they are, ma'am.

15         MS. BARRIE:  Have you had any kind of classroom for W██████ if he's placed in

16  a program?

17         MR. CLARK:  Yes, we have, ma'am.

18         MS. BARRIE:  How many students and how many teachers are in a classroom?

19         MR. CLARK:  Currently the classroom we have for W██████ – W██████ will be

20  the fourth student.  The teacher -- one teacher, a teacher's assistant.  So it's roughly

21  around two-to one or close to one to one in terms of teacher-student ratio we can have.

22  Hello?

1          MS. BARRIE:  Okay. ·I'm here.  Sorry.  All right.  You realize that [inaudible]

2    eligible for special education, correct?

3          MR. CLARK:  Yes, we do, ma'am.

4          MS. BARRIE:  Why then would you accept him into your program?

5          MR. CLARK:  Just by reading the countless observations that he has here, in

6    terms of psycho – his evaluations and so on.

7          MS. BARRIE:  Did you make this decision by yourself?

8          MR. CLARK:  No I didn't, ma'am.  It was myself along with Ms. Imelda

9    (phonetic) Allen, under the rights of the program; we met with both W████ and his

10   Mom.  And we came to this decision.

11         MS. BARRIE:  Okay.  No more questions.

12         HEARING EXAMINER SMITH:  Any cross?

13         MS. MOORE:  I have just a couple.  Hi, Mr. Clark, how are you?

14         MR. CLARK:  I'm fine, ma'am.  How are you doing?

15         MS. MOORE:  Fine, thank you.  What teacher will W████ be assigned to?

16         MR. CLARK:  Ms. Conssteiou (phonetic).  She's been with us for two years

17   currently.

18         MS. MOORE:  Can you spell that, please?

19         MR. CLARK:  Oh, boy.  C-O- (laughter)

20         MS. MOORE:  She works for you. (Laughter)

21         MR. CLARK:  I apologize.  It's Russian, and I'm going to try the best I can.

22         MS. MOORE:  Okay.

23         MR. CLARK:  Costinesque.  C-O-N-S-S-T-E-I-0-U.

80

1        MS. MOORE:  Okay.  And when did you meet with W███████and his mom?

2        MR. CLARK:  We met with W██████ and his Mom today, ma'am.

3        MS. MOORE:  Today.  Okay.  I have no further questions.  Thank you.

4        HEARING EXAMINER SMITH:  Okay.  Is that it?  Okay.  Thank you, Mr.

5    Clark.  I have no questions.

6        MR. CLARK:  No problem.  Thank you so much, sir.

7        HEARING EXAMINER SMITH:  Okay.  [NEXT WITNESS]  Do you swear and

8    affirm to tell the truth, the whole truth, nothing but the truth in the testimony that you are

9    about to give at this hearing.

10       MS. RICHARDSON:  Yes.

11       HEARING EXAMINER SMITH:  Okay.

12       MS. BARRIE:  Can you state your name for the Record, please?

13       MS. RICHARDSON:  Yes.  My name is Wanda Marie Richardson.

14       MS. BARRIE:  Speak up.

15       MS. RICHARDSON:  Wanda Marie Richardson.

16       MS. BARRIE:  Any relationship to Wi██████?

17       MS. RICHARDSON:  I'm his mother.

18       MS. BARRIE:  Okay.  Ms. Richardson, first of all, do you believe W██████ needs

19   special education services?

20       MS. RICHARSON:  Yes.  Definitely.

21       MS. BARRIE:  Okay.  Can you tell us some of the behaviors that W██████

22   exhibited at school?

23       MS. RICHARSON:  Throughout the year?  Years?

1        MS. BARRIE:  Um-hum.  Yes, in the past couple of years.

2        MS. RICHARSON:  W███████ has outbreaks disturbance in the classroom where it

3   makes it hard with for the teacher to teach.

4        MS. BARRIE:  Uh-hum.

5        MS. RICHARSON:  He needs a lot of one-on-one --

6        MS. BARRIE:  Uh-hum.

7        MS. RICHARDSON.  – which he wasn't getting.

8        MS. BARRIE:  Uh-hum.

9        MS. RICHARDSON:  His self-esteem has – just went way down because of that.

10       MS. BARRIE:  Uh-hum.

11       MS. RICHARDSON:  He's way behind.  He's not reading cursive writing.  He

12   has an eye, hand coordination where he does not copy things from the board.  He had this

13   – that started way back in the second grade.

14       MS. BARRIE:  Okay.

15       MS. RICHARDSON:  Where he just – you put it on the board – he's not going to

16   write it.  Or can he read – but if you put it in front of him –

17       MS. BARRIE:  Uh-hum.

18       MS. RICHARDSON:  -- you know, he can read it.  He just started printing, where

19   you could read it, in the third grade.  But that looked like something of someone in the

20   kindergarten.  So he struggled there.  And you know, the outbreaks in the classroom were

21   just very disruptive.  Where he would – because he wasn't getting any attention, or

22   maybe he just needed more attention than he was being given.  He would just give up.

23   Throw his books down onto the floor, you know, and –

1          MS. BARRIE:  Okay.

2          MS. RICHARDSON:  And the teacher tried to reason with him and "I don't'

3    care" – you know, just storm out.

4          MS. BARRIE:  Did he – did he have confrontations with other peers –

5          MS. RICHARDSON:  Yes, he did.  Yes, he did.

6          MS. BARRIE:  Fights?

7          MS. RICHARDSON:  Fights.  He would make up things.  He would say he was

8    going to steal my pencil.  So I hit him.  You know things like that.

9          MS. BARRIE:  Hum.

10         MS. RICHARDSON:  And the teacher would witness him hit this child, but he

11   would say he didn't do it.  You know, but the child has a bruise.

12         MS. BARRIE:  Okay.

13         MS. RICHARDSON:  And he didn't.  You know things like that.  Which, I'm on

14   disability now.  But it made it hard to hold a job because I had to not as much at

15   Assumption, because they were trying to work with me because they noticed there was a

16   problem.

17         MS. BERRY:  Uh-hum.

18         MS. RICHARDSON:  But prior to that, I was up at that school all the time.

19         MS. BARRIE:  What school?

20         MS. RICHARDSON:  Longfield's.  Before that he was at a performing arts

21   school.  I was there.  That's in the kindergarten and first grade.  That's where he was

22   hitting the teachers and things like that.

23         MS. BARRIE:  Uh-hum.

1       MS. RICHARDSON:  And I was there, not just for W████ but for the teacher,

2    too, because this child was out of control and I am not a "no, not my child" parent.  I

3    know my child and I know what he's doing.

4       MS. BARRIE:  Uh-hum.

5       MS. RICHARDSON:  So I was trying to help until, you know, until things could

6    get solved where he could get the help that he needed.

7       MS. BARRIE:  Okay.

8       MS. RICHARDSON:  We just have never have been able to get it.  I don't know

9    why, but he hasn't gotten it.

10      MS. BARRIE:  When you brought him to D.C., where did he go initially?

11      MS. RICHARDSON:  He went to Ann Veers Elementary.

12      MS. BARRIE:  Okay.  When he went to Ann Veers, what happened?

13      MS. RICHARDSON:  When he went to Ann Veers Elementary, they put him in

14    the regular classroom.  From day one when I registered him, I walked in there with the

15    IEP.

16      MS. BARRIE:  Uh-hum.

17      MS. RICHARDSON:  I was trying to keep him in P.G. County, but they found

18    out that we had moved and couldn't do it.  I was trying to finish out the year because they

19    were going to have a hearing to have him placed, but we didn't get that far.

20      MS. BARRIE:  Uh-hum.

21      MS. RICHARDSON:  When he went to Ann Veers, they looked at the IEP and

22    said it didn't – the special ed coordinator, she said it didn't make any sense.  So she said,

23    "I don't know what this is.  We have to do our own."

1        MS. BARRIE:  Okay.

2        MS. RICHARDSON:  I had never attended D.C. Public Schools so I did not know

3    how they operated.  I thought, well maybe they do another procedure.  They tested him

4    and I don't – they gave him certain tests.  I was confused with that.

5        MS. BARRIE:  Uh-hum.

6        MS. RICHARDSON:  But, in the outcome, before we were homeless, they told

7    me at Ann Veers that he didn't meet any of the requirements for special needs.

8        MS. BARRIE:  Uh-hum.

9        MS. RICHARDSON:  So, he wasn't qualified for any services.  So at that time,

10    we weren't even living in that district anymore.

11        MS. BARRIE:  Uh-hum.

12        MS. RICHARDSON:  I had to place him in a school.

13        MS. BARRIE:  Uh-hum.

14        MS. RICHARDSON:  I didn't know what to do.  All I knew was my child needed

15    help.  The only way I could help him because he had a scholarship from the Washington

16    Scholarship Fund.

17        MS. BARRIE:  Uh-hum.

18        MS. RICHARDSON:  So I thought, well, Assumption has one grade for every

19    grade, smaller classrooms than the classrooms that he had been in, and I explained to the

20    principal when I went in – I always go in.  He's got an IEP.  Can you accommodate him?

21    Mr. Kelly said, "Let me look over it and see.  Yeah.  We could accommodate him."

22        MS. BARRIE:  Okay.

85

1       MS. RICHARDSON: And the third grade teacher, she tried. I've got to give it to

2  her. She tried. They could not meet W█████ needs.  When he got to the fourth grade,

3  the teacher said, "Well, I'm going to try."

4       MS. BARRIE: Uh-hum.

5       MS. RICHARDSON: They were ready to put W█████ out then, but they told me

6  in the middle of the year, they referred me to the Care Center.

7       MS. BARRIE: Okay.

8       MS. RICHARDSON: Because they – Assumption – said "don't put him in the

9  public school system. That's not what he needs."

10      MS. BARRIE: Uh-hum.

11      MS. RICHARDSON: "He needs special attention." So they told me to go

12  through the Care Center.

13      MS. BARRIE: Okay.

14      MS. RICHARDSON: To get what he needed. And I gave the school all I had

15  and then I went through the Care Center. The school wanted to know why he wasn't

16  getting the outside therapy. I explained to them we moved to another district. W█████

17  had straight D.C. Medicaid. The therapist would no longer take it. I don't know if he

18  was refusing my calls or not. I had a hard time trying to get documents and then being

19  homeless, alone, I explained this to them when I went in.

20      MS. BARRIE: Who's them?

21      MS. RICHARDSON: Them – the people at the Care Center.

22      MS. BARRIE: Okay.

1       MS. RICHARDSON: I explained that to them. This is all I have. So they

2  wanted me to take him to the therapist, the WATS (phonetic) –

3       MS. BARRIE: Uh-hum.

4       MS. RICHARDSON: To have certain things done.

5       MS. BARRIE: Uh-hum.

6       MS. RICHARDSON: When I went there, first of all, his insurance wouldn't

7  cover it. They told me – they, the receptionist and the people in the office, because he

8  couldn't see the therapist that he had been seeing. No. His insurance isn't going to pay

9  for that. But Ms. Richardson, don't worry about it. The school system – they'll do the

10  evaluation, and it was to my understanding Ms. Everett, I think that's her name, if I'm

11  saying it right –

12       MS. BARRIE: Uh-hum.

13       MS. RICHARDSON: She said, "Don't' worry. We will sign this. We will do all

14  of the tests. So it was to my understanding that that's what they were going to do.

15       MS. BARRIE: So when they said "sign this," showed you all the tests, you

16  signed it.

17       MS. RICHARDSON: I gave permission. Right. And I explained to them when

18  he was five years old, he went to – and I can't remember – I know where, but I can't

19  remember the doctors that social security sent him to. He went to them for evaluation.

20  They immediately. I mean, W█████ case didn't take but six months, and he started

21  getting SSI. But money doesn't go over with me if he's not getting the help that he

22  needs.

23       MS. BARRIE: Right.

1      MS. RICHARDSON:  So here you have a kid that's getting services from Social

2  Security but in school, he's failing.  He's getting no services.  And so when he goes for

3  evaluation and they ask, "Well, what kind of services he is getting?"  None.

4      MS. BARRIE:  Uh-huh.

5      MS. RICHARDSON:  You know that makes me look like -- what's going on?

6      MS. BARRIE:  Uh-hum.

7      MS. RICHARDSON:  And I'm trying.  I just – I don't know where to go.  I just

8  know Assumption will not accept him this year.  I went to two other schools.  I'm not

9  going to throw my child – just put him in school.  Because his education is important.  As

10  long as he's in school, I'm in school.  So I check out the schools.

11      MS. BARRIE:  Right.

12      MS. RICHARDSON:  And see what's going on.  And three schools have turned

13  him down.

14      MS. BARRIE:  Because of his behavior?

15      ·MS. RICHARDSON:  Because of his IEPs and his behavior.  Why is it I don't

16  understand when it gets to DCPS, there's no problem?  I don't understand that.  I'm not

17  understanding that.  And I have nothing to hide.  But I don't understand that.

18      MS. BARRIE:  Did you ever give this information or change or down play

19  W██████ behavior and academics?

20      MS. RICHARDSON:  Never.

21      MS. BARRIE:  So anyone at the Care Center?

22      MS. RICHARDSON:  No. No.

23      MS. BARRIE:  Did you ever do that at MDT meeting?

1      MS. RICHARDSON: No. No. No, I did not do that ever, and I might say at the

2  MDT meeting, Ms. Everett was very angry. I don't know why, but when I would try to

3  say anything, she over-talked me. But because I wasn't there to be her enemy or I wasn't

4  at her that. My interest was education and well-being of my child. I didn't say anything.

5  I just didn't say anything because I didn't understand where she was coming from or

6  what she was arguing about. He needs—and why this is and why is that – and the

7  teacher, she asked about his outbreaks in the classroom. Ms. White said, well lately, he

8  hasn't had any. But prior to that… and then she cut it off.

9      MS. BARRIE: Uh-hum.

10     MS. RICHARDSON: But prior to that, W█████ had been suspended. Three or

11 four times.

12     MS. BARRIE: In the school year?

13     MS… RICHARDSON: The school year. Because of that.

14     MS. BARRIE: Because of the outbreaks.

15     MS. RICHARDSON: Because of the outbreaks. The pushing the desks. The

16 telling the teacher, you're not going to do this do that. Standing up to her like he's a

17 grown man. And you know, I guess she doesn't know what to do, she's got all these

18 other children. And they are watching her, and him. She can't put up with that kind of

19 behavior in the classroom.

20     MS. BARRIE: And that was almost the entire school year.

21     MS. RICHARDSON: It's a whole entire school year. He basically – he was

22 failing because he wasn't in the classroom. He spent his years – the year, isolated,

23 literally. They didn't – well, I'm not going to say they didn't care. But they didn't have

1  the specialized, you know, for him, and I didn't want to just take him out and put him in

2  another school. W▮▮▮▮ has been in one, two, three, four, maybe five different schools.

3  And he's now supposed to be entering the 5th grade. Stability is very important. Also at

4  this point, it's critical. He also needs therapeutic as far as to go along with the academic,

5  you know, part. Because he's so far behind. He's so far behind. He gets in that

6  classroom and he's a child that loves school and wants to go to school. But he's foolish

7  when he gets in there.

8      MS. BARRIE: Uh-hum.

9      MS. RICHARDSON: And so school starts and I don't know to put my baby.

10     MS. BARRIE: If say for instance, well, did you notify the school system or

11  DCPS or Ms. Everett that you were homeless and that caused you to have problems as far

12  as documents?

13     MS. RICHARDSON: Yes. I notified them of that. Also, because of some

14  psychological things that might have been going on in W▮▮▮▮▮ mind. That's the main

15  thing that made me let them know that. But I also let them know, you know, I was

16  apologizing for not having certain documents and she said, don't worry about it.

17     MS. BARRIE: Uh-hum.

18     MS. RICHARDSON: Ms. Everett. She was very nice, you know. She said,

19  don't worry about it. We will do the necessary testing and get everything he needs and

20  we will get him placed. We will help him. So. I had no reason to not believe her.

21     MS. BARRIE: No more questions.

22     MS. MOORE: I have a couple of questions if I may.

23     HEARING EXAMINER SMITH: Okay. Sure.

1       MS. MOORE:  What is your current address?

2       MS. RICHARDSON:  4321 Third Street, S.E., Apartment 302, Washington, D.C.

3   20032.

4       MS. MOORE:  And do you receive your mail there?

5       MS. RICHARDSON:  Yes I do.

6       MS. MOORE:  Have you ever received any mail from the Care Center?

7       MS. RICHARDSON:  Yes, I have.

8       MS. MOORE:  To your house?

9       MS. RICHARDSON:  Yes, I have.  Yes, I have.

10      MS. MOORE:  Did you receive a medical release form?

11      MS. RICHARDSON:  Medical release form?

12      MS. MOORE:  Uh-hum.

13      MS. RICHARDSON:  No.

14      MS. MOORE:  No?  You were in attendance at the May 10th, 2006 meeting,

15  correct?

16      MS. RICHARDSON:  Yes, that's correct.

17      MS. MOORE:  And you testified that the persons from DCPS asked you

18  questions and you gave information concerning W██████, correct?

19      MS. RICHARDSON:  Ah, yeah.  Yeah.

20      MS. MOORE:  Okay.  Did they provide you with a copy of the notes?

21      MS. RICHARDSON:  Yes they did.

22      MS. MOORE:  Okay.  And you provided those to your attorney, correct?

23      MS. RICHARDSON:  Yes.

1      MS. MOORE:  Okay.  It says here that DCPS will request from the parent

2  medical information related to current treatment.  When DCPS receives new information

3  and MDT will renew this information in an effort to determine student's educational

4  needs.  It also says, "The mother was requested to sign a medical release form which will

5  be mailed to her home."  Do you remember that taking place?

6      MS. RICHARDSON:  I don't remember that -- that writing on there.  I'm going

7  to be honest with you.  I couldn't read it.  But I have never received any medical release

8  papers that you're talking about.

9      MS. MOORE:  But was this discussed with you at the meeting, at all?

10      MS. RICHARDSON:  At the meeting I was asked for documentation from his

11  therapist and was he still attending, you know, seeing his therapist.  And I let them know

12  that I could still contact him, but he wasn't receiving services.  Because there was an

13  insurance conflict.

14      MS. MOORE:  Uh-hum.

15      MS. RICHARDSON:  And since then, to now, they don't return my calls.

16      MS. MOORE:  Do you understand that a medical release sent to a previous

17  physician, and if you sign it, they have to release all medical information?

18      MS. RICHARDSON:  Yes, I do understand that.

19      MS. MOORE:  Okay.  And so, your testimony today is that you never got one and

20  it was never discussed with you.

21      MS. RICHARDSON:  Not at a meeting.  I just know I signed for release of his

22  documents when I first saw Ms. Everett in the office.

23      MS. MOORE:  Uh-huh.

92

1          MS. RICHARDSON:  If that's what you're talking about.

2          MS. MOORE:  Uh-huh.  Okay.  Do you want your son to be found eligible for

3      services?

4          MS. RICHARDSON:  Yes, ma'am.  I do.

5          MS. MOORE:  Could you please explain to the hearing officer if you want your

6      son to be found eligible for services, why did you keep him out of special ed for two

7      years at Assumption Catholic School?

8          MS. RICHARDSON:  Because it wasn't to my understanding that I was keeping

9      him out of special ed.  I was trying to special ed him myself because he was not getting

10     the services that he needed.  It was a contradicted thing.  One jurisdiction said he did

11     need services.  I went to D.C. with an open mind, you know, that they're going to give

12     him the services that he needs, the same as Maryland, and when I was told "No, he didn't

13     need it."  I said, "No, no, no, no, no, no.  I've been with this child from birth.  He's been

14     in school.  I know what he's capable of doing.  I know what he's been doing.  I know

15     what he's been doing."  That is not true.  So I thought, oh, maybe they need some time.

16     They just don't know W███████.  So what – at the same time, I had to move from Ann

17     Veers area.  So he – the plan was to send him back to Ann Veers.  But it didn't work that

18     way.  Because I had to move.  I don't know anything else but my first impression in D.C.

19     Public Schools experience was not good at all.

20         MS. MOORE:  Do you have any documentation of this?  That item that transpired

21     at Ann Veers, do you have anything from Ann Veers?

22         MS. RICHARDSON:  I only have the evaluations that someone came over from, I

23     guess, here.  I'm not sure where they came from.  But, as far as them –

1          MS. MOORE:  What evaluations?

2          MS. RICHARDSON: I had to take W███████to the school.  Someone came out to

3     the school and gave him some type of evaluation.

4          MS. MOORE:  Did you provide these evaluations to your attorney?

5          MS. RICHARDSON:  Yes.  Yes.

6          MS. MOORE:  And these are from Ann Veers?

7          MS. RICHARDSON:  They were given to him from, at Ann Veers.  Yes.

8          MS. MOORE:  Uh-hum.  Okay.  Do you know what the concept of neighborhood

9     schools is about?

10         MS. RICHARDSON:  The concept of neighborhood schools?

11         MS. MOORE:  Uh-hum.  Is there a neighborhood school in your neighborhood?

12         MS. RICHARDSON:  Yes there is.

13         MS. MOORE:  Uh-hum.  And what is that school?

14         MS. RICHARDSON:  It's Patricia Harris – P.R. Harris.

15         MS. MOORE:  P.R. Harris?

16         MS. RICHARDSON:  Yes.

17         MS. MOORE:  Uh-hum.  And how far is it from your home?

18         MS. RICHARDSON:  It's in the back of my building.

19         MS. MOORE:  In the back of your building?

20         MS. RICHARDSON:  Okay.  I have no further questions.

21         HEARING EXAMINER SMITH:  Okay.  Any re-direct?

22         MS. BARRIE:  Yes.  Real quick.  Pointing the witness to Parent Exhibits 4 and 5.

23     Are these the evaluations you were talking about?

1       MS. RICHARDSON:  Yes.  Yes.

2       MS. BARRIE:  These two?

3       MS. RICHARDSON:  These two.

4       MS. BARRIE:  Okay.  This is a social work evaluation and a psycho-education

5  done at Ann Veers.

6       MS. RICHARDSON:  Uh-hum.

7       MS. BARRIE:  At the school.  So your only purpose of getting him, taking him to

8  just to clarify, to Assumption was because you felt that, that he could get a smaller

9  setting.

10       MS. RICHARDSON:  Right.  I-I felt that, well; I've got to start somewhere.  You

11  know, he first gets his teaching from home.  So I figured, well, I'll take him there because

12  it's one grade for every grade.  It's small.  It's in the neighborhood, and it didn't, you

13  know, cost me anything –

14       MS. BARRIE:  Right.

15       MS. RICHARDSON:  So, I put him there and I also discussed with, like I said,

16  the principal and the teacher before he went there.

17       MS. BARRIE:  Uh-hum.

18       MS. RICHARDSON:  And they said, yeah, I think we can work it out. We can

19  try.

20       MS. BARRIE:  But from your understanding from Ann Veers, he didn't qualify

21  for special ed anyway.

22       MS. RICHARDSON:  That's what I was told.

23       MS. BARRIE:  As far as you were concerned.

1          MS. RICHARDSON:  That's what I – oh.  Not only did they tell me he didn't

2     qualify.  This said the children that he would be in the classroom with – you don't want

3     him in there.  It will make him worse.

4          MS. BARRIE:  This is at Ann Veers?

5          MS. RICHARDSON:  This is at Ann Veers.  The special ed coordinator.  She told

6     me that.  So I don't, I don't, I don't know what to think.  You know.

7          MS. BARRIE:  Okay.

8          MS. RICHARDSON:  All I do know is that I suffer with mental illness.  And I

9     know how important it is to get help at a young age as opposed to when you're older.

10    Like me.  Graduating with a third grade level of reading and having to self-teach myself.

11         MS. BARRIE:  Uh-hum.

12         MS. RICHARDSON:  And, you know, bi-polar, and things of that nature.  And I

13    just don't want him to go through that, you know?

14         MS. BERRY:  Uh-hum.

15         MS. RICHARDSON:  If the teachers are recognizing things and seeing things in

16    him, based on his conduct in the classroom.

17         MS. BARRIE:  Uh-hum.

18         MS. RICHARDSON:  Then I want to deal with it.  You know, because he's got to

19    go out in society one day.  I want him to be productive.  So give him a fair chance.  While

20    he's young, you know.

21         MS. BARRIE:  No more questions.

22         HEARING EXAMINER SMITH:  Okay.  Closing?  Ms. Berry.  Are you

23    finished?

1        MS. BARRIE:  Yeah.  I'm done.

2        HEARING EXAMINER SMITH:  Okay.

3        MS. BARRIE:  I'm done.

4        HEARING EXAMINER SMITH:  (inaudible)

5        MS. BARRIE:  I'm done.

6        HEARING EXAMINER SMITH:  (inaudible)

7        MS. BARRIE:  Do I do closing first, or DCPS, oppose DCPS?

8        HEARING EXAMINER SMITH:  DCPS.

9        MS. BARRIE:  Right.

10                          CLOSING ARGUMENTS

11       MS. MOORE:  Hearing Officer, it is DCPS's contention there has been absolutely

12   no denial of (inaudible) in this paper.  The student attended the Assumption Catholic

13   School from 2003 to 2004.  Excuse me.  From 2004 to 2005.  2005 to 2006.  At a period

14   during 2006, the teacher, excuse me, the counselor, testified that she notified DCPS's

15   Care Center that the student was in need of special education services, filled out a form,

16   and the MDT came together in December of 2006 – 2005, rather.  At that time, it was

17   determined that additional evaluations would be needed and DCPS conducted those

18   evaluations.  After conducting those evaluations, the team met again in May of 2006.

19            In the interim, there was a hearing officer's determination that dismissed the

20   matter because the hearing officer found that the parent had not provided the additional

21   information in accordance with Colmes (phonetic) v. School board of Rockingham

22   County and Sanger (phonetic) v. Montgomery County.   She had not attempted to

23   engage in the MDT meeting to determine his eligibility.

                                         97

1    After that hearing transpired, then on May 10th, 2006, the Team met.  At that time,

2    as testified to by Ms. Everett, they did not have enough data to come up with a

3    determination of emotional disturbance.  He was clearly not learning disabled, and both

4    the teacher and the parent had given conflicting information in contradiction to the BASK

5    rating scale, which had been administered by the school psychologist, Yvonne Rojas.

6    Ms. Rojas also testified to that contradiction and that we needed more information to gain

7    a fuller picture of the student.  In an attempt to do so, they asked the parent for a medical

8    release form so that they could retrieve information from the previous treating

9    psychologist and because the parent had given information that she had had difficulty in

10   obtaining this information.  This was testified to by both Ms. Everett and the

11   psychologist, and the parent.

12       Then we heard testimony, Hearing Officer, from Ms. Wilson, the social worker at

13   Assumption, who also was very concerned about the student's behavior and was invited

14   to the MDT, chose not to attend.  Did not provide any anecdotal information on the

15   student to the MDT Team, besides the December 2005 information.  And even after the

16   team found the student ineligible due to the fact that they did not have enough

17   information, Ms. Wilson did not contact the Care Center, did not provide any anecdotal

18   information.  This all came out in her own testimony, Hearing Officer.

19       In addition, we have the testimony of Dr. Marryshaw.  Dr. Marryshaw spoke and

20   said that two entire school years without special education services would be detrimental

21   to a child who is in need of those services, and it is the parent's contention that the

22   student is in need of those services, so, I would interject at this point that, there has been

23   a denial, but not on the part of the school system, but on the part of the parent, in keeping

98

1    her student out of special education for two years; then trying to pin a denial of faith on

2    the District of Columbia.  That is not appropriate.  The student did not attend a DCPS

3    school in 2003-2004.  He attended Longfield Elementary School.  Then the parent stated

4    in her own testimony that he attended Ann Veers, at which time he was tested and there

5    are documents of those evaluations in parent's counsel's disclosure.  However, there is no

6    documentation of her further testimony that they were not going to find him eligible.  Her

7    own testimony was that she had to move out of that neighborhood.  She had to leave.  She

8    couldn't stay in the Ann Veers neighborhood, and that's why she sent him to the

9    Assumption Catholic School.

10            So for two years, he was at Assumption with these so-called behavioral problems,

11    and the parent wasn't the one to bring him to the Care Center, it was the social worker.

12    And at that time, as I stated previously, the Team met and asked the parent for this

13    additional information.  The parent has not provided the additional information.  DCPS

14    cannot find the student eligible with the data that they have been given because as

15    testified to by Ms. Everett and Ms. Rojas, it is not consistent.  Dr. Marryshaw even stated

16    that with not enough data from the evaluations that the Team has presently, that they

17    would have to get data from the outside.  And if conflicting information was in fact

18    given, that you would need additional data.  Although he does not believe that conflicting

19    information was given.  But he was also not in attendance at the MDT meeting on May

20    10, 2006.

21            So, Hearing Officer, we would ask that you not find a denial of faith.  That you

22    order the parent to provide the additional information, or order her to sign the release

1    form so that DCPS can obtain this information on its own and to make a proper

2    determination.

3         HEARING OFFICER SMITH:  Okay.  Ms. Barrie?

4         MS. BARRIE:  Under 20 U.S.C. Section 1412(A)(10).  If the school system is

5    required to provide faith to all children including children who are in private schools.

6    Under this law, it clearly indicates that a school system shall consult with private school

7    representatives and representative parents of parenthetic case private school children with

8    disabilities during the designed the above special education and legal services for the

9    children.  It also went so far as to indicate that the school system must have a system in

10   place to make sure that they are aware of students who might be in need of special

11   education services for students in private school.  So the argument that the student was

12   not in a D.C. public school does not dissolve DCPS of their responsibilities to make sure

13   that the student receive services as a child in need of special education services.

14        And furthermore, as the documents clearly show, the student did – was at Ann

15   Veers Elementary School.  And as the mother testified to, and there has not been any

16   contravening testimonies to the fact that, yes, they completed evaluation, and that, at the

17   time of the completion of the evaluation -- evaluations, Ann Veers determined that the

18   student no longer needed special – or why that this child did not qualify for special

19   education services.  And as the mother testified, having her child in Maryland with a

20   different system, her understanding was that well, if they've decided that he doesn't need

21   it, that means that he's not going to get it.  And because she was informed by the school

22   staff that, in fact, the student, the students in the classroom that he more than likely would

23   be in, were not appropriate, and would make him worse than what he already was.

1    D.C. Public Schools completed a social history and a psycho-educational

2    evaluation. And on both evaluations, they actually stated, on the first page of the psycho-

3    educational, according to his teachers at Veers, W█████ was performing within the

4    average range. But he is limited in social emotional skills impact his educational

5    development. That is the definition of an ED classification, right there. D.C. Public

6    Schools have known since 2004 that the student was more than likely in need of special

7    education services. And they even went so far as to again discuss the 12-14-99

8    assessment at WATTS (phonetic), which Ms. Rojas testified to, and which is included in

9    her report. They discussed the fact that even in that report, he was then indicated to be

10    suffering from ADHD and a diagnosis of bi-polar disorder was deferred at the time. And

11    as testified to by Dr. Marryshaw, he, in his professional opinion, this student more than

12    meets the criteria as ED. In fact, he covers at least three of the five criterias that are

13    needed in making a decision as far as emotional disturbance is concerned.

14    D.C. Public Schools does not have the Hearing Officer's determination. The

15    previous issue would be on the Record. But if the Hearing Officer would take that – what

16    happened at that – with that HUD (phonetic) which we don't – we do not believe should

17    be taken into consideration at this hearing, because that was a different hearing and has

18    already been litigated as this basis arguing (phonetic) on numerous occasions. Therefore

19    it should not be used at a hearing here today.

20    But if the Hearing Officer would take DCPS, would take their arguments from the

21    HUD, then we will ask the Hearing Officer to take into consideration the fact that the

22    decision – the final decision by the Hearing Officer was made as testified to by Ms.

23    Everett because a meeting was already scheduled to take place. And he felt that it was

101

1    "pre-mature" – was his language – to find any denial of faith at that particular time.  In

2    this case, the meeting took place.  However, DCPS, in their own handwriting, indicated

3    all the behavior the student was exhibiting, all the documentation from the teacher, is in

4    the Meeting Notes.  There is nothing in the Meeting Notes in reference to inconsistency

5    between the teacher – from the teacher or the mother.  If DCPS had – if that was their

6    reasoning, for not finding him eligible for special education, I believe that he would have

7    indicated as such in the Meeting Notes, or they should have.  And if they don't, which

8    according to the Meeting Notes they did not do, all they said was he did not qualify for

9    special education services.  And under the prior notice requirement, under 20 U.S.C. 14-

10   15, DCPS was to provide a written notice as to their refusal to initiate or change that

11   (inaudible) evaluation and placement of the child.

12        And they did not do so.  All they said was, they listed all his behavior problems

13   and his academic deficiencies.  And the next sentence is "The team found W██████ not

14   eligible for special education services."  And every page of these documents, there is

15   clear indication that the student is in desperate need of services.  His social worker

16   testified that in fact his behavior was inappropriate from not just this past school year but

17   the school year before.  His grades, as indicated in the disclosure, are all Fs.  Dr.

18   Marryshaw testified to that fact.  DCPS has testified.  Ms. Everett testified to the fact that

19   she was not aware that in fact the mother had problems in relation to homelessness and

20   lack of an address.  But pointing Hearing Officer to the last page of the social work

21   evaluation completed by Ms. Everett, which is Parent's Exhibit No. 15.  On the very last

22   page, Ms. Everett indicates, W██████ home environment has severely impacted his

23   emotional stability as the family has dealt with the abandonment of both parents through

102

1    (inaudible) hospitalization of the mother for psychiatric treatment, and the father's

2    recurring incarceration.  Homelessness, Mr. Hearing Officer, is written in here.  So she

3    knew about the homelessness, she knew the issues the parent was going through, but yet

4    she testified that that information was never communicated to her.  That was a complete

5    contradiction if we will talk about contradiction from Ms. Everett, since she will – and

6    interviewed the mother.  And she did the social work evaluation.

7          . The testimony here today from DCPS has not been accurate.  The documents do

8    not reflect what DCPS has testified to.  DCPS testified to the fact that the teacher was

9    present at the meeting.  And we have that documented.  On December of '05, as testified

10   to by Ms. Wilson, the student social worker.  She provided the documentation to D.C.

11   Public Schools.  And this entire packet that she gave to DCPS clearly indicates the

12   student's inappropriate interactions with teachers, with his peers.  It indicated also in the

13   Meeting Notes that he has motor problems, and yet, there was no OT evaluation

14   completed for the student.  None was recommended from that Meeting Notes – from that

15   meeting, and yet, they, themselves stated that he has the problems and the issues.  So,

16   therefore, DCPS should have completed a clinical psychological, a psychiatric evaluation

17   and an occupational therapy evaluation after this meeting was convened.

18         Especially after the communication from the teacher.  As Dr. Marryshaw testified,

19   if he had been at that meeting, he would have, after meeting the student and the parent,

20   and after reading these documents, he would have recommended at least the clinical – the

21   Connors rating scale and the psychiatric evaluation.

22         D.C. Public School testified to the fact that, yes, the BASK can in fact make a

23   determination for emotional disturbance.  Why didn't they?  There is so much

1    documentation.  I am not a psychologist.  But the --- Dr. Marryshaw, who is a

2    psychologist, who has met with the student, who has reviewed all these documents,

3    clearly indicated that these were not – that this was enough documents to show that in

4    fact, the student has ED.  If the student did not – as Dr. Marryshaw testified, having an

5    outside therapist, should not stop the process from moving forward.  If the parent is

6    unable to get documents as she testified to, and as indicated, she informed Ms. Everett of

7    that fact, so we just wait until indefinitely before we can provide services for the student?

8    When every document says otherwise?

9          The psychologist – excuse me.  The psychologist, in fact, in her testimony could

10   not, although she testified that the BASK could determine ED, she could not give a clear

11   reasoning as to why they did not make a determination of ED.  Okay, they need input

12   from the therapist – from his therapist.  The therapist does not make a determination of

13   ED.  The school system makes a determination of ED.  And the treating psychologist is

14   not the one who makes the final decision.  DCPS should have completed a clinical

15   psychological evaluation if they felt the BASK that they did was not enough to make a

16   determination of ED.

17         As a result, we ask the Hearing Officer to find in favor of the student, because as

18   indicated, it has been ruled, I would like to, this is, Hearing Officer's determination from

19   Mr. DuBow in which he made a determination that the student was indeed in need of

20   special education services and found the student eligible for special education services,

21   and refer to case law, Hacienda La Puenta Unified School District of Los Angeles v.

22   Hane (phonetic), in which the 9th Circuit indicated that the Hearing Officer could make a

23   determination of eligibility for a student and that also he also referred to Good (phonetic)

1    v. District of Columbia, in which, again, it was made a determination that the Hearing

2    Officer has authority to determine eligibility for special education services. And we

3    asked this Hearing Officer to make the same determination. Because this student is in

4    desperate need of services.

5        As the mother testified, she does not know what to do with her child. Right now

6    there is no where for him to go; there is no school for him to attend. D.C. Public Schools

7    has left the student hanging. There's an IEP that determined him to be eligible as an ED

8    student.

9        DCPS ignored this IEP. They testified that they did not, but there's no referral

10    made in the MD meeting notes that are even considered the fact that it even considered

11    the fact that he was already previously determined ED. And under IDEA, when a student

12    comes to a district where an IEP, that IEP should be implemented until such time as they

13    can re-do the IEP. That did not happen in this case. Even the mother testified to what

14    happened at Ann Veers. She handed them the IEP. They said he does not qualify after

15    completing the evaluations.

16        But as the Hearing Officer can see, those evaluations, themselves, show the

17    history of mental retardation in the family, and the behaviors that the student had been

18    showing, and as testified to by D.C. Public Schools, an ED disability

19    is when the student shows continued behavior and its clear from the documentation that

20    his behavior has continued over the last few years, including going all the way back to

21    1999, and 2004 when he was at Ann Veers Elementary School.

22        So therefore, we ask the Hearing Officer to order DCPS to complete, or rather

23    fund, the psychiatric evaluation, a complete clinical, because according to DCPS, they

1    didn't complete clinical, to determine him as an ED student. He'll have an occupational

2    therapy evaluation completed to address the issues that DCPS themselves discuss in the

3    May 10th of '06 meeting. That he has poor motor ability, so as to determine appropriate

4    services for the student. And we ask the Hearing Officer to place this student at a high

5    road (phonetic) because he does not have a placement until at least at a minimum, DCPS

6    completes an IEP. So we ask the Hearing Officer to make a determination that he is

7    eligible for special education services, and make an appropriate determination as to

8    placement for the student.

9         MS. MOORE: I just –

10        MS. BARRIE: And to also discuss and determine if special education is

11   warranted for the student (inaudible).

12        MS. MOORE: I just have four points that I'd like to touch on. One is the

13   constant referral to Ann Veers Elementary School. If the Hearing Officer takes note of

14   the due process complaint notice, a complaint notice is supposed to be pled with

15   specificity according to 507 (D)(2). There is no mention of Ann Veers Elementary

16   School anywhere in this complaint. If there had been, I would have had witnesses here to

17   testify to any testimony regarding a finding of eligibility or not finding an eligibility. But

18   there's also no documentation of that finding of eligibility or non-finding of eligibility

19   that we keep hearing about. But we have no documentation to be consistent with that.

20        Also, the Care Center fulfills the child by a requirement, as parents are made

21   aware of this process through pediatricians, churches, and schools. And that's the whole

22   purpose of the social worker being aware of that policy and being aware of the Care

23   Centers because we have all this information that we do send out under the private and

1    religious schools agreement.  So DCPS is fulfilling the child requirement in the District

2    of Columbia.

3           Number two, DCPS did not refuse the student services.  We asked for additional

4    information.  It's not unusual, it's not – Dr. Marryshaw even testified to that.  An he's,

5    you know, the adversarial witness.  He testified that additional information is not an

6    unusual request.  However, he said that it should not be the information that is waited on

7    if the data that the school system has is sufficient.  And it's our testimony, it's our

8    position that it was not consistent and it was not sufficient data so we had to go with

9    further information.  My fifth point, or fourth point, rather.  The BASK, as testified to by

10   Ms. Rojas, did give indications for emotional disturbance.  However, because the

11   information that the parent and the teacher were given at the meeting was contradictory,

12   she did not feel that that information alone was reliable.  And that's why they needed the

13   additional information from the treating psychologist.  And we would again ask the

14   Hearing Officer that this student was not denied any faith.  P.R. Harris is in the back of

15   the parent's building.  The neighborhood school concept – that is the District of

16   Columbia.  If the child needs to go to school on Monday or tomorrow, he can go to P.R.

17   Harris.  The team can have his IEP.  They can determine if P.R. Harris is appropriate for

18   him or they can find another District of Columbia school that has emotional disturbance

19   if he is in fact found eligible, program.

20          But he hasn't been found eligible, Hearing Officer, because we have not been

21   given enough information and this process has been ongoing since December '05, and

22   DCPS has tried to keep it going.

23          HEARING EXAMINER SMITH:  Okay.  I have no further questions.

107

1          MS. BARRIE:  I would like to –

2          HEARING EXAMINER SMITH:  Sure.  Give counsel (inaudible).  I think I have

3    had everyone sign.  David Clark was the last witness.

4          MS. BARRIE:  Correct.  I don't think –

5          MS. MOORE:  I think so.  I think the parent was the last witness.

6          MS. BARRIE:  No, the parent was.

7          HEARING EXAMINER SMITH:  The parent testified.  She signed in, right?

8          MS. BARRIE:  Yes.

9          HEARING OFFICER SMITH:  Yes.  Okay.

10         MS. BARRIE:  Did I put in Dr. Marryshaw?

11         HEARING OFFICER SMITH:  I wrote his name in.

12         MS. BARRIE:  Oh, you did it.  Okay.

13         HEARING OFFICER SMITH:  Okay.  If nothing further, we'll close the record.

14         MS. MOORE:  Thank you.

15         MS. BARRIE:  Thank you.

16                          [OFF THE RECORD]

17                          [END OF HEARING]

18

19