UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WANDA RICHARDSON,
Mother and Next Friend of W.R., a minor,

   Plaintiff,

     v.

DISTRICT OF COLUMBIA, *et al.*

   Defendants.

Civil Action No. 06-2121 (CKK)

**MEMORANDUM OPINION**
(March 31, 2008)

Plaintiff Wanda Richardson, on behalf of her minor son, W.R., brings this action pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et. seq.*, against the District of Columbia and Clifford B. Janey, in his official capacity as superintendent of the District of Columbia Public Schools ("DCPS") (collectively, "Defendants").[1] The IDEA provides that all children with disabilities shall receive a free and appropriate public education ("FAPE"), and creates procedural safeguards to ensure that disabled children receive individualized education programs ("IEP") to fulfill the Act's goals. *See* 20 U.S.C. §§ 1412(a)(1)(A), 1414(d)(1)(A). A parent who objects to the identification, evaluation, or educational placement of his or her child may seek a due process hearing before a Hearing Officer, and if he or she remains dissatisfied, may file a lawsuit. *Id.* § 1415(f), (i). This case involves a challenge to a Hearing Officer's decision finding that Defendants complied with the IDEA and did not deny W.R. a FAPE. Defendants have moved for summary judgment arguing

---

[1] Mr. Janey has been replaced by Michelle Rhee, Chancellor of DCPS, subsequent to the filing of this suit.

that the Hearing Officer's decision is correct and entitled to deference. After a thorough review of the Parties' submissions, the administrative record, applicable case law and statutory authority, the Court shall grant Defendants' [8] Motion for Summary Judgment, for the reasons that follow.

## I. BACKGROUND

The facts underlying this case are undisputed.[2] W.R. is an eleven-year old resident of the District of Columbia, who at the time of the Hearing Officer's decision was enrolled at Assumption Catholic School ("Assumption"), a private school in the District of Columbia without special education services. Defs.' Stmt. ¶ 1. Prior to attending third and fourth grade at Assumption, W.R. attended kindergarten through part of second grade in Maryland public schools. *Id*. ¶¶ 2-3. During W.R.'s second grade year in Maryland, a multidisciplinary team ("MDT") met and developed an IEP for him based on its determination that he suffered from an "Emotional Disturbance." *Id.* ¶ 4.

After leaving the Maryland public school system, but prior to enrolling at Assumption, W.R. briefly attended Ann Beers Elementary School, part of the DCPS. *Id.* ¶ 4. In August 2004,

---

[2] Plaintiff's Response to Defendants' Statement of Material Facts does not object to any of Defendants' proffered facts. *See* Pl.'s Opp'n at 17-19. The Court notes that it strictly adheres to the text of Local Civil Rule 56.1 when resolving motions for summary judgment. *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (district courts need to invoke Local Civil Rule 56.1 before applying it to the case). Although discretionary in the text of the Local Civil Rule 56.1, in resolving the present summary judgment motion, this Court "assumes that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1. The Court issued an Order on April 24, 2007, explaining to the Parties that they were expected to comply fully with Local Civil Rule 56.1, and stating that the Court would "assume facts identified by the moving party in its statement of material facts [were] admitted" unless controverted by the non-moving party. [6] Order at 1-2 (April 24, 2007). Accordingly, the Court shall cite to Defendants' Statement of Material Facts ("Defs.' Stmt.") throughout this Memorandum Opinion. The Court shall also cite directly to the Administrative Record ("A.R."), where appropriate, to provide additional information not covered in Defendants' Statement.

Mr. Anthony White, a school psychologist, evaluated W.R. and issued a Psycho-Educational Evaluation Report. *Id.* ¶ 5. He found that W.R.'s academic skills were within the low average range when compared to others at his age level. A.R. 4. He also found that W.R. had limited social skills that appeared to impact his educational development, along with mood swings that endangered both him and his classmates. A.R. 66 (Physco-Educational Evaluation Report). Mr. White concluded, however, that "[b]ased on the current test data, [W.R.] does not meet the criteria for special education services as a learning disabled student. At this time his academic skills are commensurate with his cognitive abilities." A.R. 69. Mr. White recommended that "a clinical psychological evaluation [] be conducted to determine if his social-emotional functioning is having a negative impact on his achievement." *Id.*

In December 2005, after W.R. was enrolled at Assumption, Ms. Alice Wilson, a school social worker at Assumption, referred W.R. to DCPS to test for special education eligibility based on observed behavioral problems, poor academic performance, and the fact that he was receiving private therapy but not specialized education services. Defs.' Stmt. ¶ 8. The Central Assessment Referral and Evaluation Center ("CARE") of DCPS, which handles such referrals, convened a meeting to develop an evaluation plan for W.R. *Id.* ¶ 10. The MDT identified multiple areas of concern as they related to W.R., including his struggles with all areas of his curriculum except math, a low self-esteem and attention span, mood swings that were often accompanied by temper tantrums, and various other behavioral problems. A.R. 54-57 (MDT Meeting Notes). The MDT recommended further evaluation of W.R. in six enumerated areas (e.g., educational observation). A.R. 52 (MDT Meeting Notes).

On January 9, 2006, Ms. Yvonne Rojas, a school psychologist, observed W.R. at Assumption. Defs.' Stmt. ¶ 11. Although she acknowledged that W.R. had been diagnosed with

3

Attention Deficit Hyperactive Disorder and Oppositional Defiant Disorder and had reportedly been having behavioral problems, Ms. Rojas indicated that W.R.'s behavior "from her observation 'seemed different from the behaviors described by his parent and teacher.'" *Id.* ¶ 14; A.R. 5 (Hearing Officer Decision).[3] Ms. Rojas did not recommend W.R. for special education as learning disabled because "[h]is academic skills are commensurate with his cognitive abilities." Defs.' Stmt. ¶ 16. She did recommend a follow-up to W.R.'s current clinical treatment to determine if further assessment was needed. *Id.*

On February 9, 2006, W.R.'s case was referred to Ms. Gloria Everett, a licensed clinical social worker with DCPS. *Id.* ¶ 18. Ms. Everett spoke with Plaintiff and drafted a report wherein she noted that W.R. began receiving psychological services at the age of three, and qualified for Social Security Income Benefits as an emotionally disturbed child at age five. *Id.* ¶ 19. She also noted that he was previously diagnosed with multiple mental health problems, his family had a history of mental illness, and that he was taking various medications to moderate his behavior. A.R. 56 (Social Work Evaluation).

On May 10, 2006, DCPS convened an MDT meeting to determine whether W.R. was eligible to receive special education services. *Id.* ¶ 21. W.R.'s report cards reflected poor academic performance and behavior that was "out of control." A.R. 6. The MDT noted that he received an IEP when attending second grade in the Maryland public school system, where he was also characterized as emotionally disturbed. *Id.* Nevertheless, most of the information available to the MDT concerned evaluations of W.R. that were performed in 2004 and 2005 and were not specifically focused on whether he had an emotional disturbance. The observations

---

[3] The Administrative Record contains the Hearing Officer's Decision at pages 2-9.

made by Ms. Rojas in 2006 did not reveal the same behavioral problems. Consistent with the recommendations of both Ms. Rojas and Mr. White that DCPS evaluate W.R.'s *psychological* information, and based on the report by Ms. Everett wherein she noted that W.R. had been receiving psychiatric treatment services since the age of three from an outside provider, the MDT asked Plaintiff to sign a consent form to allow DCPS access W.R.'s current or past psychiatric records from his outside provider:

> The parent [] requested that DCPS conduct a [new] psychiatric evaluation of the student [W.R.]; however, the DCPS team concluded that since the student was already seeing a psychiatrist, it would be better to first get information from that person, rather than conduct a new evaluation. Therefore, DCPS requested that the parent provide the information from the student's treating medical provider and the parent told the team that the information would be provided. Ms. Everett informed the parent that she would help with getting the information, but the parent had to sign a release form that would authorize DCPS to obtain the information. The information was needed because it would help support the diagnosis of the student.

Def.'s Stmt. ¶ 22; A.R. 5. Without the current treatment information,[4] the requisite connection between W.R.'s previous evaluations and an emotional disturbance was missing. *See* A.R. 173, Tr. 28:6-10 (Testimony of Gloria Everett) (explaining that DCPS needed "to have documented assessments, [and a] diagnosis, to determine if the child is ED [emotionally disturbed]. The ED has to impact him educationally. It has to have a significant impact on him as occasionally, that is . . . . he's not available for learning . . . That would help us to determine if the ED

---

[4] Although the Hearing Officer noted that W.R. had been receiving treatment services since the age of three, Plaintiff testified at the Hearing that there was an interruption in treatment due to an insurance issue that had arisen. *See* Tr: 92:10-13 ("At the meeting I was asked for documentation from his therapist and was he still attending, you know, seeing his therapist. And I let them know that I could still contact him, but he wasn't receiving services. Because there was an insurance conflict"). It is unclear from the testimony precisely when services were interrupted and when they resumed, although the Hearing Officer noted that the student was in therapy at the time of the May 10, 2006 hearing. A.R. 5.

classification was appropriate"). Even W.R.'s education advocate recognized the importance of current psychiatric information, A.R. 127-28 (Notes of A. Pressley) ("the education advocate is requesting a [psychiatric] evaluation and report"), although she inexplicably wanted DCPS to perform a new and independent evaluation that seemingly would not rely on W.R.'s past and current psychiatric treatment records. Without those records, however, the MDT determined that W.R. was not eligible for special education services at that time. However, the MDT "agreed to reconvene once DCPS received information from [W.R.'s] current medical providers." Defs.' Stmt. ¶ 25. Ms. Everett thereafter twice mailed a blank medical release form to Plaintiff for her signature, but she did not receive a signed copy in return.[5] Defs.' Stmt. ¶ 24.

Plaintiff filed a due process complaint on June 5, 2006, challenging DCPS' determination that W.R. was not eligible for special education services. Defs.' Stmt. ¶ 26. A due process hearing convened on August 29, 2006. Defs.' Stmt. ¶ 27. Plaintiff's position at the Hearing–and in the present action–is that W.R. should have been found eligible for special services based on the information that was present in the record, or that DCPS should have performed a new, independent psychiatric examination of W.R. apparently without access to W.R.'s past and current psychiatric records.

As was the case at the MDT, the record before the Hearing Officer contained evaluations from 2004 and 2005 suggesting that W.R. was underachieving academically and exhibiting behavioral issues. A.R. 3-7. For example, Ms. Alice Wilson, a School Social Worker at Assumption, testified that W.R. had behavioral problems at Assumption in 2005 and that she had

---

[5] Plaintiff did not object to this fact in her Opposition, but also stated that "Defendants fail to state that there was not evidence provided with [sic] would show that Defendants sent any medical release forms to [Plaintiff]." Pl.'s Opp'n at 18. Despite this inconsistency, the Court nevertheless addresses the release form issues in Section III.B, *infra*.

made the referral to DCPS to have W.R. reviewed for special education assistance. A.R. 5. In addition, Mr. David Clark, an Admission Director for the High Road School, testified that he would admit W.R. at High Road with a specialized education program based on his review of the 2004 and 2005 evaluations in the record. A.R. 6. On the other hand, Ms. Rojas testified that during her more recent observations of W.R. at Assumption in 2006, she did not believe W.R. was "out of control," and did not observe the behaviors described by Ms. Wilson. A.R. 8. She found that he was not eligible to be classified as "learning disabled." A.R. 4.

      Because Plaintiff did not allow access to the psychiatric records from W.R.'s outside provider, none of these evaluators considered W.R.'s current treatment records. This information was deemed critical because it was the most current information concerning W.R., the *only* psychiatric information that was already available for consideration, and it was generated by someone familiar with him since he was three years old. A.R. 4; A.R. 173, Tr. 20:10-16 (Testimony of Gloria Everett) ("This was a psychiatrist that has been seeing the child for several years . . . Who the child was familiar with. And therefore that seemed the appropriate person to request the psychiatric from. If he's in on-going treatment, I didn't see a need for us to try to ask for a new person, but to get the information from the person the child was already in treatment with"). Ms. Everett, whose testimony was deemed credible by the Hearing Officer, A.R. 8, explained at the hearing that "[W.R. is] seeing two professionals, and none of that information is at the table, we're not in a position to call this child 'emotionally disturbed.' There was no one who was treating him at the school and then he had a psychological and psychiatrist outside the school. None of that information was made available to us at the table or prior to coming to the table." *Id.*, Tr. 25:6-10. *See also* Tr. 26:6-10 ("We had no other information for any of the diagnosis. The mother was requested to please provide us with the information. We're willing

to come back to the table as soon as she did. Medical information never came back to us. Clinical psychological information [was] never returned to us. We had no new information to go back to the table.").

All of the parties agreed that this psychiatric/psychological information was important to the determination of whether W.R. could be classified as emotionally disturbed for purposes of requiring special education services. Dr. Derek Marryshow, a child development psychologist and licensed school psychologist, testified for Plaintiff at the Hearing.[6] A.R. 6-7. He did not evaluate W.R., but he reviewed the documents in the record. *Id.* He testified "that is was his opinion based on what he reviewed that [W.R.] should qualify for special education . . . ." A.R. 6. Dr. Marryshow conceded, however, that "it was important for an MDT to have available to it all information regarding a student's eligibility," and that the information from W.R.'s treating provider was "important" in determining his eligibility for special services. A.R. 6-7. Dr. Marryshow was also unable to testify concerning W.R.'s current treatment information (which he had not reviewed), and had to rely on the same past evaluative information that was contained in the record.

Plaintiff was asked at the Hearing as to why she did not sign a consent form to allow access to the most current treatment information concerning W.R. She indicated that she either did not receive the form or had already signed it. As explained in Section III.B, *infra*, that explanation is strongly belied by the record. Ms. Everett mailed two copies of the release form to Plaintiff, who testified that she received other mail from CARE at her home address–the same address listed on her due process complaint. *See* A.R. 240, Tr. 91:4-7 (Testimony of Wanda

---

[6] Although Dr. Marryshow was not presented as an expert witness, it appears from the Hearing Officer's Decision that he nevertheless provided his opinions at the Hearing. A.R.

Richardson) ("Q: do you receive your mail [at that address]? A: Yes I do.  Q: Have you ever received any mail from the Care Center?  A: Yes, I have").  She also attended the MDT with W.R.'s education advocate, where both were informed of the need for the psychiatric treatment records, and the advocate recorded the same in her notes.  Plaintiff also gave these notes to her attorney, so everyone was on notice that this information was needed.  *See id.*, Tr. 91:20-23 ("Did they provide you with a copy of the [MDT] notes?  A: Yes they did.  Q: Okay[,] and you provided those to your attorney, correct?  A: Yes").  The hearing officer specifically credited Ms. Everett's testimony that she sent the forms to Plaintiff, and she also went to other (great) lengths to have Plaintiff sign the form so they could get the psychiatric treatment records that were necessary to determine whether W.R. had a potential disability.  A.R. 5; A.R. 173, Tr. 21:1-6 (Testimony of Gloria Everett).   Plaintiff's Opposition does not suggest that even now, after all of the proceedings below, Plaintiff has allowed access to this information.

After considering the record and this testimony, the Hearing Officer found that the absence of W.R.'s psychiatric records did not permit a finding that he was emotionally disabled, and that it was reasonable for DCPS to request access to W.R.'s already-existing psychiatric records prior to undertaking a new, independent examination:

> [t]he record is clear that the student has been seeing a psychiatrist for several years.  It is reasonable to assume that the treating psychiatrist may have information relevant for the student's disability classification and therefore reasonable for DCPS to request the information.  Based on the testimony of Ms. Everett, whose testimony is deemed credible, DCPS told the parent that she would assist in obtaining the information, but needed the release form, which the parent has failed to provide . . . Furthermore, it would appear that the parent would want DCPS to get the information since DCPS agreed to reconvene the MDT meeting once it [was] received.  It should be noted here that a determination as to the eligibility of a student for special education is a decision made by a team, including the parent.  Therefore, it is necessary for the team to have as much information about the student's needs as possible.  Furthermore, DCPS' argument of not pursuing another evaluation if the information may already be available

9

>from the student's treating psychiatrist is reasonable. In this regard, Ms. Everett's
>testimony is viewed as credible.

A.R. 8. In the absence of W.R.'s psychiatric/psychological records (which all parties believed was important to determine whether W.R. suffered from am emotional disturbance that would make him eligible for special services), and without Plaintiff's consent allowing access to that information, the Hearing Officer concluded that DCPS had met its burden with respect to its evaluation of W.R. and the resolution reached by the MDT. *Id.*

This lawsuit followed on December 13, 2006.[7]

## II.  LEGAL STANDARDS

*A.    Summary Judgment*

A party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the

---

[7] The Court notes that the conduct of Plaintiff's counsel in this litigation has been either contemptuous or incompetent. In addition to missing the deadline for submitting Plaintiff's Cross-Motion for Summary Judgment and an Opposition to Defendants' Motion, Plaintiff asked this Court for leave to file a Motion and Opposition approximately six months past due. After the Court issued an Order expressly denying Plaintiff's request for leave to file a Motion based on Plaintiff's failure to demonstrate excusable neglect, Plaintiff contemptuously filed a Motion for Summary Judgment anyway. The Court struck the submission as a Motion on February 25, 2008, but construed it as an Opposition, in the interests of justice, because of the nature of this case, the judicial system's preference for resolving issues on the merits, and the particular circumstances set forth in the record. Accordingly, the Court shall refer to Plaintiff's submission throughout this Memorandum Opinion as "Plaintiff's Opposition." Defendants thereafter filed a Reply on March 11, 2008.

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come

forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

    B.    The IDEA

The IDEA permits "any party aggrieved by the findings and decision" rendered during administrative proceedings to "bring a civil action" in state or federal court without regard to the amount in controversy. 20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.512(b)(3). The reviewing court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); 34 C.F.R. § 300.512(b)(3). In a review of a Hearing Officer's decision, the burden of proof is always on the party challenging the administrative determination, who must "at least take on the burden of persuading the court that the Hearing Officer was wrong, and that a court upsetting the officer's decision must at least explain its basis for doing so." *Reid v. Dist. of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988)).

The Supreme Court has interpreted the "preponderance standard of review not to be an allowance of unfettered *de novo* review." *Id.* (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). Courts must give administrative proceedings "due weight," *id.*, and "[f]actual findings from the administrative proceedings are to be considered prima facie correct." *Id.* (quoting *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)). Courts may not substitute their own views for those of the Hearing Officer. *See Rowley*, 458 U.S. at 206. However, the statute also suggests "less deference than is conventional in administrative proceedings," *Reid*, 401 F.3d at 521, since the district court is allowed to hear additional evidence at the request of the party. 20 U.S.C. § 1415(i)(2)(C)(ii). Where, as here, no additional

evidence is introduced in a civil suit seeking review of a HOD, a motion for summary judgment operates as a motion for judgment based on the evidence comprising the record. 20 U.S.C. § 1415(i)(2)(B).

## III.  DISCUSSION

### A.    Statutory Framework

The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d)(1)(A). "Implicit" in the IDEA's guarantee "is the requirement that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 200 (1982).

As a condition of funding under the IDEA, the Act requires school districts to adopt procedures to ensure appropriate educational placement of disabled students. *See* 20 U.S.C. § 1413. School districts must also develop comprehensive plans for meeting the special educational needs of disabled students. *See* 20 U.S.C. § 1414(d)(2)(A). These plans, known as IEPs, must include a written "statement of the child's present levels of educational performance, . . . a statement of the measurable annual goals, [and] a statement of the special education and related services . . . to be provided to the child." *See* 20 U.S.C. § 1414(d)(1)(A).

A student's eligibility for a FAPE under the IDEA is determined by the results of testing and evaluating the student, and the findings of an MDT. Such a team consists of the disabled student's parents, teachers, and other educational specialists, who meet and confer in a

collaborative process to determine how best to accommodate the needs of the students to provide a FAPE. *See* 20 U.S.C. § 1414(d)(1)(B). In the case of a child whose behavior impedes his or her learning or that of others, the MDT shall consider "when appropriate, strategies, including positive behavioral interventions, strategies, and supports to address that behavior." *Id.* § 1414(d)(3)(B)(I).

      B.      *Hearing Officer's Decision*

Defendants argue that, on the basis of the record before the Hearing Officer and this Court, the Hearing Officer properly considered all of the evidence and testimony, explained the basis for his findings, and that his decision deserves deference. Defs.' Mot. for Summ. J. at 12. In her Opposition, Plaintiff identifies the various sources of information in the record that describe W.R.'s history of academic and behavioral problems and argues that the Hearing Officer should have been able to determine, on the record before him, that W.R. was entitled to special educational services even in the absence of W.R.'s psychiatric treatment records from his outside provider, or that DCPS should have performed an independent psychiatric evaluation without his past and current psychiatric treatment records. *See* Pl.'s Opp'n at 13-15. The Court agrees with Defendants.

Plaintiff has the burden of persuading the Court that the Hearing Officer was wrong to find that DCPS had met its obligations under the IDEA. The Hearing Officer observed that W.R. had received special services while attending school in Maryland, and that once he was brought into DCPS and Assumption, he continued to experience academic and behavioral problems. He also identified much of the same information highlighted in Plaintiff's Opposition by describing the various indicators in the record that suggested W.R. had an emotional disability. Nevertheless, the information described by Plaintiff was reflected in evaluations of W.R.

performed almost entirely in 2004 and 2005. A more current observation of W.R. by Ms. Rojas in 2006 indicated that W.R. was not exhibiting the same behavioral problems. The most current information, which everyone agreed was important to determine whether W.R. had an emotional disability, was the treatment information from W.R.'s outside psychiatric provider. Plaintiff could have made that information available to the MDT and the Hearing Officer by merely signing a release form and allowing access to the treatment records. Once that information was provided, a decision could be made as to whether further psychiatric examinations were needed, and/or a determination as to whether W.R. had an emotional disability that could be gleaned from the already existing treatment records.

     Ms. Everett testified that she asked Plaintiff to sign a release form so that DCPS could obtain this information, and that she sent the form to Plaintiff on at least two occasions. A.R. 5. Plaintiff was asked at the Hearing as to why she did not sign a consent form to provide DCPS with the most current treatment information concerning W.R. She indicated that she either did not receive the form or had already signed it. *See* A.R. 241, Tr. 92:19-22 ("Q: And so, your testimony today is that you never got [the form] and it was never discussed with you? A: Not at a meeting. I just know I signed for release of his documents when I first saw Ms. Everett"). That explanation is implausible for several reasons.

     First, it does not make sense that she did not receive the forms because they were mailed to the same address that was listed on her due process complaint. *Compare* A.R. 107 (Social Work Evaluation) *with* A.R. 139 (Due Process Complaint Notice). At the hearing, Plaintiff also conceded that she received other mail from CARE at that address. *See* A.R. 240, Tr. 91:4-7 (Transcript of Wanda Richardson Testimony) ("Q: do you receive your mail [at that address]? A: Yes I do. Q: Have you ever received any mail from the Care Center? A: Yes, I have").

15

Second, Ms. Everett testified at the Hearing that she went to great lengths to get the psychiatric treatment records from Plaintiff so that the MDT could properly evaluate W.R. for specialized services:

> I asked the mother prior to the meeting, to provide me with that information. And she did not provide it. I called her and asked her – to remind her – and at that time she told me she was advised to not [] give – share that information with DCPS. I wrote to the [child's] Advocate stating just that, and again asked [if they] would reconsider, and provide us with current psychiatric medical information to help us to determine the appropriate educational need for this child. I have asked for that information repeatedly.

A.R. 171, Tr. 21:1-6. The Hearing Officer specifically credited Ms. Everett's testimony concerning her efforts to access W.R.'s psychiatric information, and there is no basis in the record to second-guess that credibility determination. *See A.I. v. Dist. of Columbia*, 402 F. Supp. 2d 152, 170-71 (D.D.C. 2005) (acknowledging that judicial deference is given to the findings of Hearing Officers in the absence of facts suggesting that such deference is unwarranted).

Third, even if Plaintiff believed she had previously signed the form, it defies reason as to why she would not re-sign the form after attending the MDT where a central issue was the absence of W.R.'s psychiatric treatment records demonstrating that he was emotionally disabled. Plaintiff and W.R.'s education advocate both suggested that this psychiatric information was essential to such a determination, and the education advocate's notes reflect DCPS' request for that information. A.R. 4-5; A.R. 127-28 (A. Pressley Meeting Notes). Plaintiff also indicates that she gave these notes to her attorney, so everyone was aware these psychiatric treatment records were needed but that DCPS did not have access to it. Tr. 91:20-23 ("Q: Did they provide you with a copy of the notes? A: Yes they did. Q: Okay. And you provided those to your attorney, correct? A: Yes.").

Plaintiff argues that the Hearing Officer was wrong to rely on Ms. Everett's testimony

16

> because the social worker that the hearing officer determined was credible [Ms. Everett] contradicted herself on the record because she stated that the mom did not tell her about her homelessness but yet the evaluation she completed referred to the issue of homelessness. Therefore, obviously putting in question her credibility in regards to sending the parent any forms to sign that the defendant [sic] refers to in their motion for summary judgment . . .

Pl.'s Opp'n at 15. Plaintiff's argument simply mischaracterizes Ms. Everett's evaluation, which stated that the "[t]he mother spoke of being homeless *in the past* and though pleased with *her current housing*, is looking forward to moving into larger accommodations given the size of her increased family." A.R. at 109 (Social Work Evaluation dated February 9, 2006) (emphasis added). *See also* A.R. 58 (Social Work Evaluation dated July 13, 2004) (describing Plaintiff's *past* homelessness). In addition, the address referenced in Ms. Everett's evaluation matches the address on Plaintiff's June 5, 2006 Due Process Complaint, further corroborating Ms. Everett's testimony. *Compare* A.R. 107 (Ms. Everett Evaluation) *with* A.R. 139 (Due Process Complaint Notice). Accordingly, Plaintiff has not identified any reason to question Ms. Everett's testimony or the Hearing Officer's reliance on it.

     Plaintiff also argues that "defendant's [sic] argument is clearly flawed as their motion for summary judgment did not point to any law or case law that supports their argument that the parent was the one responsible for providing the evaluation." Pl.'s Opp'n at 14. This argument is simply obfuscation. Defendants have not argued that Plaintiff was responsible for providing an evaluation of W.R., they have argued that Plaintiff should have allowed DCPS access to the medical records from W.R.'s treating psychiatric provider *that already existed*. *See* Def.'s Reply at 3 (arguing that the "Hearing Officer was correct when he determined that the parent should provide DCPS with relevant information from the child's current treating psychiatrist, especially given the conflicting information that was before the IEP team"). There is no support in the record that DCPS required Plaintiff to prepare a new evaluation of W.R. Moreover, both the

MDT team and the Hearing Officer informed Plaintiff that the proceedings could be reopened if Plaintiff simply consented to DCPS' having access to the psychiatric treatment records. Instead, both Plaintiff and W.R.'s education advocate continued to insist that W.R. should be subject to a new, independent psychiatric examination, apparently without the benefit of his past and current psychiatric records. That position is inexplicable, as a review of the already-existing records may have been sufficient for the MDT to find that W.R. was emotionally disturbed, or the records may have provided a basis for additional examinations.

On this record, the Hearing Officer appropriately found that Plaintiff's refusal to allow access to W.R.'s psychiatric treatment records denied the MDT information that was needed to properly classify W.R. *See* A.R. 7 ("It is not clear why the parent was reluctant to sign a release form that would have enabled DCPS to obtain the information . . . It should be noted here that a determination as to the eligibility of a student for special education is a decision made by a team, including the parent. Therefore, it is necessary for the team to have as much information about the student's needs as possible"). Hearing officers may also take parental participation into account in their determinations. *See Fisher v. Atlanta Independent School Sys.*, 349 F.3d 1309, 1319 n. 10 (11th Cir. 2003) ("parental involvement in the handicapped child's education is the purpose of many of the IDEA's procedural requirements . . . If [the child's] parents significantly hindered or frustrated the development of an IEP, the district court may be justified in denying equitable relief on that ground alone").

Everyone at the hearing, including Plaintiff's own witness, Dr. Merryshow, believed that W.R.'s psychiatric records were essential to determine whether W.R. suffered from an emotional disturbance. Ms. Everett explained at the hearing that DCPS needs "to have documented assessments, [and a] diagnosis, to determine if the child is ED [emotionally disturbed]. The ED

18

has to impact him educationally. It has to have a significant impact on him as occasionally, that is . . . . he's not available for learning . . . That would help us to determine if the ED classification was appropriate." A.R. 173, Tr. 28:6-10 (Testimony of Gloria Everett). Without the psychiatric treatment records it was reasonable for the MDT and Hearing Officer to find that W.R.'s behavioral difficulties were not attributable to a disability, despite indications from some previous evaluations suggesting that W.R. could be eligible for special services. As Ms. Everett testified, "[i]f [W.R. is] seeing two professionals, and none of that information is at the table, we're not in a position to call this child 'emotionally disturbed.' There was no one who was treating him at the school and then he had a psychological and psychiatrist outside the school. None of that information was made available to us at the table or prior to coming to the table." *Id.*, Tr. 25:6-10. *See also id.*, Tr. 26:6-10 ("We had no other information for any of the diagnosis. The mother was requested to please provide us with the information. We're willing to come back to the table as soon as she did. Medical information never came back to us. Clinical psychological information [was] never returned to us. We had no new information to go back to the table.").

On this record, the Court finds that the Plaintiff has failed to meet her burden of showing that the Hearing Officer was wrong to find that DCPS complied with its obligations under the IDEA.[8]

---

[8] Plaintiff's Opposition also states that "defendant's argument that the parent placed her child in a private school is irrelevant because regardless of that fact, defendant was responsible under law to provide the student with a FAPE," Pl.'s Opp'n at 14 (citing 34 C.F.R. 300.131). Because Defendants do not argue that W.R. was ineligible for a FAPE based on the school he was attending, Plaintiff's argument is not an issue in this case. Moreover, Defendants agree with Plaintiff that "behavior problems and failing grades, among other things, may indicate a disability," but argue that "it was just those indicators which led Assumption Catholic School, a nonpublic school in the District of Columbia, to refer W.R. to DCPS for evaluations." Def.'s Reply at 5 (citing 20 U.S.C. § 1412(a)(3)).

## IV.  CONCLUSION

For the reasons set forth above, the Court shall grant Defendants' [8] Motion for Summary Judgment.  This case shall be dismissed in its entirety.  An appropriate Order accompanies this Memorandum Opinion.


Date:   March 31, 2008

                                                  /s/
                                              COLLEEN KOLLAR-KOTELLY
                                              United States District Judge